U.S. DISTRICT COURT
N.D. OF FLORIDA
PENSACOLA DIVISION

GERRARD JONES,                    CASE #3:18-CV-155-MJF
    PLAINTIFF,
    - V-

SCHWARZ, et al.,
    DEFENDANTS.

PLAINTIFF'S REPLY/OBJECTIONS TO THE DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ("MSJ").

COMES NOW PLAINTIFF, GERRARD JONES, PRO SE,
AND FILES THIS PLEADING UNDER PENALTY OF
PERJURY OATH (28 USC 1746(2)), AND STATES:

1. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
("MSJ"), DOC. 77, PAGES #1-34 W/EXHIBITS,
BEGINS WITH A STATEMENT OF MATERIAL FACTS,
AND DEFENDANTS STATE FIRST THAT PLAINTIFF
IS "SERVING A SENTENCE FOR VARIOUS CRIMINAL
CHARGES" (DOC. 77, AT 1).

2. THAT IS FALSE. PLAINTIFF IS SERVING A 30 YEAR
SENTENCE FOR A SINGLE COUNT OF DEALING IN
STOLEN PROPERTY (SELLING AN 8 YEAR OLD PICK-UP TRUCK),
PERIOD.

3. DEFENDANTS NEXT, BEGINNING AT DOC 77, PAGE #2,
JUMP RIGHT INTO THEIR "MATERIAL FACTS," LISTING
THE DISCIPLINARY REPORTS PLAINTIFF WAS CONVICTED
OF, AND DISPUTING THE INJURIES CLAIMED IN THE
LAWSUIT BY PLAINTIFF, AND MENTIONING THAT
THE FORCE USED WAS FULLY JUSTIFIED AND
WAS "REACTIONARY USE OF FORCE" (DOC. 77, PAGE #4),
AND REFERENCES THE FIXED-WING CAMERA VIDEO
(DEFENSE EXHIBIT "E").

DEFENDANTS THEN SAY PLAINTIFF WAS PLACED IN
HAND AND LEG RESTRAINTS, EXITING THE CELL AT 8:43 AM.
(DOC. 77, PAGE #4)(THE "MSJ" IS ATTACHED AS "EXHIBIT "G").

1)

4. PLAINTIFF WILL ADDRESS THE MERITS OF EACH OF THE DEFENSES MADE BY DEFENDANTS. HOWEVER, PLAINTIFF BEGINS WITH A SUBJECT THAT WILL CHANGE THE LANDSCAPE OF THE LITIGATION.

5.    PLAINTIFF'S SWORN FACTS; AND, CLAIMS THAT DEFENDANTS COMMITTED PERJURY UNDER OATH AND ENGAGED IN "SPOLIATION" OF EVIDENCE.

A). IN PARAGRAPH #51 OF HIS LAWSUIT, PLAINTIFF ALLEGED THAT THERE WAS A FIXED-WING CAMERA MOUNTED ON THE WALL, WHICH POINTED DIRECTLY INTO HIS ROOM AND CAUGHT IT ALL ON FILM. ( PLAINTIFF'S LAWSUIT IS ATTACHED AS EXHIBIT "H" HERETO).

B). PLAINTIFF FILED VARIOUS DISCOVERY DEMANDS, SPECIFICALLY ASKING DEFENDANTS FOR THE FOOTAGE FROM THE CAMERA PLAINTIFF CLAIMS WAS MOUNTED ON THE WALL THAT POINTED INTO PLAINTIFF'S ROOM (L42064); AND, PLAINTIFF FILED A "MOTION TO COMPEL" (DOC. 59), SPECIFICALLY SEEKING THAT FOOTAGE.

C). THE COURT GRANTED THAT MOTION IN PART, DOC. 68, AT PAGES 11 AND 12, AND ORDERED THE DELIVERY OF THE VIDEO FOOTAGE, OR AN AFFIDAVIT FROM THE CUSTODIAN OF THE VIDEO/AUDIO RECORDINGS, EXPLAINING WHY IT CANNOT BE PROVIDED.

D) THEREAFTER, DEFENSE COUNSEL OBTAINED A (SWORN) "DECLARATION OF JESSICA SANTIAGO" IN WHICH SANTIAGO, AN ASSISTANT WARDEN AT SANTA ROSA PRISON, STATES SHE HAD BEEN ASKED BY DEFENSE COUNSEL TO RESPOND TO PLAINTIFF'S ALLEGATION THAT ANOTHER CAMERA EXISTS (DOC. 72-1).

2).

E). SANTIAGO GOES ON TO SAY, UNDER OATH, THAT:

... AS A RESULT OF THE INMATE'S (PLAINTIFF) ALLEGATION THAT AN ADDITIONAL CAMERA EXISTED WHICH COULD BE SEEN OVER HIS LEFT SHOULDER AS HE WAS BEING ESCORTED DOWNSTAIRS FROM HIS CELL IN THE FOOTAGE (FROM THE HANDHELD CAMERA) ALREADY PROVIDED.

THERE IS NO SUCH CAMERA IN THE PLACE REFERENCED BY (PLAINTIFF)......"(DOC. 72-1)(EX."B") (PLAINTIFF'S EXHIBIT "B" ATTACHED).

F). PLAINTIFF BESEECHES THIS COURT TO LOOK AT THE HANDHELD VIDEO FOOTAGE, EXHIBIT "D", AND, AT 8 SECONDS INTO THAT VIDEO OF THE GUARDS FILMING PLAINTIFF BEING TAKEN FROM HIS ROOM, THE COURT WILL CLEARLY SEE A WALL-MOUNTED CAMERA WHICH POINTS DIRECTLY INTO ROOM L4206, WHICH WAS PLAINTIFF'S ROOM — THE PLACE WHERE THE EXCESSIVE FORCE ATTACKS OCCURRED.

G). MOREOVER, DEFENDANTS PROVIDED THIS COURT WITH COPIES OF THE DISCIPLINARY REPORTS (EXHIBITS, A, B, C, — 77-1, 77-2, 77-3), BUT, INTENTIONALLY OMITTED TO PROVIDE THE COURT WITH PLAINTIFF'S GRIEVANCES RELATIVE THERETO.

H). SPECIFICALLY, PLAINTIFF ASKS THIS COURT TO TAKE JUDICIAL NOTICE OF PENDING FEDERAL CASE NUMBER 5:18-CV-56-WTH-PRL (M.D. OCALA), AND, (DOCUMENT 9-3), FILED 6-27-18, PAGES 87, 88, 89 (ATTACHED HERETO AS EXHIBIT "A"), WHICH, AT PAGE 88, SHOWS PLAINTIFF TELLING DEFENDANTS THAT:

... THE L-DORM, WING #4 CAMERA POINTS AT MY ROOM (L4206) AND WILL CLEARLY SHOW ME AT THE DOOR OFFERING MY HANDS OUT THE DOOR

3).

TO CUFF IN FRONT...."

I). PLAINTIFF OFFERS EXHIBIT "A," AS BOTH "FACTS," AND IN FURTHERANCE OF HIS "SPOLIATION" ARGUMENT, AS DEFENDANTS KNEW AT THE OUTSET THAT THERE IS A CAMERA THAT IS STILL THERE, IN THE EXACT SPOT REFERENCED BY PLAINTIFF, WHICH DEFENDANTS HAVE PERJURED THEMSELVES ABOUT (THE "SPOLIATION" MOTION WILL BE FILED PRE-TRIAL). THEIR OWN EXHIBIT "D" (HANDHELD CAMERA FOOTAGE), FILED UNDER SEAL, SHOWS THE CAMERA FIXED ON THE CONCRETE WALL, DIRECTLY ACROSS FROM ROOM L4206, AT 8 SECONDS INTO THE FOOTAGE. IT'S CLEARLY VISIBLE, AS PLAINTIFF IS BEING TAKEN DOWNSTAIRS RIGHT AFTER DEFENDANTS HAD USED EXCESSIVE FORCE.

J). NOT ONLY WILL ALL OF THIS LEND CREDENCE TO PLAINTIFF'S (PRE-TRIAL) "SPOLIATION" MOTION, BUT, EVEN NOW, THIS COURT SHOULD EXERCISE IT'S INHERENT AUTHORITY TO VINDICATE ITS ANATHEMAZATION OF THOSE WHO WOULD DARE COMMIT BLATANT PERJURY, AS HAS BEEN DONE BY THE SWORN DECLARATION OF JESSICA SANTIAGO, AT THE BEHEST OF LEAD DEFENSE COUNSEL, KRISTIN LONERGAN.

K). IT IS UNDISPUTED THAT DEFENSE EXHIBIT "D" SHOWS, AT 8 SECONDS INTO THE VIDEO, A WALL-MOUNTED CAMERA. THAT CAMERA IS THE ONE THAT PLAINTIFF "FROM DAY ONE" HAS BEEN ASKING FOR THE FOOTAGE FROM, WHICH FOOTAGE HAS BEEN NOW DESTROYED OR HIDDEN AWAY BY DEFENDANTS.

4).

L).) DEFENSE COUNSEL, KRISTEN LONERGAN, _HERSELF HAS REVIEWED EXHIBIT "D"_, AND _HERSELF_ HAS SURELY _SEEN_ THE FOOTAGE, AND KNOWS FOR A _FACT_ THAT _SUCH A CAMERA EXISTS_, AND, IS CLEARLY _VISIBLE IN THE FOOTAGE SHE_ SUBMITTED,

M). THAT CONSTITUTES "_INTENTIONAL FRAUD UPON THE COURT_", AND PLAINTIFF _IS_, ADDITIONALLY, FILING A FORMAL COMPLAINT WITH THE FLORIDA BAR AGAINST MS. LONERGAN ON TUESDAY, SEPTEMBER 22nd, 2020, FOR HER KNOWINGLY SUBJORNING THE PERJUROUS SWORN DECLARATION OF JESSICA SANTIAGO.

N). THIS COURT ENTERED ITS ORDER OF 12-18-19, (DOC. 68), AND, AT PAGE #10, THIS COURT STATED:
"...HE (PLAINTIFF) HAS INDICATED, HOWEVER, THAT AN ADDITIONAL CAMERA CAN BE SEEN IN VIDEO FOOTAGE PROVIDED, AND THAT NO VIDEO RECORDING FROM THAT CAMERA WAS PROVIDED TO PLAINTIFF. DEFENDANTS OFFER NO EXPLANATION BEYOND STATING THAT THEY PROVIDED THE VIDEO RECORDINGS PROVIDED BY FDOC. _This does not instill this court with confidence that all of the video evidence was provided by FDOC._ ACCORDINGLY THIS COURT WILL REQUIRE ADDITIONAL ASSURANCES VIA AN AFFIDAVIT..."

O). DEFENDANTS HAVE MOCKED THIS HONORABLE COURT BY KNOWINGLY SUBMITTING AN AFFIDAVIT (DECLARATION)

5).

BY JESSICA SANTIAGO, "UNDER PENALTY OF
PERJURY OATH", WHICH SANTIAGO AND
DEFENSE COUNSEL, KRISTEN LONERGAN
KNOWS TO BE PATENTLY FALSE, AS THERE **IS**
A WALL-MOUNTED CAMERA **IN** THE EXACT
SPOT PLAINTIFF HAS SAID <u>under oath</u> ALL ALONG.

P). YET, ANOTHER REASON EXISTS TOO, WHICH GOES
TO THE STRENGTH OF PLAINTIFFS "SPOLIATION"
MOTION HE WILL BE FILING.
   DEFENDANTS BEGAN THEIR 8-18-15 CONFRONTATION
AS AN "ORGANIZED USE OF FORCE", ALTHOUGH
THEY CHARACTERIZE THEIR USE OF FORCE AS
"JUSTIFIED / REACTIONARY", AND, DEFENDANTS
CLAIM THAT UNDER *<u>HECK-V-HUMPHREY</u>, SINCE
PLAINTIFF WAS FOUND GUILTY OF THE DISCIPLINARY
REPORTS, HE CANNOT CHALLENGE WHETHER THE USE
OF FORCE WAS JUSTIFIED, BUT, CAN CHALLENGE
WHETHER THE FORCE USED WAS EXCESSIVE.
( DOC. 77 @ PAGES *8 - *14 ).

Q). PLAINTIFF WILL MAKE HIS POINT AGAINST THAT
BACKDROP, AND ARGUES AS FOLLOWS:
   NOTWITHSTANDING THAT DEFENDANTS USED
"REACTIONARY FORCE" ( LATER), WHEN THEY <u>FIRST</u>
ARRIVED ON THE SCENE, IT WAS, AT THAT
FIRST POINT AN "<u>ORGANIZED USE OF FORCE</u>".
CHAPTER 33-602.210(1) THRU (17) GOVERNS <u>ALL</u>
USES OF FORCE.
   IT SPECIFICALLY DEFINES "REACTIONARY FORCE" AS
"<u>ANY FORCE THAT MUST BE ADMINISTERED QUICKLY OR</u>
<u>IMMEDIATELY TO COMPEL THE CESSATION OF AN INMATES</u>

6).

* 512 U.S. 477 (1994).

VIOLENCE OR RESISTANCE TO ORDERS (EXHIBIT "C", PAGE #1). IT ALSO DEFINES "**ORGANIZED** USE OF FORCE" AS, "... ANY FORCE THAT MAY BE ADMINISTERED TO CONTROL, ESCORT, OR GEOGRAPHICALLY RELOCATE ANY INMATE WHEN THE IMMEDIATE APPLICATION (OF FORCE) IS NOT IMMEDIATELY NECESSARY TO PREVENT A HAZARD TO ANY PERSON...(EXHIBIT "C", PAGE #1.).

R). PLAINTIFF CONTENDS THAT THE EVIDENCE SHOWS THAT DEFENDANTS AND NUMEROUS OTHER OFFICERS WERE NOTIFIED BY THE DEFENDANT GOLDHAGAN, THAT: "... INMATE JONES, WHO WAS PRESENT in his assigned cell, L4206, WAS GIVEN ORDERS TO SUBMIT TO RESTRAINTS SO HE COULD BE ESCORTED TO MEDICAL FOR A PRE-CONFINEMENT PHYSICAL DUE TO A PRIOR RULE VIOLATION, AFTER several minutes and more orders, INMATE JONES STATED "OK, I'LL CUFF UP." (DOC. 77-3, @ PAGE #1).

5). THE PRECEDING STATEMENT IS DIRECTLY FROM THE BATTERY / ATTEMPTED BATTERY DISCIPLINARY REPORT ("D.R").
DEFENDANT GOLDHAGAN'S OTHER "DR" HE WROTE FOR "DISOBEYING AN ORDER", STATES, IN PERTINENT PART: "... ON AUGUST 18, 2015, I WAS ASSIGNED AS AN INTERNAL SECURITY OFFICER. AT APPROXIMATELY 8:31 AM, I WAS PRESENT IN FRONT OF CELL L4206, WHERE INMATE JONES IS ASSIGNED. AT THIS TIME (8:31 AM) I GAVE INMATE JONES SEVERAL VERBAL ORDERS TO SUBMIT TO RESTRAINTS SO HE COULD BE ESCORTED TO MEDICAL FOR A PRE-CONFINEMENT PHYSICAL DUE TO A PRIOR RULE VIOLATION. INMATE JONES REFUSED TO COMPLY... (DOC. 77-2, @ PAGE #1).

7).

T). THE VERY IMPORTANT POINT HERE, IS THAT DEFENDANTS DURING THE 8 MINUTES WHEN THEY WERE AT PLAINTIFFS CELL, GIVING HIM "CUFF UP" ORDERS, THAT THEY SAY PLAINTIFF WAS REFUSING, WERE ALREADY IN THE MODE OF AN "ORGANIZED USE OF FORCE", AND, AS SUCH, THEY WERE SUPPOSED TO HAVE THE HANDHELD CAMERA ROLLING AND POINTED AT PLAINTIFF FROM THE MOMENT THEY ARRIVED, AND, SURELY, FROM THE MOMENT THEY CLAIM PLAINTIFF BEGAN REFUSING THEIR ORDERS TO CUFF UP.

INDEED, USE OF <u>ORGANIZED FORCE RULE 33-602-210</u>(3) STATES THAT:

"... ALL <u>**ORGANIZED** USE OF FORCE INCIDENTS</u> shall be video recorded UNLESS EXIGENT OR EMERGENCY CIRCUMSTANCES PREVENT SUCH ACTION....."(<u>EXHIBIT "C", @ PAGE 2</u>)

U). REMEMBER NOW, DEFENDANT GOLDHAGAN STATES IN HIS <u>DISOBEYING AN ORDER "DR"</u>, THAT AT <u>8:31</u> PLAINTIFF BEGAN REFUSING THE "CUFF UP" ORDERS. (<u>DOC. 77-2 @ PAGE 1</u>).

THE FIXED-WING VIDEO THEN SHOWS AN ORGANIZED FORCE OF <u>4 OFFICERS</u>, AT <u>8:36</u>, BEGIN YELLING AT ALL OTHER <u>INMATES</u> (<u>DOZENS</u>) TO GO INTO THEIR ROOMS. (DEFENSE EXHIBIT       ).

THEN, A CLOCK MINUTE LATER, AT 8:37 AM, OFFICERS #5, 6, 7, 8, 9, AND #10 (SCHWARZ) ARRIVE AND ARE GOING TO THE OTHER <u>DOZENS</u> OF INMATES ROOMS, LOCKING THOSE INMATES <u>INTO</u> THEIR ROOMS, OFFICERS #11, 12, 13, 14 AND 15 WILL ARRIVE BY 8:39.02 AM

DESPITE THIS CLEARLY "<u>ORGANIZED</u> USE OF FORCE," **NO** HANDHELD VIDEO CAMERA HAS BEEN BROUGHT, WHICH SHOWS DEFENDANTS DID NOT COMPLY WITH THEIR OWN RULE (33-602.210(3)). "<u>EDOC MUST COMPLY WITH ITS OWN RULES</u>" (PLYMEL-V-MOORE, 770 So. 2d 242 (1ST DCA 2002)).

8).

V). IT IS IMPORTANT TO CONSIDER THE EVIDENCE TOO, THAT DEFENDANT GOLDHAGAN WROTE IN THE BATTERY/ATTEMPTED BATTERY "DR", THAT (DURING THE ENTIRE INCIDENT OF THEM GIVING THE CUFF UP ORDERS), INMATE JONES (PLAINTIFF): "....was present in his assigned cell...." (DOC. 77-3, @ PAGE #1).

THE QUESTION BEGS — WHY DIDN'T DEFENDANTS at that point, WHEN PLAINTIFF WAS "REFUSING TO CUFF UP" (FOR AT LEAST 5 CLOCK MINUTES), AND, WHILE, DURING THE SAME TIME, DEFENDANTS AND OTHER OFFICERS WHO WERE PART OF THIS "ORGANIZED" USE OF FORCE OF 15 OFFICERS — WHY DIDN'T THEY SIMPLY LOCK PLAINTIFF'S DOOR? PLAINTIFF, BY DEFENDANTS OWN ADMISSIONS WAS "present in his assigned cell" (DOC. 77-3, @ PAGE #1). WHY DID DEFENDANTS GO AROUND LOCKING THE OTHER INMATES INTO THEIR ROOM? BECAUSE, THIS WAS AN "ORGANIZED" USE OF FORCE, AND, PRIOR TO ANYTHING ELSE THAT DEFENDANTS SAY OCCURRED after THEY ENTERED THE ROOM, THEIR OWN RULE OF USE OF FORCE, REQUIRED THEM TO HAVE A CAMERA (HANDHELD) at the outset (33-602.210(3) AND (3)(C) DEFENDANTS CANNOT (WITH ANY EVIDENTIARY WEIGHT) ARGUE THAT EXIGENT CIRCUMSTANCES KEPT THEM FROM BRINGING THE HANDHELD CAMERA at the outset.

DEFENDANT GOLDHAGEN, AND THE OTHER DEFENDANTS WERE BY LAW AND RULE, REQUIRED TO VIDEO "....A BRIEF DESCRIPTION of efforts taken to stabilize or control the inmate prior TO APPLICATION OF FORCE (AND) "FINAL WARNING" ORDER (AND) CLEAR, CONCISE AND AUDIBLE

9). VERBAL WARNING OF UPCOMING FORCE"(33-602.210(3)(4)(7)(8)(9))

(SEE, EXHIBIT "C", AT PAGE #2, ATTACHED HERETO).

W). CLEARLY, DEFENDANTS' OWN (UNFOLLOWED) RULES MANDATED THAT THEY VIDEO THEMSELVES MAKING SOME KIND OF EFFORTS TO FOREGO THE USE OF FORCE, WHICH THEY DID NOT DO. "SPOLIATION" OCCURRED HERE TOO, AS DEFENDANTS INTENTIONALLY NEGLECTED TO BRING THE HANDHELD CAMERA at the outset, WHICH FAILURE BY THEM CAUSED THEIR EXCESSIVE FORCE TO NOT BE RECORDED ON THE HANDHELD CAMERA. FURTHER EVIDENCE TOO OF THE DEFENDANTS FAILURE TO TEMPER THE SEVERITY OF THEIR EXCESSIVE FORCE CAN BE IMPUTED BY THE SPOLIATION JURY INSTRUCTIONS AS TO THEIR FAILURE TO SUPPLY THE FIXED-WING CAMERA, WHICH, AT PARAGRAPH #51 OF HIS LAWSUIT, PLAINTIFF STATED UNDER PENALTY OF PERJURY OATH:

"...THERE IS A CAMERA THAT POINTED STRAIGHT AT MY ROOM AND ALL THE ATTACK IS ON VIDEO...."

DEFENDANTS CITE TO CASE LAW, CAMPBELL-V-SIKES, 169 F.3d 1353, 1375 (11th CIR. 1999), ACKNOWLEDGING THAT:

"...TO DETERMINE WHETHER FORCE WAS APPLIED "MALICIOUSLY AND SADISTICALLY," COURTS CONSIDER THE FOLLOWING FACTORS (1) THE EXTENT OF INJURY; (2) THE NEED FOR APPLICATION OF FORCE; (3) THE RELATIONSHIP BETWEEN THAT NEED AND THE AMOUNT OF FORCE USED; (4) any efforts made to temper the severity of a forceful response; AND (5) THE EXTENT OF THE THREAT TO THE SAFETY OF STAFF AND INMATES, AS REASONABLY PERCEIVED BY THE RESPONSIBLE OFFICIALS ON THE BASIS OF FACTS KNOWN TO THEM...."

("MSJ", DOC. 77, @ PAGE #9).

10).

NO MATTER THE HECK BAR, AS TO "EXCESSIVE FORCE", PLAINTIFF CAN ARGUE, AND WILL ARGUE AND TESTIFY AT TRIAL, THAT DEFENDANTS: GOLDHAGEN, AFTER FULLY RESTRAINING PLAINTIFF, CHOKED PLAINTIFF UNCONSCIOUS, WHILE THE OTHER DEFENDANTS IN THE ROOM, HELPED TAKE ME DOWN TO THE FLOOR, WITH THE OTHER DEFENDANTS IN THE ROOM ALSO "PIN AND HURT ME". THEIR FORCE HAD ME BENT BACKWARDS, AS IF TO "HOGTIE" MY NECK TO MY ANKLES. I COULDN'T BREATHE. I WAS IN SEVERE PAIN (LAWSUIT, AT PARAGRAPH #12).

... HE (GOLDHAGAN) THEN BEGAN PULLING MY UNDERWEAR (BOXER SHORTS) INTO MY BUTT, AND HE HAD SOMETHING IN HIS HAND. HE STARTED PUSHING IT WILDLY, TO PUSH IT INTO MY RECTUM. I SQUIRMED / WIGGLED, AND HE KEPT PUSHING IT TO GET IT INSIDE OF ME. THE OBJECT CUT MY LEFT BUTTOCK, THEN WENT INTO MY RECTUM, AS THE OTHER OFFICERS (IN THE ROOM) PUSHED DOWN ON MY WRISTS BACKWARDS. AND BENT MY FEET / ANKLES BACKWARDS WITH GREAT FORCE, CAUSING ME EXCRUTIATING PAIN AND INJURIES. I SCREAMED OUT IN PAIN...

... I HEARD, THEN FELT BONES POPPING. I SCREAMED SOME MORE, AND REALIZED GOLDHAGAN WAS BENDING / BREAKING MY HANDS AND FINGERS IN ALL PAINFUL DIRECTIONS. GOLDHAGAN DID THIS FOR ABOUT A FULL CLOCK MINUTE, THEN, SOMEONE HEAVY SAT ON MY BACK, WHILE THE OTHERS KEPT BENDING ME BACKWARDS AND PUTTING PAIN-WRENCHING PRESSURE ON MY WRISTS / ANKLES / FEET, AND IT HURT SO SO MUCH AND I SCREAMED SO SO LOUDLY.

... SCHWARZ CAME IN, AND STOOD UP NEAR MY HEAD... GOLDHAGEN TURNED MY FACE TOWARDS SCHWARZ AND PUSHED MY HEAD DOWN FLAT WITH HIS PALMS AND INVITED SCHWARZ TO KICK ME IN THE FACE... I TRIED TO TALK BUT THE WEIGHT OF THE OFFICERS ON ME WAS TOO GREAT. I WAS SUFFOCATING, GOING BACK UNCONSCIOUS.~~~ (LAWSUIT, AT PARAGRAPHS #13, #14, AND #15)

11).

X). ADDITIONALLY, PLAINTIFF, AS WELL, STATES UNDER PENALTY OF PERJURY OATH THAT DURING THE SAME TIME-PERIOD:

"... OFFICERS BEAUDRY, DENMUN, AND E.D. POGUE all kept pinning me down to hurt me. ..." (LAWSUIT, AT PARAGRAPH #16).

AT PARAGRAPH #37, (OF THE LAWSUIT) PLAINTIFF NAMED EACH DEFENDANT AS BEING PRESENT IN L-DORM DURING THE 8-18-15 ATTACK (EXCESSIVE FORCE) AND, THAT:

"... EACH DEFENDANT INJURED, AND FAILED TO PROTECT ME. ..."

PLAINTIFF ALSO LISTED; AND REITERATES NOW, THAT AS A RESULT OF THE EXCESSIVE FORCE:

"... I SUFFERED BEING CHOKED UNCONSCIOUS BY CONSTRICTION OF MY AIR PASSAGES; BEING ALSO CRUSHED UNDER THE WEIGHT of the officers; I SUFFERED BROKEN FINGERS ON BOTH HANDS, A POPPED BLOOD VESSEL IN MY RIGHT HAND; A BROKEN BONE ON THE BACK MIDDLE OF MY RIGHT HAND; SEVERE NERVE DAMAGE IN MY RIGHT HAND/RIGHT WRIST; PERMANENT DISFIGUREMENT OF MY EXTREMITIES; THE CUTTING OF MY LEFT BUTTOCK; THE FORCED ENTRY OF A (METAL) OBJECT PUSHED INTO MY RECTUM; RE-DISLOCATION OF MY LEFT ARM/ SHOULDER; PERMANENT SCARRING OF MY WRISTS AND ANKLES FROM THE BENDING OF THOSE LIMBS AGAINST HANDCUFFS AND LEG-SHACKLES SADISTICALLY to torture me. I SUFFERED THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY ALL THE OFFICERS, WHO WHOLLY FAILED TO PROTECT ME. I SUFFERED AND STILL SUFFER A WORSENING OF MY MENTAL DISABILITIES AND POST-TRAUMATIC STRESSES. ..." (LAWSUIT, AT PARAGRAPH #38).

Y). FURTHERMORE, ALTHOUGH DEFENDANTS OFFER AN EXHIBIT F, "DECLARATION OF KELLIE CASWELL, A NURSE EMPLOYED BY DEFENDANTS AGENCY ("FDOC"), SHE DOES NOT CLAIM TO HAVE PERSONALLY WITNESSED

12).

ANY OF THE 8-18-15 INCIDENT, NOR DID SHE EVER STATE THAT SHE "EXAMINED PLAINTIFF".

OUR 11th CIRCUIT COURT OF APPEALS HAS HELD THAT SUCH RECORDS GENERATED BY PRISON EMPLOYEES: "... ARE NOT OBJECTIVE TO THE EXTENT THEY WERE CREATED BY DOC EMPLOYEES...." (SEARS-V-WARDEN, 762 F. APPX. 910, 916 (11th CIR. 2019)).

PLAINTIFF ALSO SPECIFICALLY STATES UNDER OATH THAT THE HANDHELD CAMERA FOOTAGE OF PLAINTIFF'S SO-CALLED MEDICAL EXAMINATION ON 8-18-15, HAS BOTH VIDEO AND AUDIO, AND, PLAINTIFF STATES THAT THE VIDEO/AUDIO WILL SHOW:

✓ PLAINTIFF, AT 8:50 AM, IS ESCORTED INTO THE EXAM ROOM, AND GOLDHAGAN AND SCHWARZ FOLLOW PLAINTIFF INSIDE, TO INTIMIDATE PLAINTIFF INTO NOT SAYING ANYTHING ABOUT THE EXCESSIVE FORCE;

✓ PLAINTIFF, AT 8:51 AM, IS TELLING THE NURSE THAT SCHWARZ LET GOLDHAGAN STICK A PIECE OF METAL IN PLAINTIFF'S RECTUM. SCHWARZ HEARS PLAINTIFF, TURNS AROUND, TELLS THE NURSE TO "DO THE MINIMUM" AND, ON AUDIO/VIDEO TELLS PLAINTIFF "SHUT UP, YOU'RE FINE, FOR RIGHT NOW" (INTIMATING TO PLAINTIFF THAT HE WOULD BE VICTIMIZED WITH MORE EXCESSIVE FORCE IF PLAINTIFF KEPT TRYING TO TELL WHAT THEY DID;

✓ THE NURSE TAKES PLAINTIFF'S TEMPERATURE FOR 9 SECONDS, AND, AS SOON AS THE TEMP IS TAKEN, PLAINTIFF AGAIN STARTS TELLING NURSE THAT "THEY STUCK SOMETHING IN MY RECTUM".

✓ SCHWARZ RETHREATENS PLAINTIFF, AND PLAINTIFF TELLS SCHWARZ, AUDIBLY (ON THE HANDHELD CAMERA) "YOU CAN'T STOP ME FROM REPORTING YOU, SIR." (SCHWARZ THEN BEGINS TO GO OUT THE EXAM DOOR TO TALK TO THE CAMERA AND CLOSE OUT THE INCIDENT), AND PLAINTIFF MOUTHS THE WORDS "THEY STUCK SOMETHING IN ME." PLAINTIFF ALSO TELLS THE NURSE THIS AGAIN.

13).

NURSE CASWELL'S DECLARATION, AND THE MEDICAL RECORDS ONLY PROVIDE EVIDENCE RELATING TO PLAINTIFF'S ALLEGATIONS OF INJURY, AND DO NOT PROVIDE UNCONTROVERTED EVIDENCE OF WHETHER DEFENDANTS APPLIED EXCESSIVE FORCE OR WHETHER DEFENDANTS FAILED TO INTERVENE. IN SHORT, THE DECLARATION OF CASWELL AND THE MEDICAL RECORDS DO NOT CONTRADICT PLAINTIFF'S ACCOUNT OF DEFENDANTS ACTIONS REGARDING EXCESSIVE USES OF FORCE, AND THUS, DO NOT NEGATE PLAINTIFF'S SWORN FACTS/TESTIMONY HERE OR ELSEWHERE IN THE PLEADINGS (SEE, SEARS-V-ROBERTS, 922 F.3d 1208 @ N. 4 ("IN ANY EVENT, THE NURSE'S REPORT DOES NOT ESTABLISH WHETHER (EXCESSIVE) FORCE WAS APPLIED TO (PLAINTIFF) after HE WAS HANDCUFFED AND COMPLIANT")).

RECENTLY, IN A NEARLY IDENTICAL "HE SAID/SHE SAID" DISPUTE BETWEEN OTHER FDOC DEFENDANTS WHO ALSO SUBMITTED A "NURSE'S DECLARATION" TOWARDS THEIR MOTION FOR SUMMARY JUDGMENT, THIS PLAINTIFF, (GERRARD JONES) PREVAILED, WINNING A JURY TRIAL AS TO ALL OF HIS CLAIMS, IN JONES-V-JOHNSON, 4:18-CV-76-MW-GRJ, N.D. FLA. (TALLAHASSEE), WHERE THOSE DEFENDANTS ALSO ATTACKED PLAINTIFF WHILE HE WAS "HANDCUFFED AND SHACKLED AND COMPLIANT." (SEE, REPORT/RECOMMENDATION, JONES-V-JOHNSON, EXHIBIT "D"). WHAT'S MORE, THE SAME LAWYER WHO LOST THAT SUMMARY JUDGMENT MOTION, ARGUING THAT SAME ISSUE IS THE SAME LAWYER DEFENDING INSTANT DEFENDANTS UPON THIS "NURSE'S DECLARATION" THAT DEFENSE COUNSEL LONERGAN KNOWS IS NOT TENABLE. PLAINTIFF'S VERSION IS NOT BLATANTLY (NOR OTHERWISE) CONTRADICTED BY THE RECORD, AND, AS THE NON-MOVANT, PLAINTIFF MUST BE GIVEN EVERY REASONABLE INFERENCE.

14).

(GRAHAM-V-STATE FARM, 193 F.3d 1274, 1282 (11th CIR. 1999).).

✓ SCHWARZ FALSELY STATES TO THE CAMERA
OPERATOR, IN HIS CLOSE-OUT REPORT,
THAT (PLAINTIFF) WAS ASSIGNED TO CELL
4106L. (WHEN PLAINTIFF WAS ACTUALLY
ASSIGNED TO L4206L.

✓ WHILE SCHWARZ CONTINUES, GOLDHAGAN IS
STILL IN THE ROOM WITH PLAINTIFF, AND
PLAINTIFF CONTINUES TELLING THE NURSE
OF THE EXCESSIVE FORCE AND INJURIES AS
LISTED IN PARAGRAPH #38 OF THE LAWSUIT.

✓ GOLDHAGAN THREATENS PLAINTIFF; TRIES TO
STOP PLAINTIFF FROM TALKING TO THE NURSE,
AND PLAINTIFF BEGINS LOOKING AT THE
CAMERA, MOUTHING THE WORDS "I NEED HELP/
THEY TRIED TO KILL ME" (WITH EXCESSIVE FORCE).

✓ THE NURSE, AT SCHWARZ AND GOLDHAGAN'S
DIRECTIONS, FAILS TO DOCUMENT PLAINTIFF'S
(REPORTED) INJURIES, AND THE NURSE NEVER
EXAMINES PLAINTIFF'S RECTUM, NOR OTHER
REPORTED INJURIES.

✓ DURING FILMING, AN OFFICER OPENS THE
DOOR AND PLAINTIFF CAN BE HEARD CLEARLY
ASKING FOR "A MENTAL HEALTH SPECIALIST".
THE OFFICER HANDS SCHWARZ A PIECE OF PAPER,
THUS ALLOWING THE SOUND OF PLAINTIFF'S WORDS
TO BE PICKED UP BY THE HANDHELD CAMERA.

✓ PLAINTIFF SAW THAT THE NURSE WAS NOT GOING
TO HELP HIM, AND, ASKED FOR THE "MENTAL
HEALTH SPECIALIST" SO HE COULD REPORT
THE "PREA" (PRISON RAPE ELIMINATION ACT) VIOLATIONS
COMMITTED BY GOLDHAGAN AND THE OTHER DEFENDANTS,
BUT, ALTHOUGH THE AUDIO WILL CONFIRM PLAINTIFF'S
REQUESTING SUCH, NO MENTAL HEALTH COUNSELOR
WAS PROVIDED.

15).

√ IT IS A VIOLATION OF DEFENDANT'S OWN AGENCY RULES TOO, FOR THE OFFICERS WHO ARE DIRECTLY INVOLVED IN A USE OF FORCE AND/OR "PREA" INCIDENT, TO REMAIN IN any kind of Contact WITH THE VICTIM, (SEE, POLICY AND PROCEDURE DIRECTIVE 602.053 (1) THRY (4)).

√ DEFENDANTS, AS STATED ON PAGE #5, AT PARAGRAPH #3 AND THE FOOTNOTE #5-A, KNEW THAT PLAINTIFF WAS MENTALLY IMPAIRED, TAKING PSYCHOTROPIC MEDS, AND WAS A "S-3", AND, EXHIBIT "C" (USE OF FORCE RULE 33-602.210(2)(L)) REQUIRED CONSULT W/ MENTAL STAFF.

√ MOREOVER, AS TO DEFENDANTS CONTENTION THAT THE RETALIATION ALLEGATIONS MUST FAIL, DEFENDANTS RELY SOLELY ON THE FACT OF THE "DR" GUILTY VERDICT ON J.W. STRAINS "LYING TO STAFF" DR". HOWEVER, PLAINTIFF MADE different allegations OF ONGOING RETALIATION, NOT COVERED BY THE "LYING TO STAFF" DR", (SEE, THIS LAWSUIT, @ PARAGRAPHS #18-26). INDEED, PLAINTIFF ASKS THIS COURT TO TAKE JUDICIAL NOTICE OF THE HABEAS (FEDERAL) IN JONES.V-FDOC, (CASE #3:18-CV-390-MMH-JRK, M.D. FLA. Jacksonville). THEREIN PLAINTIFF ALLEGED HARASSMENT, RETALIATION, REPRISAL (LONG-RUNNING) AND:

√ DENIAL OF ACCESS TO COURTS, ACCESS TO GRIEVANCE PROCESS, ACCESS TO THE LAW LIBRARY, DISCRIMINATION, VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT "ADA", AND CONSPIRACY.

THIS HABEAS IS KNOWN TO DEFENSE COUNSEL LONERGAN, AS SHE IS ALSO COUNSEL OF RECORD FOR FDOC IN THAT PENDING CASE TOO, AND, SHE ACKNOWLEDGES, AT PAGE #4, DOC. 27, IN THAT CASE (#3:18-CV-390) THAT PLAINTIFF ALREADY HAD THOSE separately FILED ALLEGATIONS WHICH ARE NOT THE SUBJECT OF THOSE IN THE "LYING" DR".

16),

MOREOVER, THE JURY COULD EASILY INFER, BASED UPON THOSE ALLEGATIONS, THAT DEFENDANTS WERE EXERCISING A TRADITION, POLICY, CUSTOM AND/OR PRACTICE OF LONGSTANDING DISCRIMINATION AGAINST PLAINTIFF.

SO TOO, COULD THE JURY INFER, THAT DEFENDANTS RETALIATED/DISCRIMINATED AGAINST PLAINTIFF BY COERCING THE MEDICAL STAFF ON 8-18-15, IN THE INSTANT CASE, TO "DO THE MINIMUM", I.E., WITHHOLD MEDICAL TREATMENT FROM PLAINTIFF'S "EXCESSIVE FORCE" INJURIES, INDEPENDENT OF THE ALLEGATIONS CONNECTED TO THE "LYING TO STAFF"/BATTERY-ATTEMPT BATTERY" "D.R.'S".

MOREOVER, SINCE DEFENDANT'S THEMSELVES CAUSED THE INJURIES TO PLAINTIFF, BY THEIR USE OF "EXCESSIVE FORCE", THIS OBVIATES THE NEED FOR PLAINTIFF TO PRESENT, OR FOR DEFENDANTS TO KNOW OF—A FORMAL MEDICAL DIAGNOSIS OF PLAINTIFF'S INJURIES AT THIS PLEADING STAGE JUNCTURE. (THOMSEN-V-ROSS, 368 F. SUPP. 2d 961, 973 (D. MINN. 2005)("ABSENT A MEDICAL DIAGNOSIS A SERIOUS MEDICAL NEED IS ONE THAT IS SO OBVIOUS THAT A LAYPERSON WOULD EASILY RECOGNIZE THE NECESSITY FOR A DOCTORS' ATTENTION"). ALTHOUGH PLAINTIFF WAS (OSTENSIBLY) "EXAMINED" THAT DAY DEFENDANTS INDIVIDUAL AND/OR COLLECTIVE KNOWLEDGE OF THEIR "EXCESSIVE FORCE" IS FULLY RELEVANT TO WHAT PLAINTIFF CLAIMS WAS A LATER ("DO THE MINIMUM") UNCONSTITUTIONAL INTERFERENCE WITH THE PROPER/CONTINUING TREATMENT OF HIS INJURIES. THAT IS, A REASONABLE JURY MAY EASILY CONCLUDE THAT DEFENDANT'S WERE DELIBERATELY INDIFFERENT TO A SERIOUS RISK OF HARM WHEN THEY REFUSED TO ALLOW THE NURSES TO CONDUCT A BONA FIDE EXAMINATION,

17).

AS OPPOSED TO DEFENDANTS' ORDERING MEDICAL STAFF
TO "DO THE MINIMUM".
THE SAME JURY WILL FIRST HAVE TO DETERMINE THE
"EXCESSIVE FORCE" ALLEGATIONS, I.E., WHETHER THERE
WAS A LEGITIMATE PENOLOGICAL REASON FOR THE
AMOUNT OF FORCE ("EXCESSIVE") USED, AND, A
LEGITIMATE PENOLOGICAL REASON FOR DEFENDANTS
TO HAVE PROHIBITED MEDICAL STAFF FROM DOING
A BONA FIDE MEDICAL EXAMINATION — OR, AS
PLAINTIFF CONTENDS, IT WAS A PRETEXT FOR DEFENDANTS
TO OBSTRUCT/WITHHOLD PROPER MEDICAL TREATMENT
FROM PLAINTIFF, TO "COVER-UP" DEFENDANTS INJURIES
TO PLAINTIFF, CAUSED BY THEIR SADISTIC USE OF
EXCESSIVE FORCE, WHEN THERE WAS NO SECURITY RISK.
THE SAME JURY COULD FIND "FIRST AMENDMENT"
VIOLATIVE "RETALIATION" UNDER SUCH "WITHHOLDING
MEDICAL TREATMENT" FACTS (THOMAS-V-EVANS,
880 F.2d 1235, 1242 (11th CIR. 1989)).
CONSEQUENTLY, O'BRYANT-V-FINCH, 637 F.3d 1207, 1212,
(11th CIR. 2011) DOES NOT COME TO BEAR.
PLAINTIFF'S PRIOR GRIEVANCES AND LONGSTANDING
COMPLAINTS, I.E., (JONES-V-FDOC, 3:18-CV-390) SHOWS
DEFENDANTS WERE ALREADY "MOTIVATED" TO DISCIPLINE
PLAINTIFF FOR EXERCISING HIS FIRST AMENDMENT RIGHTS.
(BENNETT-V-HENDRIX, 423 F.3d 1247, 1250 (11th CIR. 2005));
MOTON-V-COWART, 631 F.3d 1337, 1341 (11th CIR. 2011)).
PLAINTIFF HAS, ADDITIONALLY, ALLEGED RACIAL ANIMUS,
OF DEFENDANTS, MOST PARTICULARLY GOLDHAGAN,
(LAWSUIT, AT PAGE 5-C (FOOTNOTE) "GOLDHAGAN AND ME
(PLAINTIFF) DISCUSSED POLITICS, RELIGION, RACE-RELATIONS.
HE SAID HE WAS "PROUDLY RACIST/KKK AND HE DON'T LIKE
RACE-MIXING, ESPECIALLY BLACK MEN WITH WHITE WOMEN
SEXUALLY. HE TOLD ME HE HATES JAILHOUSE LAWYERS AND HE
OPENLY TOLD ME HE "TOOK UP A MONEY-COLLECTION FOR HIS
BROTHER, NAMED DAVID MORAN, WHO IS ON TRIAL FOR A

18).

KKK MURDER PLOT TO KILL A BLACK PRISONER,
GOLDHAGEN SAID HE GOT MONEY FOR MORAN'S LAWYER
FROM HIS SANTA ROSA "KKK BROTHERS AND OTHER WHITE STAFF."
(DAVID MORAN HAS BEEN SINCE CONVICTED OF THE CHARGES).
GOLDHAGEN ALSO THREATENED PLAINTIFF after USING THE
EXCESSIVE FORCE, TO DISSUADE PLAINTIFF FROM FILING
MORE GRIEVANCES ABOUT THIS EXCESSIVE FORCE, TELLING
PLAINTIFF:
..... YOU SEE JONES (PLAINTIFF) WE GOT A BIG BIG FAMILY
UP HERE IN THE PANHANDLE. THIS IS REDNECK/CRACKER/
COUNTRY BOY/KKK TURF — AND IF YOU THINK WE
WON'T KILL YOU JONES, JUST TRY US...."
(LAWSUIT, AT PARAGRAPH #20).
GOLDHAGEN REFERRED TO SCHWARZ AS HIS "BROTHER"
(LAWSUIT, AT PARAGRAPHS #4, AND #6).
WHICH GOLDHAGEN INTENDED, AND PLAINTIFF TOOK TO
MEAN "KKK BROTHERS".
GOLDHAGEN, after USING THE EXCESSIVE FORCE, ALSO
TOLD PLAINTIFF HE WAS:
"....GONNA TURN YOU (PLAINTIFF) OVER TO another one
of our (GOLDHAGEN AND SCHWARZ' KKK) BROTHERS...."
(LAWSUIT, AT PARAGRAPH #21).
GOLDHAGEN TURNED PLAINTIFF OVER TO OFFICER RICHARDSON,
WHO IDENTIFIED HIMSELF AS GOLDHAGEN AND SCHWARZ'
"BROTHER", AND SAID:
"....*LAWYERBOY, WE WILL STARVE YOU TO DEATH, GET YOU
GASSED - MACED, WRITE BOGUS DISCIPLINARY REPORTS
("DR'S"), TEAR UP ALL YOUR MAIL AND MORE AN
get clean away with it....."(LAWSUIT, @ PARAGRAPH #23).
RICHARDSON ADVISED PLAINTIFF TO "LOOK OUT THE WINDOW
TONIGHT", OVER TO THE TRAINING BUILDING AREA, CLEARLY
VISIBLE FROM THE CELL THEY PUT PLAINTIFF IN (J2108L).

19).

*"LAWYERBOY" IS PLAINTIFF'S PRISON NICKNAME, AS EXPLAINED.
(LAWSUIT, AT PAGE #5-C, FOOTNOTE).

(THE OFFICERS OFTEN PARK THEIR TRUCKS THERE AND CLEAN THEIR PERSONAL WEAPONS, IT'S LIKE A MEETING SPOT FOR THE WHITE OFFICERS).

THAT NIGHT, AS RICHARDSON HAD STATED, ANOTHER OFFICER WOKE PLAINTIFF BY BANGING ON THE J-210BL WINDOW. PLAINTIFF LOOKED OUT AND SEVERAL WHITE MEN (PRESUMABLY GOLDHAGAN/SCHWARZ/RICHARDSONS BROTHERS") WERE ALL POINTING GUNS, AT PLAINTIFF THROUGH THE WINDOW, LIKE TO AIM AT PLAINTIFF TO SHOOT PLAINTIFF. (LAWSUIT, AT PARAGRAPH #23, 24).

RICHARDSON CAME BACK TO WORK SOON AFTER THAT GUN-POINTING INCIDENT, AND RE-THREATENED PLAINTIFF TO NOT FILE ANY MORE GRIEVANCES/COURT ACTIONS ABOUT THE EXCESSIVE FORCE.

INTERESTINGLY, DEFENSE COUNSEL LONERGAN HAS STATED IN DISCOVERY THAT NO DISCIPLINARY HISTORY/FILES EXIST FOR DEFENDANTS.

HOWEVER, GOLDHAGAN WAS A CAPTAIN AND WAS DEMOTED TO A SEARGANT FOR INMATE ABUSE, GOLDHAGAN ON DORM (AUDIO/FILM) ADMITTED THIS IN PLAINTIFF'S HEARING TO ANOTHER PRISONER IN J-DORM, AS GOLDHAGAN WAS WORKING THE DORM (CONFINGMENT) after THEIR USE OF EXCESSIVE FORCE UPON PLAINTIFF (ON OR ABOUT 8-27-15). GOLDHAGAN BEING A "KKK MEMBER" HAS BEEN ALLEGED BY OTHER PRISONERS AND, A NEWSPAPER REPORTER HAS PRELIMINARY INVESTIGATION GOLDHAGANS KKK AFFILIATION, AND "FOUND TWO OTHER PEOPLE WHO HAD COMPLAINED ABOUT (GOLDHAGAN'S) KKK MEMBERSHIP". (SEE, EXHIBIT "E", A LETTER FROM JACKSONVILLE TIMES-UNION, INVESTICATIVE REPORTER, BEN CONARCK, DATED 7-10-18).

ALSO, AS TO PAGE #16 OF DOC. 72, WHERE DEFENDANTS CLAIM THAT THE OTHER DEFENDANT HAD A "NEED" TO HOLD PLAINTIFF DOWN, PLAINTIFF ALLEGES THAT EVEN IF THERE WAS A "NEED" TO HOLD PLAINTIFF DOWN TO CUFF/SHACKLE HIM, THE "NEED"

20).

EVAPORATED AND THE "EXCESSIVE FORCE" OF GOLDHAGAN
STICKING AN OBJECT INTO PLAINTIFF'S RECTUM, AND THE
BENDING OF HIS WRISTS/ANKLES, AND THE BENDING/BREAKING
OF PLAINTIFF'S FINGERS AND THE SUFFOCATING/CHOKING
PLAINTIFF UNCONSCIOUS ALL OCCURRED after PLAINTIFF
WAS CUFFED/SHACKLED.

HECK DOES NOT BAR PLAINTIFF'S CLAIMS, AS THE
"EXCESSIVE FORCE" after PLAINTIFF WAS CUFFED/SHACKLED
DOES NOT IN ANY WAY CHALLENGE THE FACTS OF THE "DR".
THE "DR" FOR BATTERY/ATTEMPT BATTERY ONLY SUGGESTS
THE FORCE NEEDED TO RESTRAIN PLAINTIFF INITIALLY WAS
LEGITIMATE, NOT, AS PLAINTIFF ALLEGES, THAT THE
CONTINUED FORCE AFTERWARDS WAS.

THUS, WITHOUT CHALLENGING THE FORCE USED IN THE
FIRST INSTANCE, I.E., THE "DR" ALLEGATION, PLAINTIFF'S
CLAIMS HERE SURVIVE SUMMARY JUDGMENT FOR THE
POST CUFF/SHACKLED FORCE, WHICH WAS EXCESSIVE.
ALL DEFENDANT KNEW PLAINTIFF WAS CUFFED/SHACKLED
AND THAT GOLDHAGAN WAS SHOVING AN OBJECT INTO
PLAINTIFF'S RECTUM, AND USING THE OTHER EXCESSIVE
FORCE AS DESCRIBED supra AND infra.

NEXT, AS TO THE FLORIDA BAR COMPLAINT, DEFENSE
COUNSEL LONERGAN FALSELY STATES THE FLORIDA
BAR "DETERMINED TO BE MERITLESS" PLAINTIFF'S
COMPLAINT AGAINST ASSISTANT ATTORNEY GENERAL
KATHLEEN HAGAN (PAGE #26 of DOC. 77).

HOWEVER, THE FLORIDA BAR SIMPLY SAID THAT HER
INTERPRETATION OF THE LAW REGARDING THE ISSUE
DIDN'T CONSTITUTE A VIOLATION OF BAR RULES.

AND, ADVISED PLAINTIFF HE COULD UNDERTAKE OTHER
REMEDIES ABOUT THE ISSUE.

THE BAR NEVER REACHED the merits OF THE ISSUE
WE WERE SPARRING OVER, AND DID NOT EVER STATE
PLAINTIFF'S ISSUE HAD NOT MERIT, AS FALSELY STATED
BY MS. LONERGAN AT PAGE #26, DOC. 77 (SEE BAR REPLY, DOC 77-5).

21).

PLAINTIFF HAD SECRETED HIS BLOODY UNDERWEAR FROM THE ATTACK, AND PUT THEM IN PLASTIC (A BAG). THE UNDER HAD GOLDHAGAN'S <u>DNA</u> AND PLAINTIFF'S BLOOD/FECES FROM THE OBJECT GOLDHAGAN USED TO CUT PLAINTIFF'S LEFT BUTTOCK AND SHOVE INTO PLAINTIFF'S RECTUM.

PLAINTIFF KEPT IT, AND WROTE TO THE FEDERAL COURT IN TALLAHASSEE TO GET SOMEONE TRUSTWORTHY TO RETRIEVE THE UNDERWEAR FOR USE AT TRIAL, AND TO FILE CRIMINAL CHARGES AGAINST DEFENDANTS. BUT, THE JUDGE DID NOT ORDER IT (PLAINTIFF ASKS FOR JUDICIAL NOTICE OF THAT CASE, WHERE THIS CASE WAS FILED AS AN OVERALL SINGLE CASE IN TALLAHASSEE, BEFORE MAGISTRATE ("CAS"?) DISMISSED IT, AND TOLD DEFENDANT TO FILE SEPARATE LAWSUITS AGAINST FDOC FOR THE JEFFERSON C.I. ATTACKS AND THE SANTA ROSA ATTACKS (I THINK THE PRIOR CASE WAS *313?). PLAINTIFF, WHILE AT JEFFERSON C.I., WAS ATTACKED BY STAFF (<u>JONES-V-JOHNSON</u>, NOW #18-CV-76, SEE <u>EXHIBIT "D"</u> HEREIN). DEFENDANT <u>JOHNSON</u> HAD PREVIOUSLY WORKED AT SANTA ROSA, BUT GOT A JOB AT JEFFERSON AND PARTICIPATED IN ATTACKING PLAINTIFF (EXHIBIT "D"). THEN, AFTER ATTACKING PLAINTIFF, JOHNSON RIGGED A TRANSFER TO SEND PLAINTIFF TO SANTA ROSA C.I., FOR JOHNSON'S FRIENDS THERE TO "FUCK PLAINTIFF UP". (SEE, 18-CV-76, TALLAHASSEE LAWSUIT).

ANYWAY, ONCE PLAINTIFF GOT TO SANTA ROSA AND WAS ATTACKED THERE (THIS LAWSUIT), HE WAS PUT ON "CM" (CLOSE MANAGEMENT ISOLATION) AT SANTA ROSA, WHEN HE WAS RELEASED FROM "CM", HE WAS SENT TO TOMOKA C.I. AT TOMOKA, PLAINTIFF TOLD STAFF THERE OF THE UNDERWEAR SECRETED IN HIS PROPERTY IN THE TOMOKA PROPERTY ROOM IN THE PLASTIC BAG. PLAINTIFF WROTE TO THE FDLE AND FDOC INSPECTOR GENERAL, ASKING THEM TO RETRIEVE THE UNDERWEAR. TOMOKA STAFF LEARNED OF THIS, AND STOLE THE UNDERWEAR AND WHEN THE OFFICIALS CAME TO GET IT, IT WAS GONE,

22).

LASTLY, PLAINTIFF FILED IN THE STATE COURT IN NOVEMBER 2015 (EXHIBIT "F") TO GET ALL THE CAMERA FOOTAGES RETAINED. HOWEVER, THE COURT DID NOT ADDRESS IT. EVEN ON APPEAL. THE SERIOUSNESS OF THE CHARGE (BATTERY/ATTEMPT) SHOULD HAVE CAUSED DEFENDANTS TO RETAIN IT, FOR POSSIBLE USE IN CHARGING PLAINTIFF. PLAINTIFF, IN FACT, IN LATE 2015 OR EARLY 2016, WROTE A LETTER TO SANTA ROSA STATE ATTORNEY, JEFFREY STEIGMASTER, BEGGING HIS OFFICE TO CHARGE PLAINTIFF FOR BATTERY and to get all THE VIDEO. PLAINTIFF ASKS THIS COURT TO TAKE JUDICIAL NOTICE OF HIS LETTER, IN THE SANTA ROSA STATE ATTORNEY FILES, AS PLAINTIFF CANNOT AFFORD TO BUY A COPY, AND PLAINTIFF ORIGINAL COPY WAS STOLEN, ALONG WITH COPIES OF PLAINTIFF'S OTHER GRIEVANCES/COURT PAPERS BY OFFICER RICHARDSON, GOLDWAGON'S "KKK BROTHER". (LAWSUIT, AT PAGE #5-II, PARAGRAPH #39).

AS THE MOVING PARTY, DEFENDANTS HAVE THE BURDEN OF PROVING "NONEXISTENCE OF A TRIABLE ISSUE" (CELOTEX CORP. V. CATRETT, 477 U.S. 317 (1986)). OFFICERS WHO ARE PRESENT AND DO NOTHING TO STOP AN EXCESSIVE FORCE ATTACK ON A PRISONER ARE LIABLE FOR DAMAGES FOR THEIR NONFEASANCE. (SKRTICH V. THORNTON, 280 F.3d 1295 (11th Cir. 2002)). "CONTRADICTIONS BETWEEN THE PARTIES SWORN ALLEGATIONS PRESENTS A CLASSIC SWEARING MATCH, WHICH IS THE STUFF OF WHICH JURY TRIALS ARE MADE OF. (FELICIANO V. MIAMI, 707 F.3d 1244 (11th CIR. 2013)). THERE REMAINS GENUINE ISSUES OF MATERIAL FACTS IN DISPUTE, AND THE MOTION FOR SUMMARY JUDGMENT MUST BE DENIED AS A MATTER OF LAW, AND PLAINTIFF SEEKS A JURY TRIAL ON ALL ISSUES/CLAIMS.

GENARO JONES, PLAINTIFF PRO SE

23).

(JURAT) CERTIFICATE OF SERVICE

I DECLARE UNDER PENALTY OF PERJURY OATH, 28 U.S.C. 1746(2), THAT I HAVE READ THIS PLEADING AND ALL FACTS ARE TRUE AND CORRECT. SIGNED, SWORN, DATED AND SENT ("MAILBOX RULE") U.S. MAIL, ON SEPTEMBER 25th, 2020 TO:

(ORIGINAL)
CLERK OF COURT
N.D. PENSACOLA
100 PALAFOX ST.
PENSACOLA, FLORIDA
32502

(1 COPY)
ASSISTANT ATTORNEY GENERAL
KRISTEN LONERGAN
THE CAPITOL -PL-01
TALLAHASSEE, FLORIDA
32399-1050

(1 COPY)
ATTORNEY AT-LAW
KEVIN ROSS-ANDINO
E'CLAT LAW
300 CRANES ROOST BLVD.
SUITE #2010
ALTAMONTE SPRINGS, FL.
32701

GERRARD D'ANDRE JONES
DC# 503034
DADE CORRECTIONAL INSTITUTION
19000 S.W. 377th STREET
FLORIDA CITY, FLORIDA
33034

(PLAINTIFF PRO SE)

28).

## EXHIBITS

A — COPY OF BATTERY "DR", SHOWING PLAINTIFF WAS IN
   HIS ROOM, AND DEFENDANTS COULD HAVE JUST LOCKED HIS DOOR.

B — COPY OF (FALSE) "DECLARATION OF JESSICA SANTIAGO"
   (STATING FALSELY THAT NO CAMERA FACED INTO PLAINTIFF'S ROOM).

C — COPY OF "USE OF FORCE" RULES.

D — COPY OF REPORT/RECOMMENDATION, AWARDING PLAINTIFF A
   JURY TRIAL ON ALL ISSUES. (JONES·V·JOHANSON, 4:18-CV-76-MW-GRJ).

E — COPY OF LETTER FROM JACKSONVILLE TIMES-UNION NEWSPAPER
   REPORTER, BEN CONARCK, VERIFYING GOLDHAGANS "KKK" TIES.

F — COPY OF MOTION FILED IN STATE COURT, WHERE PLAINTIFF
   SOUGHT THE COURTS TO FORCE DEFENDANTS TO RETAIN ALL
   THE RELEVANT CAMERA FOOTAGES AS OF NOVEMBER 2015.

G — DEFENDANT'S "MOTION FOR SUMMARY JUDGMENT" (COPY).

H — COPY OF PLAINTIFF "4ᵀᴴ AMENDED" LAWSUIT IN THIS CASE)

```
              FLORIDA DEPARTMENT OF CORRECTIONS        01/15/2019
                    DISCIPLINARY REPORT                  PAGE   1
                    LOG # 135-151305
██████████
------------------------------------------------------------------------
DC#: 503034    INMATE NAME: JONES, GERRARD D.      INFRACTION
VIOLATION CODE:  0115   TITLE: BATTERY/ATT/CO       DATE: 08/18/2015
FACILITY CODE: 135    NAME: SANTA ROSA ANNEX        TIME: 08:39
------------------------------------------------------------------------
```

I.   STATEMENT OF FACTS:
          INMATE JONES, GERRARD DC#503034 IS BEING CHARGED WITH A
     VIOLATION OF F.A.C. CHAPTER 33-601.314 RULES OF PROHIBITED
     CONDUCT: 1-15 BATTERY OR ATTEMPTED BATTERY ON A CORRECTIONAL
     OFFICER. ON AUGUST 18, 2015, I WAS ASSIGNED AS INTERNAL
     SECURITY OFFICER. AT APPROXIMATELY 8:39AM, INMATE JONES, WHO
     WAS PRESENT IN HIS ASSIGNED CELL, L4206, WAS GIVEN ORDERS
     TO SUBMIT TO RESTRAINTS SO HE COULD BE ESCORTED TO MEDICAL
     FOR A PRE-CONFINEMENT PHYSICAL DUE TO A PRIOR RULE
     VIOLATION. AFTER SEVERAL MINUTES AND MORE ORDERS, INMATE
     JONES STATED, "OK, I'LL CUFF UP." CAPTAIN J. SCHWARZ THEN
     INSTRUCTED OFFICER DENMON, OFFICER POGUE, OFFICER BEAUDRY
     AND MYSELF TO ENTER THE CELL AND PLACE INMATE JONES IN
     RESTRAINTS. UPON ENTERING THE CELL, INMATE JONES STATED,
     "LET'S GO MOTHERFUCKERS" AND ATTEMPTED TO STRIKE ME WITH A
     CLOSED FIST TO THE FACIAL AREA. IT THEN BECAME NECESSARY TO
     UTILIZE REACTIONARY PHYSICAL FORCE TO DEFEND MYSELF AGAINST
     INMATE JONES' ACTIONS THAT WERE LIKELY TO CAUSE INJURY TO
     ME. THE SHIFT SUPERVISOR WAS NOTIFIED AND AUTHORIZED THIS
     REPORT. INMATE JONES WILL REMAIN IN ADMINISTRATIVE
     CONFINEMENT PENDING DISCIPLINARY TEAM ACTION.

  REPORT WRITTEN: 08/18/2015, AT 12:00   OFFICER: ████ - GOLDHAGEN,M.K.
  ASSIGNED AND APPROVED BY: ████ - SCHWARZ, JOHN E
------------------------------------------------------------------------
II.  INVESTIGATION:
       COMMENTS:
          INMATE JONES, GERRARD DC#503034 REFUSED TO PARTICIPATE IN
          PROVIDING A STATEMENT, WITNESSES OR EVIDENCE FOR THIS
          REPORT.
       WITNESSES:
          CAPTAIN J. SCHWARZ; OFFICER J. DENMON; OFFICER E. POGUE AND
          OFFICER J. BEAUDRY
          INMATE OFFERED STAFF ASSISTANCE: DECLINED

  INVESTIGATION BEGUN: 08/18/2015, AT 15:00   OFFICER: ████ - MELANSON, H. A.
  INVESTIGATION ENDED: 08/24/2015, AT 08:56
------------------------------------------------------------------------

III. INMATE NOTIFICATION OF CHARGES: DATE DELIVERED: 08/21/2015, AT: 09:10

                     DELIVERED BY : ████ - MELANSON, H. A.
------------------------------------------------------------------------
IV.  DESIGNATING AUTHORITY REVIEW   LEVEL: MAJOR   DATE: 08/24/2015

                     OFFICER: ████ - BROWN, P.J.
------------------------------------------------------------------------
V.        TEAM   FINDINGS AND ACTION  DATE: 08/25/2015, AT: 08:58
          INMATE OFFERED STAFF ASSISTANCE: DECLINED
          INMATE PLEA: NOT GUILTY   FINDINGS: GUILTY
          INM PRESNT: Y   WAIVED 24 HR NOTICE: N
```

EXHIBIT "A"

```
              FLORIDA DEPARTMENT OF CORRECTIONS          01/15/2019
                     DISCIPLINARY REPORT                   PAGE   2
                     LOG # 135-151305
---------------------------------------------------------------------
DC#: 503034   INMATE NAME: JONES, GERRARD D.        INFRACTION
VIOLATION CODE:  0115    TITLE: BATTERY/ATT/CO      DATE: 08/18/2015
FACILITY CODE:  135      NAME: SANTA ROSA ANNEX     TIME: 08:39
---------------------------------------------------------------------
   POSTPONEMENT:
   BASIS FOR DECISION:
        BASED IN PART ON THE WRITTEN STATEMENT OF SERGEANT M.
        GOLDHAGEN AND CONFIRMED IN THE INVESTIGATION THAT INMATE
        JONES, GERRARD DC#503034 WAS GUILTY OF BATTERY OR ATTEMPTED
        BATTERY ON AN OFFICER, WHEN ON 08/18/15, AT APPROXIMATELY
        8:39 A.M., WHILE ASSIGNED AS THE INTERNAL SECURITY
        SUPERVISOR AT SANTA ROSA CI ANNEX, SGT. GOLDHAGEN WAS
        PRESENT AT CELL L4206, WHEN INMATE JONES WAS GIVEN ORDERS TO
        SUBMIT TO RESTRAINTS TO BE ESCORTED TO MEDICAL. AFTER
        SEVERAL ORDERS, INMATE JONES STATED THAT HE WOULD COMPLY.
        CAPTAIN SCHWARZ, WHO WAS PRESENT, INSTRUCTED OFFICER J
        DENMON, OFFICER POGUE, OFFICER BEAUDRY AND SGT.  GOLDHAGEN
        TO ENTER THE CELL AND PLACE INMATE JONES IN RESTRAINTS.
        INMATE JONES AT THIS TIME STATED "LET'S GO, MOTHER FUCKERS"
        AND ATTEMPTED TO STRIKE SGT. GOLDHAGEN WITH A CLOSED FIST TO
        THE FACIAL AREA. IT BECAME NECESSARY FOR SGT. GOLDHAGEN TO
        USE REACTIONARY FORCE TO DEFEND HIMSELF. INMATE JONES DID
        NOT PROVIDE ANY NEW WITNESSES OR EVIDENCE DURING THE HEARING
        BUT DID OFFER A VERBAL STATEMENT IN HIS DEFENSE. ALL
        WITNESS STATEMENTS WERE READ AND ALL EVIDENCE WAS REVIEWED
        AND CONSIDERED BY THE DISCIPLINARY TEAM.  A COPY OF THE
        TEAM'S FINDINGS WAS PROVIDED TO INMATE JONES AND HE WAS
        ADVISED HE HAS FIFTEEN DAYS TO APPEAL THE TEAM'S DECISION.


   ACTIONS TAKEN:
    LOSS OF GAIN TIME:      364; PROBATION DAYS SET:   0
    DISCIPLINARY CONFINEMENT:  60; PROBATION DAYS SET:   0 CONSECUTIVE
    ALTERNATIVE HOUSING:     0000;
                            0000;                      000

    RESTITUTION:     $.00; INDIV.REVIEW/COUNSEL?: N; CONFISCATE CONTRABAND?: N

   TEAM CHAIRMAN:  ████  - CALDWELL, R. F.
   TEAM MEMBERS:   ████  - CONLEE, C. C.          -
---------------------------------------------------------------------
VI.  REVIEW AND FINAL ACTION: APPROVED
        WARDEN:  ████  - COKER, JAMES G.     DATE: 08/27/2015
---------------------------------------------------------------------
VII. APPEAL PROCESS DISPOSITION: NO INSTITUTIONAL ACTION
        WARDEN:         -                   DATE: 00/00/0000
---------------------------------------------------------------------

   INFORMATIONAL NOTES:
      MAXIMUM GAIN TIME DAYS AVAILABLE TO BE TAKEN:    0 DAYS
---------------------------------------------------------------------
DC4-804
```

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION



**GERRARD D. JONES**
**DOC # 503034,**

      Plaintiff,

v.                           Case No. 3:18-cv-155-LAC-MJF

**SCHWARZ, ET AL.,**

      Defendants.

_____/

## DECLARATION OF JESSICA SANTIAGO

I, JESSICA SANTIAGO, pursuant to 28 U.S.C. § 1746, make this declaration under penalty of perjury and declare that the statements made below are true and correct:

1.    My name is Jessica Santiago. I am employed by the Florida Department of Corrections (FDC) as the Assistant Warden of Programs at Santa Rosa Correctional Institution.

2.    I have been asked by the Attorney General's Office to respond as to whether additional footage exists of an incident involving inmate Gerrard Jones, DC#503034 which took place at Santa Rosa Correctional Institution Annex on August 18, 2015 in addition to the footage already provided per their earlier request, as a result of the inmate's allegation that an additional camera existed which could be seen over his left shoulder as he was being escorted downstairs from his cell in the footage already provided.

3.    There is no such camera in the place referenced by the inmate according to the dormitory diagram. Additionally, all existing footage from the dormitory cameras which do exist and which was retained related to this incident has already been provided.

4.    The foregoing facts are known by me to be true and correct based upon my review of the records. I am over the age of 18, am competent to testify to the foregoing facts, and would so testify if I appeared in court as a witness regarding this matter.


_____        1-21-2020

**JESSICA SANTIAGO**           **Date**
**Declarant**

**33-602.210   Use of Force.**

(1) Prior to any organized use of force, the shift supervisor shall review Form DC4-650B, Risk Assessment for the Use of Chemical Restraint Agents and Electronic Immobilization Devices, to determine whether the inmate has a medical condition that may be exacerbated by the intended force. Form DC4-650B is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500, http://www.flrules.org/Gateway/reference.asp?No=Ref-01693. The effective date of the form is 12-12. Medical staff shall be consulted about physical conditions of an inmate that may be aggravated by the application of force or chemical agents unless safety concerns prevent prior consultation.

(2) Definitions.

(a) Direct Firing - The practice of firing specialty munitions directly into a group of rioters with a target area of the waist or below from a minimum distance designated by the manufacturer of the munitions.

(b) Correctional Emergency Response Team - A team comprised of staff trained in special tactics including the use of lethal force for the intervention and resolution of life-threatening crisis events.

(c) Emergency Action Center - The unit located in the Central Office charged with receiving reports regarding serious incidents, such as riots and escapes, from all Department of Corrections (Department) facilities and reporting the information to the proper authorities. This unit also receives requests for criminal histories, warrant confirmations, and offender location requests from law enforcement agencies throughout the United States.

(d) Incident Commander - The employee responsible for the management of emergency incidents, such as riots and natural disasters.

(e) Less Than Lethal Force - Any force that is neither intended nor likely to cause death or serious bodily harm.

(f) Organized Use of Force - Any force that may be administered to control, escort, or geographically relocate any inmate when the immediate application is not immediately necessary to prevent a hazard to any person.

(g) Reactionary Use of Force - Any force that must be administered quickly or immediately to compel the cessation of an inmates violence or resistance to orders.

(h) Reasonable Force - Any force that is not excessive for protecting oneself or another or for gaining an inmates compliance with a lawful order.

(i) Rapid Response Team - A team comprised of Correctional Officers specially trained in less lethal and lethal munitions, chemical munitions, crowd control, and riot suppression.

(j) Rubber Ball Rounds - Multiple pellets fired from cartridges at the lower extremities of rioters and designed to inflict pain compliance.

(k) S-2 - The mental health classification denoting mild impairment in the ability to meet the ordinary demands of living within general inmate housing (which includes segregation) due to a diagnosed mental disorder. The impairment in functioning is not so severe as to prevent satisfactory adjustment in general inmate housing with provision of mental health services. Clinical management of the disorder may require at least periodic administration of psychotropic medication, which the inmate may exercise his or her right to refuse.

(l) S-3 - The mental health classification denoting moderate impairment in the ability to meet the ordinary demands of living within general inmate housing, due to a diagnosed mental disorder. The impairment in functioning is not so severe as to prevent satisfactory adjustment in general inmate housing with provision of mental health services. Clinical management of the disorder may require at least periodic administration of psychotropic medication, which the inmate may exercise his or her right to refuse.

(m) Shift Supervisor - The highest ranking correctional officer of the on-duty shift.

(n) Skip Firing - The practice of firing specialty impact munitions 5-7 feet in front of rioters, thereby deflecting the munitions into the legs of the rioters.

(o) Serious Bodily Injury - A physical condition that creates a substantial risk of death, serious personal disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

(p) Specialty Impact Munitions - Munitions designed to incapacitate, distract, and control a subject with a relatively low likelihood of life-threatening injury.

(q) Wooden Baton Rounds - Multiple wooden projectiles fired from a 37/40-mm weapon, designed to be skip fired into the lower extremities of rioters to inflict pain compliance.

(3) A video camera operator shall commence recording all reactionary use of force incidents upon arrival at the scene as soon as possible. All organized use of force incidents shall be video recorded unless exigent or emergency circumstances prevent such action.  Except in the circumstances described in sub-subparagraph (9)(n)2.e., video recordings shall continue uninterrupted from commencement until the situation is stable and under control and the inmate is placed in a secure cell or transport vehicle for transfer. Additionally, the camera operator shall, to the best of his or her ability, ensure that all staff actively involved in any use of force and captured within the view finder of the camera is identified by rank/title and name.

(a) The shift supervisor during any organized use of force shall include in each video recorded markers of the following:

1. Date and time of the recording;

2. Location of the recording;

3. Name and rank of supervisor(s) present;

4. Name and rank of person authorizing use of chemical agent (if applicable);

5. Name and DC number of the inmate involved in the use of force;

6. Name of the camera operator;

7. Brief description of efforts taken to stabilize or control the inmate prior to the application of force;

8. Final warning order administered by a supervisor or incident commander;

9. Clear, concise, and audible verbal warning to the inmate of pending application of force or entry into cell for extraction;

10. Application of chemical agents;

11. Verbal order for a decontamination shower;

12. Decontamination of the inmate;

13. Any medical examination performed after the use of force;

14. Physical escort and placement in a decontaminated cell after incident;

15. Verbal refusals by inmates to participate in decontamination or medical examination (if applicable);

16. The name and rank of each Department staff member present.

(b) Whenever an inmate fails to comply with a lawful order and exhibits a threatening demeanor or disruptive or hazardous behavior, the on-scene supervisor of an organized use of force shall announce a clear, concise, and audible warning to the inmate that force will be administered if there is no immediate compliance and cessation of the behavior.

(c) Video recordings of post use of force medical exams shall be conducted through a window or at a distance in such a manner so as to provide the maximum amount of privacy needed for the exams and so as to limit the disclosure of inmate protected health information to the minimum amount necessary. The fact that the footage is taken through a window or at a sufficient distance is to keep communication between the inmate and medical staff confidential and to ensure that only the minimum amount of protected health information, e.g., visible injuries or the lack therefore, etc., is disclosed. Inmates involved in an organized use of force shall be  video recorded continually until they have been placed in a vehicle for transportation or in a secure cell.

(d) Anytime there is a change in the on-scene supervisor or other staff during an application of an organized use of force, a new video recording will be initiated and the requirements in paragraphs (3)(a) and (b) above shall be repeated.



(e) In the event of a reactionary use of force, once the camera operator and shift supervisor arrive on the scene, the shift supervisor - upon assessing the situation and being properly briefed - shall:

1. Make a brief statement noting the reason(s) for the use of force. This shall be prior to the conclusion of recording:

2. The rank/title and name of staff involved in the use of force;

3. The rank/title and name of any staff who were present, but not involved in the use of force;

4. The name and DC number of the inmate(s) involved;

5. The type and amount of force used;

6. Any other pertinent information that he or she deems relevant.

(4) Department staff shall use force, organized or reactionary, only as a last resort when it reasonably appears that other alternatives are not feasible to obtain compliance with law or administrative rules or to defend themselves or others against any physical threat of injury or death.

(5) Any use of force shall cease being applied whenever an inmate complies with orders or ceases the behavior for which the use of force was necessary.

(6) Use of force shall not be applied for punishment. Physical restraints such as handcuffs, leg irons, flex cuffs, and other such devices shall only be used for restraint purposes and not for punishment.

(7) Inmates shall not be carried, dragged, or lifted by restraint devices. This shall not be construed to prohibit the use of an escort chair pursuant to Rule 33-602.212, F.A.C.

(8) Hands-on physical force shall not be used if injury is less likely to occur by using chemical agents, specialty impact munitions, or EIDs. Batons, chemical agents, EIDs, specialty impact munitions, and other authorized less lethal weapons shall not be used on inmates who are assigned to inpatient mental health care in an infirmary, transitional care unit, crisis stabilization unit, corrections mental health institution, or other mental health treatment facility, as such facilities are defined in Rule 33-404.103, F.A.C., except when attempts by available mental health staff to otherwise de-escalate and resolve the situation are unsuccessful and it appears reasonably necessary to:

(a) Prevent an inmate or inmates from taking control of the health unit, or to subdue a take-over of the health unit.

(b) Prevent an inmate or inmates from taking a hostage or to help free a hostage.

(c) Prevent an inmate or inmates from escaping.

(d) Stop an assault on staff or other inmates when other means of intervention are likely to be ineffective or pose a risk of injury to the intervening staff.

(e) Disarm an inmate in possession of a weapon capable of causing injury to staff when other possible means of disarming the inmate pose a risk of injury to the staff involved.

(9) Use of Chemical Agents. All chemical agents shall be used with caution and in accordance with the manufacturers instructions.

(a) The following chemical agents are authorized for use by the Department:

1. OC - Oleoresin Capsicum (pepper spray) - An inflammatory agent that causes tearing and involuntary closing of the eyes, nasal discharge, sneezing, disorientation, and the sensation of respiratory distress. OC is the primary chemical agent to be utilized for cell extractions and other in-cell uses unless circumstances exist as outlined below, and they shall only be used in the manner prescribed herein.

2. CS - Orthochlorobenzal Malononitrile or Orthochlorobenzylidene Malononitrile - An irritant agent that causes burning sensation and tearing of the eyes, nasal discharge, and skin and upper respiratory irritation.

a. CS may be used during cell extractions and other in-cell incidents if OC applications previously administered were ineffective in obtaining compliance or ceasing disruptive actions or physically threatening behavior.



b. The warden or designee may authorize the use of CS as an initial primary chemical agent whenever past applications of OC to an inmate were documented on Form DC6-230, Report of Force Used, as having been applied and ineffective. Form DC6-230 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500, http://www.flrules.org/Gateway/reference.asp?No=Ref-01700. The effective date of the form is 12-12.

c. The warden or designee may authorize the use of CS as an initial or primary chemical agent during in-cell applications whenever an inmate attempts to deploy a shield, barrier, or obstruction in an obvious attempt to avoid contact with an application of chemical agents. Justification for the use of CS whenever an inmate barricades or presents physical obstructions to counter chemical agent applications shall be noted on Form DC6-230, Report of Force Used, by the reporting officer.

(b) Chemical agents shall be used only after other reasonable efforts to control a disorderly inmate or group of inmates have been exhausted.

(c) Chemical agents shall only be used when the use of force is authorized and the level of force is necessary to prevent injuries to staff or inmates including any self-injurious behavior exhibited by inmates.

(d) Any accidental or incidental discharge of a chemical agent by a staff member within any institution shall be reported on Form DC6-210, Incident Report.

(e) Authorization for an organized use of force application of chemical agents within an institution may only be authorized by the warden or designee.

(f) Only staff members who have received training in the use of chemical agents may discharge, carry, possess, or use chemical agents within an institution, except during emergencies such as riots or disasters or at the direction of the warden or designee.

(g) A confinement or close management lieutenant or shift supervisor shall be responsible for the issuance of a final order to an inmate ordering compliance or cessation of disruptive behavior prior to the application of chemical agents. Additionally, a confinement or close management lieutenant, shift supervisor, or staff member of greater rank shall be present and observe the application of chemical agents to inmates in such housing settings.

(h) Any application of chemical agents within an institution shall be noted on Form DC6-230, Report of Force Used. Any officer who uses chemical agents shall record the following on Form DC6-230:

1. Type of agent discharged;

2. Amount of agent discharged;

3. Method of administration;

4. Name of the person who authorized issuance or possession of the chemical agent;

5. Name of person who administered the chemical agent;

6. Amount of the chemical agent used;

7. Reason the chemical agent was used.

(i) Chemical agents shall be stored in the designated main arsenal in a secure manner. The warden shall authorize and designate secure locations where chemical agents shall be stored that are accessible only to officers.

(j) Chemical agents assigned to institutions may not be removed from the facility at any time without authorization from the warden or designee.

(k) All chemical agent dispensers shall be numbered and recorded on Form DC6-216, Chemical Agent Accountability Log. Form DC6-216 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500, http://www.flrules.org/Gateway/reference.asp?No=Ref-02950. The effective date of the form is 8-13. Form DC6-216 shall be maintained in any location where chemical agents are stored. Chemical agent dispensers shall be weighed prior to issuance and upon return to storage. The shift supervisor shall verify the weight of chemical agent dispensers upon return to storage. Additionally, the shift supervisor shall ensure all issued chemical agent dispensers are accounted for



and recorded on Form DC6-216. The chief of security shall monitor the canister weights following each use of chemical agents to ensure the contents are consistent after a reported use of force and recorded on Form DC6-216.

(l) Issuance and use of chemical agents:

1. Only correctional officers and staff trained in the use of chemical agents, in possession of a current and valid certification, and assigned to institutions and work camps shall be issued an approved OC dispenser to carry while on duty. Officers who have been issued chemical agent dispensers are authorized to administer or dispense chemical agents during the performance of their duties under reactionary circumstances (including but not limited to self-defense, the defense of others, or in opposition to force) without additional authorization for intervention for self-defense or the defense of others. The warden is authorized to exempt an officer from carrying, possessing, or using chemical agents. Officers assigned to armed perimeter posts may be exempted from the requirement to carry OC by the warden or designee.

2. An MK-9 sized canister or equivalent OC dispenser shall be issued to correctional officers who have received appropriate training, are in possession of a valid certification, and who are assigned to internal security posts, recreation fields, shift supervisor posts, or designated as special response team members within an institution, including work camps. These officers are authorized to administer chemical agents during reactionary disturbance incidents that involve multiple inmates housed in locations where multiple inmates are generally present, such as open bay dorms, dining halls, recreation fields, canteens, and meal lines. This option shall only be exercised in response to mass disturbance critical incidents and as necessary to restore control, stability, or disciplinary order and shall normally not be used indoors.

3. For those security positions assigned to housing units with a secure officers station, an MK-4 sized canister or equivalent OC dispenser will be passed on from shift to shift and accounted for on Form DC6-209, Housing Unit Log, at the beginning of each shift with an entry for each canister indicated by canister number and officer initials who is assigned that canister. Form DC6-209 is incorporated by reference in Rule 33-601.800, F.A.C. Canisters that are not being worn by staff on shifts that have fewer assigned staff will remain in the officer station, stored in a secure, locked cabinet or drawer designated for this purpose. The number of chemical agent canisters assigned to a housing unit shall not exceed the maximum number of staff (officer and sergeant) assigned for the highest staffed shift per the institutional post chart. Any evidence of tampering, broken or missing seal, or signs that the canister is not functional will be immediately reported to the shift officer in charge. Additionally, Form DC6-210, Incident Report, will be completed by the end of the officers shift and a replacement of the canister will occur. Form DC6-210 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun Street, Tallahassee, FL 32399-2500, http://www.flrules.org/Gateway/reference.asp?No=Ref-01697. The effective date of the form is 12-12. The canisters will be inventoried and inspected once per week by the arsenal sergeant with appropriate entry placed on the Housing Unit Log.

4. For those staff assigned to internal security and designated A-Team members, exchange of approved canisters shall occur on the compound, with the canister number and confirmation of seal status and condition of canister called into the control room and notation made on the DC6-281, Control Room Security Equipment/Weapons Check Out/In Log. Form DC6-281 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun Street, Tallahassee, FL 32399-2500, http://www.flrules.org/Gateway/reference.asp?No=Ref-02952. The effective date of the form is 8-13. The canisters will be inventoried and inspected once per week by the arsenal sergeant with appropriate entry placed on the Control Room Log.

5. For those staff assigned to food service, wellness, gate areas, program areas, and other compound posts that are not manned on a 24-hour basis, the staff assigned to the daylight shift shall pick up their canisters at the control room immediately prior to proceeding to their assigned post. The exchange of canisters for their reliefs shall occur on the compound, with the canister number and confirmation of seal status and condition of canister called into the Control Room and notation made on Form DC6-281 Control Room Security Equipment/Weapons Check Out/In Log. The canisters will be inventoried and inspected once per week by the arsenal sergeant with appropriate entry placed on the Control Room Log.

6. Chemical agent dispensers shall be securely encased and attached to the officers belt. Each chemical agent dispenser shall be secured within a pouch or to a holstering device by a numbered, breakable seal. Officers shall examine the condition of the canister and the safety seal at the time of receiving or being issued any chemical dispenser to ensure that the canister is not damaged and that the seal is intact and report any alteration or broken seal to the shift supervisor. Shift supervisors shall examine the seal of any chemical dispenser reported to be altered, broken, or manipulated and upon confirmation of alteration, breakage, or manipulation shall report the observation on Form DC6-210, Incident Report, prior to the end of the shift. The sergeant in charge of the arsenal shall maintain a master inventory of all individual chemical agent dispensers in storage. The master inventory shall indicate the weight of each dispenser at the time the original seal is attached and shall annotate the weight of the dispenser any time a dispenser is returned with a broken seal on Form DC6-216, Chemical Agent Accountability Log, and replace the seal or attach a new one. The arsenal sergeant shall report any discrepancies in the weight of the dispenser to the chief of security and complete Form DC6-210.

(m) Use of chemical agents on inmates outside of controlled conditions. Officers may utilize chemical agents whenever an inmate becomes disorderly or disruptive or does not comply with clear and audible orders that have been communicated to cease such

behavior. During emergency situations with multiple inmates in an outside area, chemical agents may be applied to quell the disturbance. An inmate shall at no time be removed from his or her assigned cell or placed at an alternate location, have clothing removed, or be restrained for the purpose of chemical agent application. If an officer administers chemical agents while an inmate is handcuffed or wearing restraints, and removal of such restraints was not possible prior to the application, the officer shall record an explanation of the circumstances on Form DC6-230, Report of Force Used.

(n) Use of chemical agents on inmates under controlled conditions:

1. When an inmate in a secure housing unit occupied by other inmates becomes disorderly or disruptive or the officers ability to provide unit security is adversely impacted by an inmates behavior, and the inmate refuses to comply with clear and audible orders to cease his or her behavior, the confinement or close management lieutenant, shift supervisor, or person of higher rank shall be contacted and consulted for instructions prior to any application of chemical agents.

2. Whenever the confinement, close management lieutenant, or shift supervisors efforts to control a disorderly inmate have failed, and the use of chemical agents is necessary to gain control of the inmate while minimizing the risk of injuries to others, the shift supervisor shall ensure the following:

a. Uninvolved inmates in the cell or immediate area are given the opportunity to exit or depart the potentially affected area, if such relocation does not create or cause a hazard to the safety of others.

b. The warden or designee is contacted and gives authorization to use chemical agents in the area.

c. A clear and audible order is given for the inmate to cease the disruptive or dangerous behavior.

d. If the inmate fails to comply with the order of the shift supervisor and continues to disobey lawful orders or continues disruptive behavior, the shift supervisor shall issue a clear and audible final order. During the final order, the shift supervisor shall put the inmate on notice that chemical agents are to be administered imminently if his or her disruptive behavior does not immediately cease.

e. A video recording is not required if, during the same shift, the inmate ceases the conduct creating the disturbance while the shift supervisor and camera operator are present with a camera but resumes such conduct after the shift supervisor and camera operator have departed the area prior to an application of chemical agents. The shift supervisor has the authority at anytime to recommence video tape recording of subsequent incidents, but in all cases where the administration of chemical agents is subsequently required video recording will resume following the final exposure to chemical agents, include a statement referring to the originating incident, and continue from this point until the decontaminating shower is ordered, medical examination is offered, and the inmate is returned to secure, decontaminated housing.

f. The application of chemical agents in the amount of no greater than three one-second bursts may be administered upon an inmate after at least three minutes have elapsed from the time a clear and audible final warning is communicated to the inmate to cease his or her disruptive or dangerous behavior and the inmate does not comply with the orders.

g. If the inmates disruptive behavior continues after the initial application, a subsequent application of chemical agents in the amount of no greater than three one-second bursts may be administered upon an inmate after at least five minutes have elapsed since the initial chemical agent application.

h. If the inmate does not comply with orders after a minimum of five minutes have elapsed from the conclusion of the second application of chemical agents, the warden or designee shall be consulted to evaluate what further response is necessary to regain compliance or control of the inmate.

(o) Additional applications of chemical agents and forced cell extractions:

1. The warden or designee shall be consulted to evaluate further responses after a third application of chemical agents has been administered, the inmate fails to cease his or her disruptive or dangerous behavior, and such inmate does not comply with orders. Additional copies of Form DC6-230, Report of Force Used, shall be used to document the incident. The shift supervisor shall ensure all use of force applications are properly documented on Form DC6-230.

2. The warden or designee may authorize subsequent applications of chemical agents as necessary to obtain safety or compliance; however, such applications shall not be administered or discharged upon an inmate after the initial three applications until at least 60 minutes have elapsed from the time of the last application.

(p) Medical requirements:



1. Inmates who have been administered any chemical agent shall be constantly monitored by a staff member or officer for no less than one hour after application. The affected inmate shall remain in a standing or sitting position. The monitoring staff members or officers shall immediately seek medical attention by the appropriate medical staff or competent medical authority any time signs of respiratory distress, labored breathing, excessive or persistent coughing, or chest or arm pain are evident or if unconsciousness occurs or other signs of medical distress are observed. The absence of medical staff on scene does not preclude taking action as an emergency responder.

2. All inmates exposed to chemical agents shall be ordered to shower in cool water and change inner and outer garments within 20 minutes from the last application of chemical agents, unless there is a documentable emergency resulting in an extension of this time frame or unless the inmate refuses to participate in the decontamination process. The shift supervisor or confinement lieutenant shall record the decontamination activities on the following forms:

a. Form DC6-210, Incident Report; or

b. Form DC6-229, Daily Record of Special Housing. Form DC6-229 is incorporated by reference in Rule 33-601.800, F.A.C.

3. The shift supervisor shall summon a medical staff member to the physical location of an inmate who has been exposed to a chemical application. The medical staff member shall conduct an examination of the inmate after the decontamination process is completed. The health services staff or ranking officer present shall ensure that any inmate who has a history of experiencing or who exhibits symptoms of physical distress as a result of chemical agent exposure is immediately provided all necessary medical attention. Medical staff members shall record any observations and medical actions taken on the following forms, including the presence or non-presence of injury:

a. Form DC4-701C, Emergency Room Record. Form DC4-701C is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500, http://www.flrules.org/Gateway/reference.asp?No=Ref-01695. The effective date of the form is 12-12.

b. Form DC4-708, Diagram of Injury. Form DC4-708 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500, http://www.flrules.org/Gateway/reference.asp?No=Ref-01696. The effective date of the form is 10-04-07.

4. In addition to completing a medical examination of any inmate who is exposed to chemical agents, the attending medical staff member shall make a mental health referral for any inmate classified as S-2 or S-3 on Form DC4-529, Staff Request/Referral, and forward it immediately for a mental health evaluation to be conducted on the inmate. Form DC4-529 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500, http://www.flrules.org/Gateway/reference.asp?No=Ref-01692. The effective date of the form is 12-12. Mental health staff shall evaluate the inmate no later than the next business day. The mental health staff member who conducts the evaluation shall consult with the shift supervisor and recommend appropriate measures that may be necessary for the safety of the inmate, including placement in isolation management, a transitional care unit, or crisis stabilization as those placements are defined in Rule 33-404.103, F.A.C.

5. Any time an inmate refuses to take a shower after an application of chemical agents, medical staff shall conduct a cell-front examination and explain in a clear and audible tone the purpose of decontamination and potential physical implications of not completing decontamination. Medical staff members shall record notes of any decontamination consultation on Form DC4-701C, Emergency Room Record.

6. Upon completion of the decontamination consultation with the inmate by a medical services staff member, the shift supervisor shall order the inmate to submit to a decontamination shower. If the affected inmate refuses to participate in a decontamination shower, a second order shall be given by the shift supervisor with a member of the medical services staff or a supervisor physically present when possible. The shift supervisor shall annotate on Form DC6-210, Incident Report, that a second order was administered and the inmate refused compliance.

7. The shift supervisor shall consult with the attending medical services staff member and determine if an inmate requires medical attention or treatment any time decontamination is not completed. Whenever the medical services staff member has observed the inmate who has refused decontamination post application of chemical agents and determined that reasonable medical attention is not necessary, the shift supervisor shall ensure that the affected inmate is monitored for a minimum of two hours and offered a shower at least every 30 minutes during the two hour observation period. All inmate welfare checks or required physical observations post refusal to submit to decontamination orders shall be recorded on Form DC6-229, Daily Record of Special Housing. The officer assigned to conduct welfare checks or physical observations of an inmate shall without unnecessary delay summon medical attention if he or she at any time observes or suspects that an inmate may be experiencing medical distress.



8. The shift supervisor shall comply with provisions stated in paragraph (10)(h) if, upon consultation with medical services staff, he or she is advised a decontamination shower is necessary for the safety of the inmate or the failure to complete a decontamination shower is a hazard to the inmate. The inmate shall be relocated to a decontamination cell.

a. Upon introduction into a decontamination cell, the inmate who refused or obstructed efforts to participate in a decontamination shower shall be placed in a sitting or standing position for a minimum of 45 to 60 minutes after the use of chemical agents, including any inmate who must be physically held or is incapacitated, to permit officers to place approved restraining devices on the inmate, e.g., handcuffs.

b. Officers shall use all reasonable and due care to avoid physically placing the inmate in any position that may contribute to positional asphyxia, restricted blood circulation, or interference with physical functions that permit life processes to occur or in any position that causes any physical injury. Restraints shall not be applied in any manner for the purpose of administration of punishment. The inmate shall not be directed, ordered, or required to stand or sit uninterrupted if such action is intended for reasons of punishment or likely to cause injury. Any portion of the inmates body exposed to or that came into contact with chemical agents, including the eyes, shall be flushed with water as soon as possible after application for at least approximately five to 10 minutes or until the affected inmate experiences relief. The inmate should be advised by the officer in charge to avoid rubbing any irritated area with a cloth or towel. No oils, creams, or topical medications shall be applied to the inmate without approval of a member of the medical services staff.

9. The warden or designee may authorize placing an inmate in four point or multipoint restraints after consultation with a member of health services staff. Approval from the warden or designee shall be obtained prior to any inmate being placed in four-point or multipoint restraints. Health services staff shall review the medical record of the inmate prior to advising the warden or designee of known medical conditions that would affect the health of the inmate should chemical agents be administered or the inmate be placed in four-point or multipoint restraints. A member of the health services staff shall monitor without interruption an inmate post application of chemical agents and when the inmate is subsequently placed in four or multipoint restraints. Medical attention shall be provided, upon detection of physical distress, without unnecessary delay. No inmate shall be restrained in a manner which restricts breathing.

10. Medical services staff members shall record all observations and recommendations on the following forms:

a. Form DC4-701C, Emergency Room Record.

b. Form DC4-708, Diagram of Injury.

c. Form DC4-701, Chronological Record of Health Care. Form DC4-701 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500, http://www.flrules.org/Gateway/reference.asp?No=Ref-01694. The effective date of the form is 4-8-10.

(10) Non-deadly Force. In accordance with Section 944.35, F.S., officers are authorized to apply lawful and reasonably necessary physical force to:

(a) Defend themselves or others from actions that are likely to cause injury or death;

(b) Prevent the escape of a convicted felon from the custody of a correctional institution, any facility where an inmate is not permitted to depart without authorization, or as necessary to gain custody of an escaped inmate;

(c) Prevent the escape of an inmate during transport or while outside a correctional institution or facility;

(d) Prevent damage to property;

(e) Quell a disturbance;

(f) Overcome an inmates physical resistance to a lawful command;

(g) Prevent an inmate from inflicting any self-injury or from attempts to commit suicide; or

(h) Reasonably restrain an inmate to permit the administration of necessary medical treatment.

(11) Only reasonable, lawful, and the minimal amount of force necessary shall be employed to control the situation. Force shall not be used solely as a response to verbal abuse. Utilization of the custodial touch, with the hand firmly grasped around the inmates triceps or elbow, during internal transport of restrained inmates when resistance is not encountered shall not be considered a use of force when the transport hold is for the safety of the inmate or officer. The warden or designee shall be consulted and must authorize



any organized use of force prior to application. The warden or designee shall be notified without unnecessary delay any time a reactionary use of force incident occurs and circumstances did not permit obtaining authorization prior to the use of force. The person who was responsible for requesting authorization to use force shall prepare, date, and sign Form DC6-232, Authorization for Use of Force, either prior to or immediately after the end of the shift when force was used. Form DC6-232 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500, http://www.flrules.org/Gateway/reference.asp?No=Ref-01701. The effective date of the form is 9-99. If the authorization for an organized use of force is granted after normal working hours, the authority granting the action shall complete and sign Form DC6-232 within one day following the incident, excluding weekends and holidays.

(12) Any time force is used, the officer initially using force shall complete Form DC6-230, Report of Force Used. The completed form must contain a clear and comprehensive narrative of the circumstances that led to the use of force, the specific justification and necessity for the use of force and a description of the actual events that occurred as well as the post-event actions. An incident report prepared by the author of the DC6-230, Report of Force Used, may be referenced in Section A., Narrative of Pre-event, and attached to the report to provide additional detail regarding the justification and necessity for using force. If more than one officer was involved in the use of force, the initial officer using force shall complete the report. Any participant who objects to information recorded by the reporting officer or who has additional observations to add to the narrative or description of the incident written by the reporting officer shall complete and attach Form DC6-230, Report of Force Used. No officer or employee shall receive discipline for providing updated information to a use of force report, provided the updated information is presented without unnecessary delay after discovery of the discrepancy. Updates or addendums recorded on any Form DC6-230, Report of Force Used, should be completed and forwarded to the warden not later than one business day (excluding weekends and holidays) following the date that the original Form DC6-232, Authorization for Use of Force, is signed and dated.

(a) Form DC6-230, Report of Force Used, shall be completed by those staff involved in any application of force, reactionary or organized, that occurred during their shift. Form DC6-230 shall be completed no later than the end of the shift during which the use of force occurred. The warden or designee is authorized to permit a delay of completing required use of force reports for up to 72 hours when circumstances prohibit completion of the reports by the end of the shift. All reports must be typed. No use of force report may be altered, changed, or destroyed by any employee. Officers may submit amendments to a report at any time with authorization from the warden or designee. The warden or designee shall then appoint a staff member of equal or higher rank than those involved in the use of force incident to collect all pertinent information and required documentation. This information shall include the reports of all involved staff who do not agree with the account as reported in the DC6-230 or the statements of staff witnesses, inmate witnesses, or the inmate subject. All inmate statements (subject and witnesses) shall be made in writing using Form DC6-112C, Witness Statement. Form DC6-112C is incorporated by reference in Rule 33-601.313, F.A.C. Any employee who witnesses but does not participate in a use of force and suspects inappropriate action shall complete Form DC6-210, Incident Report. The warden shall ensure that Form DC4-701C, Emergency Room Record, and Form DC4-708, Diagram of Injury, are included in the review of all uses of force and also forwarded with the rest of the required documentation to the Office of the Inspector General - Use of Force Unit. The Office of Inspector General field offices within each region shall provide the institutions, via electronic mail, with a use of force number once one is assigned and entered into the Office of Inspector General electronic logging system.

(b) The warden or designee shall conduct a preliminary review of facts recorded in reports to determine if the application or demonstration of force was lawful and a procedurally appropriate application. All use of force incidents involving physical force will be reviewed by a designee of the rank of Correctional Officer Major or above and shall include a review of all videotapes of the incident. The warden shall ensure that any designee that reviews any use of force incident conducts the review in a comprehensive manner and that, in addition to procedural concerns, the review ensure that the force used was necessary, justified, proper, and not excessive. Any time improperly applied or unlawful use of force is indicated in a report, the warden shall personally review the incident. The warden shall personally review the reports, and all videotapes of any use of force incident that results in outside medical treatment for the involved inmate; this includes transfers to another correctional facility specifically for medical treatment. The warden shall consult with the Health Service Administrator or other medical personnel as appropriate, regarding the nature of the injuries and required treatment determined to be necessary by the outside medical entity and incorporate this information into the determination if the force used was excessive, improper, or unnecessary.

(c) If during any part of the review process there is any indication of excessive, improper, or unnecessary force, the reviewer will notify the warden, who shall conduct a personal review of all pertinent information, reports, documentation, and videotapes and notify the Office of the Inspector General - Chief or Assistant Chief of Investigations in Central Office within one business day.

(d) The warden or designee shall review the information and note any inappropriate actions in memorandum and attach the information to Form DC6-230, Report of Force Used. The warden or designees signature in the Wardens Review signature block on Form DC6-230 indicates that the review of the reports, and videotapes as required, did or did not reveal, in addition to procedural concerns, any indication of excessive, improper, or unnecessary force. All videotape recordings of force applications and the original and one copy of Form DC6-230 shall be forwarded to the Office of Inspector General within 11 business days. Requests for extensions for DC6-230s to be forwarded after 11 days shall require authorization from the Assistant Secretary of Institutions and the Inspector General or designee. Requests for extensions for submission of DC6-230s beyond 11 days may be granted if required staff is unavailable for signatures due to extended leave or similar circumstances, e.g., a staff member was injured in the use of force, etc., and



major incidents occurring at the institution necessitate an extension, e.g., a riot or other major disturbance, nature disaster evacuation, etc.

(e) The warden shall keep all original completed forms and a copy of Form DC6-230, Report of Force Used, until notified that the final review by the Office of Inspector General is complete. All original reports pertaining to a use of force shall be retained by the warden or designee.

(f) The Office of Inspector General shall report a disposition to the warden of any use of force within 14 business days of receipt. The warden shall be noticed of any extension to the review granted by the Inspector General or designee prior to the expiration of the 14 business days. The Inspector General shall notify the warden that a case has been reviewed and action was appropriate or a further review has commenced.

(g) Any time a witness of a reported use of force chooses to make a written statement, or is a use of force participating staff member and chooses to provide additional information not annotated in the reporting officers initial Form DC6-230, Report of Force Used, submission, such person shall complete Form DC6-230. No employee may interfere with or obstruct such reporting or order any participant or witness involved in the use of force to alter, change, or not produce a written report of an incident in which the employee was involved or which he or she observed.

(h) Upon review of the submitted documents, the Office of Inspector General shall notify the warden in writing or by electronic mail of the findings. All video recordings submitted with use of force reports shall be retained and maintained by the Office of Inspector General in accordance with records retention statutes. The Office of Inspector General shall notify the regional director and warden any time a reasonable suspicion or probable cause is found that the force administered by a staff member was not in compliance with law, rule, or procedure. The Office of Inspector General or the warden, upon referral by the Office of Inspector General, shall conduct an investigation of the incident. Any staff member who is a subject of an investigation based on suspicion or allegation that force administered with their participation was not in compliance with this rule shall be notified by written letter when the matter is being investigated by the Office of Inspector General. Staff members shall not disclose or discuss any information concerning a use of force administrative investigation until receiving notice that a determination has been issued by the Office of Inspector General or warden. Wardens shall complete Form DC6-296, Disapproved Use of Force/Warden Disposition Report, should their review of referred cases lead to a determination that force was not appropriately used. All disciplinary actions shall be forwarded to the Human Resources Section upon completion. Form DC6-296, Disapproved Use of Force/Warden Disposition Report, is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500, http://www.flrules.org/Gateway/reference.asp?No=Ref-01703. The effective date of the form is 7-25-02.

(i) The Assistant Secretary of Institutions, regional director, or warden shall be responsible for issuing any corrective action pursuant to a finding of non-compliance with this rule. Copies of the employees report, the wardens summary, and the Office of Inspector General review and determination shall be kept in the inmates file pursuant to public records retention law. Form DC2-802, Use of Force Log, shall be placed in every employees personnel file. Form DC2-802 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500, http://www.rules.org/Gateway/reference.asp?No=Ref-01691. The effective date of the form is 2-7-00. This form shall be maintained by the servicing personnel office and shall contain a record of every use of force report completed by the employee.

(j) The warden or designee shall be responsible for submitting accurate information to the personnel office in order to maintain Form DC2-802. Any use of force reports completed prior to April 15, 1998, shall remain in the file and be retained for the applicable retention period.

(k) The Office of Inspector General shall notify the warden of any officer involved in eight or more use of force incidents in an eighteen month period.

(l) Any incident that necessitates the drafting of Form DC6-230, Report of Force Used, shall be reported to the Emergency Action Center (EAC).

(m) Any employee or officer who witnesses, has reasonable cause to suspect, or has knowledge that any inmate has been a victim or subject of an unlawful battery or has been abused in violation of law or the Departments administrative rules shall without unnecessary delay report the incident to the warden or designee and complete Form DC6-210, Incident Report, describing his or her observations, knowledge, or suspicion. No employee shall commit a battery on or engage in cruel or inhuman treatment of any inmate. The warden or designee shall forward a copy of all reports involving allegations of inmate abuse, neglect, or battery to the Office of Inspector General without unnecessary delay.

(n) Officers may use reasonable physical force to restrain an inmate, upon supervision and direction of a physician or medical practitioner, for the purpose of providing necessary treatment or for the safety of an employee. The attending Qualified Health Care Provider who directs or observes medically necessary use of force shall prepare Form DC6-232, Authorization for Use of Force.



Officers who use force pursuant to a physician or medical practitioners request shall complete Form DC6-230, Re
when actual force is used, or Form DC6-210, Incident Report, when restraints are applied with no physical resista
and the form shall be forwarded to the warden.

(o) The attending physician or medical practitioner shall complete Form DC4-701C, Emergency Room Re
708, Diagram of Injury, with applicable data or the letters N/A used to indicate inapplicability. The attending ph
practitioner shall document the presence or absence of any injury in his or her records whenever force has been
physical examination of an inmate patient who has been the subject of an application of force shall be documented w.... -,
the attending physician or medical practitioner to include extent of injury, type of injury, and a description of any injury. Any time a
physician or attending medical practitioner reports reasonable suspicion of abuse of an inmate to the warden or the Office of Inspector
General, it shall be reported on Form DC6-210, Incident Report.

(p) Any employee or officer who participates in the application of reactionary or organized use of force and receives or
experiences any injury shall report such injury to the officer in charge. Injured staff shall be offered an opportunity to receive a
medical examination. Should the employee or officer decline a post-use of force medical examination, he or she shall sign Form DC4-
711A, Refusal of Health Care Services, indicating an examination was offered but declined. In those cases where an injury is claimed
but not substantiated by medical examination, the statement by the medical provider shall indicate this, and the documentation shall be
sufficient to support that no injury was found upon examination. Form DC4-711A is incorporated by reference in Rule 33-401.105,
F.A.C.

(q) When the use of four-point or five-point psychiatric restraints is authorized, and the inmate does not offer resistance to the
application of the restraints, the completion of Form DC6-210, Incident Report, shall be required. The application of the restraints will
be videotaped. The videotape, Form DC6-210, Incident Report, Form DC6-232, Authorization for Use of Force Report, Form DC4-
701C, Emergency Room Record, and Form DC4-708, Diagram of Injury, shall also be completed in their entirety with applicable data
or the letters N/A used to indicate inapplicability and shall be forwarded to the warden or acting warden for review within one
working day. Each institution shall retain the reports for the applicable retention period. If at any time prior to or during the
application of the psychiatric restraints, the inmate offers resistance to the application, the steps outlined in subsection (4) shall be
followed.

(13) Use of Deadly Force. For the purposes of this rule, deadly force refers to force that is likely to cause death or great bodily
harm. An officer is authorized to use deadly force only when the officer believes that such force is necessary to prevent imminent
death or great bodily harm to him or herself or another.

(a) Use of Firearms. In order for all concerned to be aware of their responsibilities, the procedures set forth in this rule shall be
readily available at all institutions and facilities for staff review.

(b) Firearms or weapons shall be issued to an officer only upon instructions of the warden, duty warden, chief of security, or
shift supervisor by the arsenal officer or the officer designated to issue weapons. Officers shall not intentionally discharge a firearm at
or in the direction of another person except under the following circumstances and after all reasonable non-lethal alternatives have
been exhausted, and there is no reasonable danger to innocent bystanders:

1. To prevent an escape of an inmate who is actively attempting to flee custody;

2. To prevent any conveyance to gain unauthorized entry into or exit from a correctional institution;

3. To prevent serious or life threatening injury to themselves or another person; or

4. To quell a riot.

(c) Shot guns are approved for use by the Departments designated armed response team, Rapid Response Teams, Correctional
Emergency Response Teams and/or other trained staff as authorized by the Assistant Secretary of Institutions for use during riots and
mass disturbances. The type of authorized lethal or non-lethal ammunition used will be at the discretion of the Incident Commander.

(d) Weapons to be used shall be designated by the person in charge.

(e) Firearms shall not be discharged:

1. In any case where there is a reasonable belief that the life of a bystander may be endangered by discharge of the firearm;

2. From any moving vehicle unless such action is reasonably believed necessary to protect oneself or another from imminent
death or great bodily harm;



3. As a warning, except during escapes;

4. Until the employee is sure that an escape is occurring or has occurred and he or she reasonably believes that the person to be fired upon is an escapee that is serving a sentence for a violation of a felony;

5. Unless the officer has positively identified an escape is occurring and the target is a Department inmate;

6. Except after all reasonable non-lethal alternatives have been exhausted; or

7. On the mere suspicion that a crime, no matter how serious, has been committed.

(f) No officer shall discharge any firearm except as authorized by Florida law.

(g) Because helicopters or other aircraft may be used during an escape or assault, the following policy shall apply:

1. When it can be done safely, actions other than firing weapons, such as waving arms in a manner to indicate disapproval to enter an area, shall be made in an attempt to cause the aircraft to leave.

2. If these attempts fail, the aircraft shall be allowed to land.

3. All inmates shall be kept away from the aircraft.

4. The aircraft shall be secured using armed security staff and shall be prevented from being flown away by securing the flight equipment with locks and chains without causing damage to the aircraft.

5. If the landing occurs due to an in-flight emergency, e.g., engine failure, staff shall maintain security of the aircraft and all occupants until their removal from the site.

6. Once the aircraft lands, efforts shall be directed to stop any inmate from boarding the aircraft. Staff are authorized to shoot any inmate attempting to escape in accordance with this rule. When circumstances permit, a verbal warning to halt and a warning shot shall be fired prior to the inmate reaching the aircraft to board.

7. If weapons are fired from an aircraft, Department personnel are authorized to return fire and use deadly force to protect the themselves and others upon property of the institution.

8. Firearms shall not be used on departing aircraft after leaving contact with the ground. Immediate notification, without delay, shall be made to the law enforcement agency of local jurisdiction and the Office of Inspector General upon an aircraft landing on Department property. The Office of Inspector General shall notify the Florida Department of Law Enforcement, Federal Bureau of Investigation, and the Federal Aviation Administration.

9. All inmates shall receive orientation in regard to this subsection of the rule. This orientation shall contain instructions indicating that should any aircraft attempt to land on or near the property of any Department facility, inmates are required to move away from the aircraft. Movement toward the aircraft by an inmate shall be viewed as an escape attempt and shall subject the inmate to the use of deadly force to prevent him or her from escaping.

10. This subsection of the rule shall be made a part of the Departments orientation program at all reception centers.

(h) Use of a conveyance to gain unauthorized entry into or exit from a correctional institution or facility. The institution or facility shall take the following steps to prevent any conveyance or vehicle from being used to gain unauthorized forced entry into or forced exit from its perimeter area:

1. Time permitting, a verbal order to halt shall be issued followed by a warning shot if the vehicle fails to stop.

2. If the vehicle does not stop and continues to be driven or operated in a manner that indicates the driver intends to or is in the process of forcibly entering or exiting the perimeter, officers may use deadly force to prevent serious injury or death to any person or to prevent the escape of an inmate.

(i) Any officer who discharges a firearm shall report the incident on Form DC6-210, Incident Report. Any officer who has fired a weapon during the performance of his or her duty, time permitting, shall secure the scene and immediately notify his or her supervisor and the Office of Inspector General. The senior officer in charge at the scene of the incident shall ensure all evidence is undisturbed, including locations of empty cartridges, until processed by a law enforcement agency or the Office of Inspector General.



(j) Any officer who accidently or negligently discharges a Department firearm or any firearm upon institutional property shall report the incident to the warden or designee without unnecessary delay and shall complete Form DC6-210, Incident Report.

(14) Use of Deadly Force to Prevent Escape or to Recapture Escapee. Officers are authorized to use force, including deadly force, as necessary to prevent the escape of an inmate from a correctional institution.

(a) Escape attempts from inside an institutional perimeter where armed perimeter staff are assigned:

1. A loud verbal warning shall be made, if possible, instructing the inmate to stop or halt prior to the inmates contact with any inner fence in institutions that have a double fence. A warning shot may be safely fired prior to any inmates attempt to cross or pass over, through, or under the inner fence. The firearm shall not be fired at the inmate until he or she has begun to cross or pass over, through, or under the inner fence.

2. A loud verbal warning shall be reasonably made where possible instructing the inmate to stop or halt and a warning shot safely fired prior to the inmates contact with the fence. A firearm shall not be fired at the inmate until he or she has begun to cross, or to pass over, through, or under the fence in institutions that have a single fence.

3. Warning shots are authorized only as provided herein. In all other instances where deadly force is authorized during inmate escape attempts, a loud verbal warning shall be issued if time and circumstances permit.

(b) Apprehension of escaped inmates once they are outside an institutional perimeter.

1. Officers are considered to be in active pursuit of an escaped inmate who has fled from an institution or supervised work detail so long as the escape commander determines that the escape recovery efforts are active. An officer is authorized to use deadly force, after giving a loud verbal warning for the inmate to stop or halt the escape attempt, when the inmate is demonstrating a refusal to cease active flight or escape from an institution or supervised work detail. A firearm shall not be fired if it creates a hazard to persons other than the inmate.

2. The officer in charge of the incident shall be the Incident Commander until relieved by a higher authority or the incident is turned over to a law enforcement agency or the Office of Inspector General. The Incident Commander of the escape attempt shall determine when active recapture efforts are terminated. Upon order of incident termination, the Incident Commander of the escape attempt may provide assistance to any law enforcement agency that is conducting an investigation of the incident. Officers who are utilized to assist outside law enforcement agencies are authorized to use deadly force pursuant to Florida law.

3. Officers may provide assistance to any law enforcement agency that is seeking to capture or take into custody any inmate who has failed to return from a furlough or non-supervised outside assignment or who has escaped from any work release center. Correctional officers who are utilized to assist outside law enforcement agencies are authorized to use deadly force pursuant to Florida law.

(c) Escape attempts by inmates who are being transported or escorted outside institutional perimeters, e.g., court appearances, hearings, and medical visits, or while being supervised while in a hospital for treatment, are included within the purview of this subsection.

(15) Other authorized uses of force. The use of electronic immobilization devices (EIDs), batons, chemical agents, specialty impact munitions, or other less lethal weapons within institutions shall be authorized only by the warden or designee. Such weapons shall be utilized by officers who have completed training on their use and shall be used in accordance with manufacturer specifications.

(a) Use of EIDs and less lethal weapons. EIDs shall not be used on anyone other than an inmate during an authorized use of force or upon any person to prevent serious injury or death. EIDs authorized by the Department include:

1. Handheld EIDs, which shall be the intermediate level of force alternative, issued primarily for the purpose of transportation and supervision of inmates outside the institution;

2. Electronic shields, which may be used by force cell extraction teams; and

3. Electronic restraint belts, which are authorized to be placed on an inmate for appearance in court, during transportation, or when the inmate is determined to be high risk or to have a history of violent behavior.

4. If possible, the shift supervisor shall counsel with the inmate, issue the final order, and be present prior to the use of an EID at an institution or during work detail or transport.



5. Handheld EIDs shall be issued to unarmed officers on any inmate transport or any outside hospital visit where firearms are issued. The chief of security or, in his or her absence, the shift supervisor shall determine the number of officers who will be issued firearms and EIDs during the transportation or movement of inmates.

6. An inmate shall be provided a medical examination and treatment as necessary any time he or she has been subject to an application of an EID or less lethal weapon. Medical staff shall, upon completing the medical examination, make a mental health referral for each inmate who is classified with a mental health grade of S-2 or S-3. A referral shall be made upon Form DC4-529, Staff Request/Referral, and forwarded to mental health staff as soon as possible. Mental health staff shall evaluate an inmate no later than the next working day to determine whether a higher level of mental health care (for example, isolation management, transitional care, or crisis stabilization) is indicated.

7. The application of force by an EID or less lethal weapon shall be reported by completion of Form DC6-230, Report of Force Used, by the officer who deployed the device.

8. EIDs and other less lethal weapons shall be stored and maintained in either the main arsenal or the control room mini-arsenal. The warden may authorize, in writing, the storage of one handheld unit and one shield in the confinement unit or close management unit. All EIDs or less lethal weapons shall be secured in a locked cabinet when not in use. The arsenal sergeant shall be responsible for the proper documentation of the maintenance, storage, and issue of EIDs and less lethal weapons.

9. All EIDs and other less lethal weapons shall be accounted for in the same manner as firearms.

10. There shall be no attempt to alter, tamper with, or repair any EID or less lethal weapon. Devices shall be sent to an authorized repair station if a malfunction occurs or repair is necessary. Any EID or less lethal weapon that is dropped or is subject to possible damage shall be immediately tested to determine if it is safe and properly functioning. EIDs shall not be used after the application of any chemical agents.

(b) Specialty impact munitions. Specialty impact munitions shall be used primarily by the Departments designated armed response teams, Rapid Response Teams, Correctional Emergency Response Teams and/or trained staff as authorized by the Assistant Secretary of Institutions for use during riots and disturbances and to respond to staff assaults. They are intended as a less lethal alternative to the use of deadly force. Specialty impact munitions shall not be used on anyone other than an inmate during an authorized use of force.

1. The following specialty impact munitions have been approved for use by the Department:

a. 37/40-mm rubber ball pellet rounds;

b. 12 gauge rubber ball pellet rounds - high velocity;

c. 12 gauge rubber ball pellet rounds - low velocity;

d. 12 gauge drag stabilized (bean bag) rounds;

e. 37/40-mm wooden baton rounds (skip fired 6 feet in front of target, no direct fire);

f. Stinger rubber ball grenades (stun grenade);

g. 40-mm impact munitions (OC, marking and inert foam) long range; and

h. 40-mm impact munitions (OC, marking and inert foam) short range.

2. Specialty impact munitions engagement distance will be in accordance with training and dependent on the situation and the level of force required to resolve the situation.

3. Selection and deployment of specialty impact munitions during a riot or disturbance or other instance where less lethal force options are needed shall be authorized by the Secretary, regional director, or warden or designee.

4. Specialty impact munitions shall only be used after all other reasonable alternatives to regain control have been exhausted and their use is necessary. They are intended to be used as an interim force response between the use of chemical agents and lethal force.

5. Specialty impact munitions shall not be deployed in the direction of any individual in a manner contrary to the manufacturers directions or at a distance of less than that recommended by the manufacturer, unless the threat of bodily harm or death justifies the escalation to deadly force.

6. Storage of Specialty Impact Munitions.

a. Specialty impact munitions shall be stored and maintained in the main arsenal.

b. Specialty impact munitions shall not be mixed with lethal munitions. Weapons designated to deploy specialty impact munitions shall be marked in a manner to alert staff of their intended use.

c. All specialty impact munitions shall be accounted for in the same manner as firearms and ammunition.

7. After each use of specialty impact munitions, exposed inmates shall be examined by medical personnel.

8. In any case where specialty impact munitions are deployed, the incident shall be recorded on Form DC6-230, Report of Force Used.

(c) Pepperball Launching System (PLS). The PLS shall be used primarily by restricted labor squad supervisors and exercise officers for confinement, close management, maximum management, and death row populations. The PLS is intended for the dispersal of chemical agents in situations where the use of aerosol-type agents would not be effective due to weather conditions or when their use could subject the officer or uninvolved inmates to injury. The PLS shall only be employed by officers trained in their use and effects.

1. The Secretary shall designate those institutions authorized to use the PLS.

2. In controlled situations when time constraints are not an issue, the PLS can only be used if authorized by the warden or designee. The warden or designee shall only authorize trained and certified officers to use the PLS.

3. The PLS is authorized for use to quell mass disturbances, violent events, assaults, and fights among inmates assigned to restricted labor squads. Authorized activation of the PLS by staff assigned to restricted labor squads does not constitute deadly force.

4. PLS is authorized for use in confinement, close management, maximum management, and death row recreation areas to quell mass disturbances, violent events, assaults, and fights among inmates.

5. PLS is classified as less-than-lethal at all distances, but, unless the incident necessitates otherwise, it should be primarily utilized at a distance of five feet or greater to prevent the inmate from attempting to take control of the launcher.

6. Written authorization from the warden or designee shall be received prior to utilization of the PLS for situations other than those described in subparagraphs 3. and 4. above. This written authorization shall detail the reasons it was necessary to utilize the PLS in addition to or in place of aerosol-type chemical agents.

7. All subsequent reports, medical requirements, and reviews required for the use of chemical agents as outlined in this rule shall be completed after the use of the PLS.

8. Each assigned PLS system shall be numbered, maintained, and inventoried by the shift supervisor or designee on Form DC6-216, Chemical Agent Accountability Log.

9. Noise flash distraction devices. Noise flash distraction devices shall be used primarily by the Departments Rapid Response Teams, Correctional Emergency Response Teams and/or other trained staff as authorized by the Assistant Secretary of Institutions for the purpose of creating a momentary diversion to assist correctional staff in restoring order in hostile situations. These situations include hostage rescue, crowd control and certain escape and recapture efforts.

a. The following noise flash distraction devices have been approved for use by the Department:

(I) Hand-launched, reloaded noise flash distraction devices;

(II) Hand-launched, single use noise flash distraction devices;

(III) Shotgun-launched (aerial distraction) noise flash distraction devices.

(16) Medical Attention Following Use of Force. Appropriate medical treatment shall be provided immediately or, in the case of a riot or other man-made or natural disaster, as soon as possible following resolution of the riot or disaster. Any treatment or follow-up action shall be documented on Form DC6-230, Report of Force Used. A Qualified Health Care Provider shall examine any person physically involved in a use of force to determine the extent of injury, if any, and shall prepare a report that shall include a statement



of whether further examination by a physician is necessary. Any noticeable physical injury shall be examined by a physician, and the physician shall prepare a report documenting the extent of the injury and the treatment prescribed. Such report shall be completed within one business day of the incident and shall be submitted to the warden for initial review. The qualified health provider and physician shall use Form DC4-701C, Emergency Room Record, to document an examination following use of force. Form DC4-708, Diagram of Injury, shall be used along with Form DC4-701C to document observed or known physical injuries. A copy of the report, including referenced forms, shall be attached to Form DC6-230. The original reports shall be filed in the inmates medical record.

(17) No weapon shall be issued for any purpose other than the authorized use of force or to a certified training officer for the purpose of approved training without prior written authorization from the warden or designee.

**AUTHORITY**

Rulemaking Authority 944.09 FS.

Law Implemented 776.07, 944.09, 944.35 FS.

**HISTORY**

HISTORY

New 4-8-81, Amended 10-10-83, 9-28-85, Formerly 33-3.066, Amended 3-26-86, 11-21-86, 4-21-93, 7-26-93, 11-2-94, 2-12-97, 11-8-98, Formerly 33-3.0066, Amended 10-6-99, 2-7-00, 7-25-02, 8-25-03, 2-25-04, 11-7-04, 4-17-05, 8-1-05, 3-2-06, 9-18-06, 10-4-07, 3-3-08, 8-4-08, 1-6-09, 5-26-09, 4-8-10, 9-13-10, 3-22-11, 12-16-12, 8-11-13, 11-5-13.

EXHIBIT
"D"
27 PAGES

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

GERRARD D'ANDRE JONES,

    Plaintiff,

v.                                                   Case No. 4:18-cv-76-MW-GRJ

TORREY M. JOHNSON, et al.,

    Defendants.

_____/

## REPORT AND RECOMMENDATION

Pending before the Court is Defendants' Motion for Summary

Judgment.  ECF No. 89.  Plaintiff, an inmate in the custody of the Florida

Department of Corrections ("DOC") proceeding *pro se* and *in forma*

*pauperis*, initiated this civil rights action under 42 U.S.C. § 1983 on

February 2, 2018,[1] for conduct that allegedly occurred when he was

incarcerated at Jefferson Correctional Institution ("Jefferson CI") in

Monticello, Fla.  ECF No. 1.  Thereafter he filed the Second Amended

Complaint, which is the operative pleading in this case.  ECF No. 15.

---

[1] The "mailbox rule" applies to Plaintiff's filings because he is incarcerated and proceeding *pro se*. *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009); *Garvey v. Vaughn*, 993 F.2d 776, 783 (11th Cir. 1993).

The parties have since engaged in discovery regarding Plaintiff's constitutional claims, *see* ECF No. 102, and on July 18, 2019, Defendants filed the instant dispositive motion, ECF No. 89.[2]  Plaintiff has filed a response in opposition.  ECF No. 104.  The motion is therefore ripe for the Court's consideration.  For the reasons discussed below, it is respectfully **RECOMMENDED** that Defendants' motion for summary judgment should be **DENIED**.

## I. BACKGROUND

### A.   Evidence

On October 4, 2014, Plaintiff submitted a formal grievance concerning "personal threats" Defendant Torrey Johnson (referred to in the grievance as Colonel Johnson) made against Plaintiff.  ECF No. 89-3.  In his grievance, Plaintiff made disparaging remarks about Defendant

---

[2] Defendants filed as exhibits to their motion for summary judgment: Plaintiff's "Inmate Population Information Detail" from the DOC website (ECF No. 89-2); Plaintiff's grievance dated October 4, 2014 (ECF No. 89-3); DOC disciplinary report #103-141396 (ECF No. 89-4); a DOC disciplinary worksheet, pertaining to disciplinary report #103-141396 (ECF No. 89-5); a declaration from Defendant Johnson, dated June 14, 2019 (ECF No. 89-6); a declaration from Defendant Butler, dated June 13, 2019 (ECF No. 89-7); DOC Inspector General Master Report #14-13324 (ECF No. 89-8); DOC Inspector General Master Report #14-13752 (ECF No. 89-9); DOC disciplinary report #103-141395 (ECF No. 89-10); a DOC disciplinary worksheet, pertaining to disciplinary report #103-141395 (ECF No. 89-11); audio of DOC Senior Inspector John Ulm's interview of Plaintiff on October 21, 2014 (ECF No. 89-12); audio of Senior Inspector Ulm's interview of Defendant Johnson on December 17, 2015 (ECF No. 89-13); audio of Senior Inspector Ulm's interview of Assistant Warden Antonio Hudson on December 21, 2015 (ECF No. 89-14); Plaintiff's deposition on January 25, 2019 (ECF No. 89-15); and Plaintiff's DOC medical records (ECF Nos. 89-16, 89-17, 89-18, 89-19, 89-20, 89-21, 89-22, 89-23, 89-24).

Johnson, including calling him "a Black Hitler." *Id.* Although the grievance was referred to the DOC Inspector General, *id.* at 3, Plaintiff was issued a disciplinary report (#103-141396) on October 6, 2014, for his comments about Defendant Johnson, citing the Florida Administrative Code's prohibition on disrespecting "officials, employees, or other person of constituted authority ... by means of words, gestures, and the like," ECF No. 89-4 at 1. The disciplinary report appears to have been written by Defendant Johnson. *Id.*

On October 7, 2014, Plaintiff was called into a meeting at which Assistant Wardens Antonio Hudson and J. Speights (both now deceased) were present, as well as Defendant Johnson and Defendant Patricia Butler. ECF Nos. 15, 89-6, 89-7. This is where the parties' stories diverge.

According to Defendants,[3] they served on an Institution Classification Team ("ICT") with Hudson and Speights that conducted several meetings on October 7, 2014, to address classification decisions for inmates at

---

[3] Defendants offer sworn declarations from Defendants Johnson and Butler in support of the instant motion, as well as other DOC records. "A non-conclusory affidavit which complies with [Federal Rule of Civil Procedure 56] can create a genuine dispute concerning an issue of material fact, even if it is self-serving and/or uncorroborated." *United States v. Stein*, 881 F.3d 853, 858–59 (11th Cir. 2018) (en banc). "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Jefferson CI.  ECF No. 89-6 at 1; ECF No. 89-7 at 1.  Defendant Johnson

recalls that the ICT attempted to meet with Plaintiff regarding concerns for

his safety, specifically those raised in his October 4, 2014, grievance.  ECF

No. 89-6 at 1.  During the meeting, Plaintiff was loud and argumentative.

ECF No. 89-6 at 2; ECF No. 89-7 at 1.  Plaintiff was ordered on "several

occasions" to "cease his behavior," but refused to comply.  ECF No. 89-6 at

2; ECF No. 89-7 at 1.  Consequently, Plaintiff was escorted out of the ICT

meeting room.  ECF No. 89-6 at 2; ECF No. 89-7 at 1.  Defendants state

that they did not witness Hudson abuse Plaintiff in the meeting room or

when he was escorted outside, and that had they witnessed any abuse

they would have intervened on Plaintiff's behalf.  ECF No. 89-6 at 2; ECF

No. 89-7 at 2.[4]

    According to Plaintiff,[5] on October 7, 2014, after he was handcuffed

---

[4] When Defendant Johnson was interviewed by Senior Inspector Ulm on December 17, 2015, he stated under oath that he "did not hear Mr. Hudson cursing or yelling at [Plaintiff] and did not see him use any physical force on Inmate Jones, he said [Plaintiff] did become belligerent and was escorted out of the room."  ECF No. 89-9 at 22.

[5] Plaintiff signed under penalty of perjury the Second Amended Complaint and his response in opposition to Defendants' motion for summary judgment.  ECF No. 15 at 12; ECF No. 104 at 9.  These filings, therefore, are treated by the Court like sworn affidavits.  *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019) (treating a plaintiff's "statements in his verified complaint" and "sworn response to the officers' motion for summary judgment]" as testimony); *Sammons v. Taylor*, 967 F.2d 1533, 1545 n.5 (11th Cir. 1992) ("[T]his Court has recognized that facts alleged in an inmate's sworn pleading are sufficient [to defeat a properly supported motion for summary judgment] and that a separate affidavit is not necessary.").  Plaintiff also testified under oath in a discovery deposition on January 25, 2019, ECF No. 89-15, and in an interview with Senior Inspector

and escorted to the meeting room where Defendants, Hudson, and Speights were present, Hudson and Defendant Johnson approached Plaintiff ("getting physically in [his] face"), screamed at him, and pointed their fingers in his face. ECF No. 15 at 8. Hudson then told Plaintiff not to "write Johnson up no more." *Id.* When Hudson called Plaintiff "old school," Plaintiff asked Hudson whether he was going to harm him. *Id.* at 8–9. Hudson then grabbed Plaintiff (while Plaintiff was still handcuffed) and twisted Plaintiff's left arm and shoulder "into a painfully unnatural series of directions, resulting in the dislocation of [his] arm/shoulder, completely out of the socket." *Id.* at 9; *see also* ECF No. 89-9 at 16; ECF No. 104 at 2. Hudson continued to manhandle Plaintiff for two minutes while Defendant Johnson cursed at Plaintiff. ECF No. 15 at 9.[6] Speights and Defendant Butler did not physically or verbally intervene. *Id.*

Hudson then "jacked [Plaintiff] up by [his] left arm/shoulder and collared [him] with his other hand" before dragging Plaintiff into the hallway. ECF No. 15 at 9. Plaintiff "scream[ed] in extreme pain," and Hudson ordered two officers to return Plaintiff to his cell. *Id.* at 9–10.

---

Ulm on October 21, 2014. ECF No. 89-9 at 16.

[6] Plaintiff testified in his deposition that Defendant Johnson encouraged Hudson's use of force while Plaintiff was screaming. *See* ECF No. 89-15 at 41. Plaintiff testified further that Hudson slammed him into a wall (hitting Plaintiff's head) and grabbed him around his neck to drag him into the hallway. *Id.* at 42–43.

Plaintiff asked the officers to take him to "medical" (the infirmary) to treat his injuries, but the officers said Hudson ordered them to take Plaintiff to his cell and forbid him from going to the infirmary. ECF No. 15 at 10; ECF No. 104 at 3. Plaintiff submitted a "sick-call slip" with the "confinement nurse" and was taken to the infirmary on October 8, 2014. ECF No. 104 at 3. Plaintiff claims that he was examined by "Dr. Pliskin" on October 8, 2014, who ordered that he receive pain-relief medications and an arm sling and have an x-ray of his left shoulder. *Id.* at 3. When Pliskin told Plaintiff that his shoulder "slipped back in place," Plaintiff responded that he laid on his back all night pressing it "back into place" but the muscle felt "torn loose." ECF No. 89-15 at 44–45.

Plaintiff states that following the October 7, 2014, incident and his October 8, 2014, medical visit, Defendant Johnson, along with Hudson, "intercepted/stole" his grievances and interfered with medical treatment by canceling his surgery, ordering that he not be permitted to leave his cell, and prohibiting his access to his medical files. ECF No. 15 at 10–11; *see also* ECF No. 89-15 at 45 ("So Hudson and Johnson got wind of it and they got my medical records. And near the end of November—you've got my medical records. End of November, they went into my medical records, they went to medical, and they wrote in their own handwriting do not let this

6

inmate go to Lake Butler for his surgery. He is not to go anywhere. He is a security threat. And they signed they [sic] names to it.").

Defendants submitted Plaintiff's DOC medical records as exhibits to their motion for summary judgment, ECF Nos. 89-16, 89-17, 89-18, 89-19, 89-20, 89-21, 89-22, 89-23, 89-24, and they reflect the following. On October 8, 2014, at about 9:20 a.m., Plaintiff was examined by Nurse Martinez. ECF No. 89-20 at 22. Nurse Martinez notated that an injury was not noticed, *id.*, but completed the Department's "Fracture/Dislocation/Sprain Protocol" form, *id.* at 21. Martinez directed Plaintiff to report to an advanced practice nurse prescriber ("APNP") for evaluation and ordered an x-ray of Plaintiff's shoulder. *Id.* at 20–21.

On October 14, 2014, Plaintiff underwent an x-ray of his left shoulder. ECF No. 89-20 at 20, 40. The radiologist, Dr. Dineen, determined that the image did not demonstrate a "fracture, dislocation, or subluxation," the "cortical margins [were] intact," and the "soft tissue planes [were] normal." *Id.* at 40. However, Dr. Dineen notated findings of "mild osteoarthritis of the glenohumeral joint and the acromioclavicular joint," "lateral downsloping of the acromion," and "an anatomic variant which can predispose to rotator cuff pathology." *Id.* Dr. Dineen recommended "[f]ollow up as clinically indicated." *Id.*

7

On October 17, 2014, APNP Pliskin reviewed Dr. Dineen's radiology report from Plaintiff's October 14, 2014, x-ray and completed a Department "Consultation Request" for Plaintiff to receive a "routine" orthopedic consult that would allow the infirmary to "[e]vauate and recommend [a] diagnostic plan." ECF No. 89-18 at 5. Pliskin noted a "provisional diagnosis" of a "left shoulder injury." *Id.*

On November 6, 2014, Plaintiff submitted an "Inmate Request" complaining that his left "shoulder/arm" was "popping out of place" and that the shoulder muscle felt "torn." ECF No. 89-19 at 32. On November 7, 2014, the infirmary was advised that Plaintiff was unable to leave his cell "per orders of the warden." ECF No. 89-20 at 9. Pliskin directed that Plaintiff be advised "Dr. Cherry" recommended "rotator cuff exercise in lieu of [orthopedic] referral." *Id.* The infirmary was also informed on November 19, 2014, and November 26, 2014, that Plaintiff was being held in his cell. *Id.* at 8. The November 19, 2014, entry in his medical record explains the hold was "per [Defendant] Johnson." *Id.*

Plaintiff continued to complain about the pain in his left shoulder until (at least) December 2014. ECF No. 89-19 at 16, 34, 35, 38; ECF No. 89-20 at 3–4, 15. Plaintiff was transferred to Santa Rosa Correctional Institution in December, at which point he was (again) referred to an

8

orthopedic specialist for treatment.  ECF No. 89-18 at 6.

**B.    Plaintiff's Constitutional Claims and Defendants' Motion for Summary Judgment**

In the Second Amended Complaint, Plaintiff asserts Defendants violated his First, Eighth, and Fourteenth Amendment rights.  ECF No. 15 at 12.  Specifically—construing Plaintiff's pleadings liberally—Plaintiff complains that: (1) Defendants failed to intervene when Hudson used excessive force against him in violation of the Eighth Amendment on October 7, 2014, *id.* at 12; (2) Defendant Johnson was deliberately indifferent to his serious medical need in violation of the Eighth Amendment when Johnson canceled Plaintiff's "medical surgery/treatment" and denied him "needed care," *id.* at 11;[7] and (3) Defendants retaliated against Plaintiff in violation of the First Amendment by intercepting his grievances, interfering with his medical treatment, prohibiting him from accessing his medical files, and writing disciplinary reports against him, *id.* at 11–12.  As to relief, Plaintiff seeks nominal damages, a declaratory judgment that

---

[7] Plaintiff states in the Second Amended Complaint that these "actions or inactions" denied him "due process/equal protection of the law" in contravention of the Fourteenth Amendment, but the Court construes these allegations as a claim for deliberate indifference under the Eighth Amendment (made applicable to the states through the Fourteenth Amendment).  *Gary v. Modena*, 244 F. App'x 997 1000 (11th Cir. 2007). Plaintiff does not otherwise state a cause of action under the Fourteenth Amendment's Due Process or Equal Protection Clauses for the reasons explained by Defendants. ECF No. 89 at 17–21.  As evidenced by the arguments in the instant motion, Defendants were on notice that Plaintiff raised a deliberate indifference claim.  *Id.* at 12–16.

Defendants violated his rights, compensatory damages, attorney's fees, and all other relief deemed just and proper. *Id.* at 12.

Defendants argue they are entitled to summary judgment on Plaintiff's Eighth Amendment claims because "all objective evidence points towards nothing happening consistent with the allegations alleged by Plaintiff." ECF No. 89 at 14; *see also id.* at 15–16 ("The incident alleged by Plaintiff did not happen, and there simply is no supporting information, other than Plaintiff's own allegations. All evidence, including the medical records which Plaintiff attempts to rely upon indicate that Plaintiff was no [sic] injured."). Defendants say further that Plaintiff's First Amendment retaliation claim fails because he has not alleged an adverse action by Defendants to deter constitutionally protected speech and that any claim based on the October 6, 2014, disciplinary report, No. 89-4, is barred under *O'Bryant v. Finch*, 637 F.3d 1207 (11th Cir. 2011), because Plaintiff was found guilty of the conduct giving rise to the report. ECF No. 89 at 8–12. Finally, Defendants allege that the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e), precludes an award of compensatory damages in this case because Plaintiff was not injured. *Id.* at 21–25.

## II. SUMMARY JUDGMENT STANDARD

The entry of summary judgment is appropriate only when the Court is satisfied "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." *Samples on Behalf of Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988).

But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986) (to defeat summary judgment "there must be evidence on which the jury could reasonably find for the plaintiff"). "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999); *see also Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n.12 (11th Cir. 1988) ("The summary judgment standard requires that we resolve all

11

reasonable doubts in favor of the non-moving party, but it does not require us to resolve all doubts in such a manner.").

As the Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. *See Anderson,* 477 U.S. at 250; *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 785–86 (11th Cir. 2005). In civil actions filed by inmates, federal courts,

> must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgement stage.

*Beard v. Banks,* 548 U.S. 521, 530 (2006) (internal citations omitted).

Conclusory allegations based on subjective beliefs are insufficient to create

a genuine issue of material fact. *Leigh v. Warner Bros., Inc.*, 212 F.3d

1210, 1217 (11th Cir. 2000).

## III. DISCUSSION

### A.    Eighth Amendment Failure to Intervene Claims

Disputed issues of material fact preclude summary judgment on

Plaintiff's Eighth Amendment failure to intervene claims against

Defendants.  The Eighth Amendment provides the right to be free from

cruel and unusual punishment.  U.S. Const. amend. VIII.  The use of

excessive physical force against a prisoner may constitute cruel and

unusual punishment in violation of the Eighth Amendment. *Hudson v.*

*McMillian*, 503 U.S. 1, 4 (1992).  "In Eighth Amendment excessive force

cases, the 'core judicial inquiry' is 'not whether a certain quantum of injury

was sustained, but rather whether force was applied in a good-faith effort to

maintain or restore discipline, or maliciously and sadistically to cause

harm.'" *Bowden v. Stokely*, 576 F. App'x 951, 953 (11th Cir. 2014) (quoting

*Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)); *see also Sears v. Roberts*, 922

F.3d 1199, 1205 (11th Cir. 2019) ("*Sears v. Roberts*").

Five factors should be considered in determining whether force was

used sadistically and maliciously: (1) the extent of injury; (2) the need for

application of force; (3) the relationship between that need and the amount

of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them. *Campbell v. Sikes*, 169 F.3d 1353, 1375 (11th Cir. 1999); *see also Jacoby v. Mack*, 755 F. App'x 888, 898 (11th Cir. 2018).

When the Court considers whether a corrections officer's use of force was excessive, it affords the officer a wide range of deference. *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 1990). "Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990). That is, "Eighth Amendment claims based on *de minimis* uses of physical force by prison guards are not cognizable unless they involve 'force that is repugnant to the conscience of mankind.'" *Johnson v. Moody*, 206 F. App'x 880, 884–85 (11th Cir. 2006) (quoting *Hudson*, 503 U.S. at 9–10).

Lastly, "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002). This duty to intervene arises from the requirement embedded in the Eighth Amendment that

14

prison officials "'take reasonable measures to guarantee the safety of the inmates.'" *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).

Although the facts underlying any two constitutional claims are seldom identical, Plaintiff's Eighth Amendment claims are typical in that the parties present two different versions of events. Plaintiff says under penalty of perjury—on multiple occasions prior to and during this litigation— that he was brutally attacked by Hudson at the encouragement of Defendant Johnson and without intervention by Defendant Butler. On the other hand, Defendants swear that the assault did not occur. This is a genuine issue of material fact.

There is no question that both stories about what occurred in the ICT meeting room on October 7, 2014, cannot be true. The Court, however, is duty-bound at this juncture to view the evidence in Plaintiff's favor. So assuming Defendants failed to intervene when Hudson attacked Plaintiff— as the undersigned must accept because Plaintiff's sworn testimony in the record is evidence—a reasonable jury could find that Hudson's use of force was sadistic and malicious *and* that Defendants abandoned their constitutional obligation to protect Plaintiff from Hudson's abuse. Therefore, summary judgment is not warranted on Plaintiff's Eighth

15

Amendment failure to intervene claims. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (holding the contradiction between the parties' sworn allegations about what they observed "presents a classic swearing match, which is the stuff of which jury trials are made").

Defendants nevertheless argue they are entitled to summary judgment because Plaintiff's allegations are contradicted by "all" of the "objective evidence" in the record, namely the DOC medical records. ECF No. 89 at 14. This argument rests on the legal principle the Supreme Court set forth in *Scott v. Harris*—that courts need not accept a party's assertion when it is "blatantly contradicted by the record, so that no reasonable jury could believe it." 550 U.S. at 380.[8] The objective evidence the Supreme Court credited there was a videotape of the incident giving rise to the plaintiff's claims, which refuted the plaintiff's allegations. *Id.* at 378.

Defendants' reliance on Plaintiff's DOC medical records is different. First, the records are not objective to the extent they were created by DOC employees and contractors. *See Sears v. Warden Okeechobee Corr. Inst.*, 762 F. App'x 910, 916 (11th Cir. 2019) ("*Sears v. Warden*") ("Although

---

[8] The rule announced in *Scott*, however, was not groundbreaking in the Eleventh Circuit and "did not tinker with the summary judgment standard[.]" *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013).

16

*Sears v. Warden*, 762 F. App'x at 916–17 (distinguishing medical records from the "incontrovertible video evidence" in *Scott* because the "records involve people and all their attendant mental infirmities, biases, and limitations-in their creation"); *Reid v. Sec'y, Fla. Dep't of Corr.*, 486 F. App'x 848, 852 (11th Cir. 2012) ("While it is true that Reid's medical records do not support the version of the facts he presents in his affidavit, all this means is that there is conflict in the evidence, which we must resolve at the summary judgment stage in Reid's favor.").

Third, and finally, Plaintiff's medical records only provide evidence relating to his allegations of injury and do not provide uncontroverted evidence whether Hudson applied excessive force or whether Defendants failed to intervene. In short, the records do not contradict Plaintiff's account of Defendants' actions and thus do not negate his other sworn testimony in this case. *See Sears v. Roberts*, 922 F.3d at 1208 n.4 ("In any event, the nurse's report does not establish whether force was applied to Sears after he was handcuffed and compliant."); *Joassin*, 661 F. App'x at 560 ("[T]he nurse's declaration and medical records, if credited, refute Joassin's allegations only as to the severity of existence of Joassin's injuries. The nurse does not claim to have witnessed any potion of the allegedly excessive use of force."). In any event, a reasonable jury could conclude

18

that Plaintiff's medical records do not include a diagnosis for a dislocated shoulder on October 8, 2014, because, as Plaintiff stated, he attempted to correct the displacement before his examination.  ECF No. 89-15 at 44–45.

At bottom, any discrepancy between Plaintiff's sworn statements, Defendants' testimony, and the medical records may be fertile ground for cross-examination at trial or a matter for debate during jury deliberations, but it is not a basis for summary judgment.  *See Anderson*, 477 U.S. at 29 ("[A]t the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").  Defendants' motion for summary judgment as to Plaintiff's Eighth Amendment failure to intervene claims is **DENIED**.

## B.    Eighth Amendment Deliberate Indifference Claim

Defendant Johnson's motion for summary judgment on Plaintiff's Eighth Amendment deliberate indifference claim also fails because there are genuine issues of material fact. [10]  Deliberate indifference to the serious medical needs of prisoners violates the Constitution's prohibition against

---

[10] Plaintiff has only sued Ms. Butler for her aforementioned failure to intervene, which he contends violated the Eighth Amendment.  ECF No. 89-15 at 42 ("And that's my basis for suing Ms. Butler, because her failure to intervene.").

Johnson's knowledge is relevant to what Plaintiff claims was a later

unconstitutional interference with the continued treatment of his shoulder.

That is, a reasonable jury may conclude that Defendant Johnson was

deliberately indifferent to a serious risk of harm when he refused to allow

Plaintiff to visit the infirmary for treatment, in part, because he witnessed

the injury itself.  That same jury will first have to determine whether there

was a legitimate penological reason for Defendant Johnson to have

prohibited Plaintiff from visiting the infirmary, as noted in the medical

records, or if that was a pretext for Defendant Johnson to obstruct Plaintiff's

continued medical treatment, as Plaintiff claims.

Accordingly, Defendant Johnson's motion for summary judgment as

to Plaintiff's Eighth Amendment deliberate indifference claim is **DENIED**.

### C.   **First Amendment Retaliation Claim**

Plaintiff's final claim is one under the First Amendment for retaliation.

"The First Amendment forbids prison officials from retaliating against

prisoners for exercising the right of free speech." *Farrow*, 320 F.3d at

1248.  An inmate is considered to be exercising his right of free speech

when he complains to prison administrators about the conditions of his

confinement. *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008).

"An inmate may maintain a cause of action for retaliation under 42

23

U.S.C. § 1983 by showing that a prison official's actions were 'the result of the inmate's having filed a grievance concerning the conditions of his imprisonment.'" *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011) (quoting *Farrow*, 320 F.3d at 1248).

> To prevail on a retaliation claim, the inmate must establish that: "(1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the official's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action (the disciplinary punishment) and the protected speech (the grievance)."

*Id.* (quoting *Smith*, 532 F.3d at 1276); *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). "To establish causation, the plaintiff must show that the defendant was 'subjectively motivated to discipline' the plaintiff for exercising his First Amendment rights." *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011).

Defendant Johnson avers that summary judgment is warranted because Plaintiff has "fail[ed] to state any cause of action for retaliation" and any claim based on the October 6, 2014, disciplinary report is barred under *O'Bryant*. Plaintiff, however, has alleged under penalty of perjury that Defendant Johnson, in concert with Hudson, withheld medical care from him. ECF No. 15 at 10.

If a reasonable jury finds that Plaintiff did not present a security risk in

24

November 2014 and should have been allowed to visit the infirmary on the dates reflected in the medical records, it could easily find that Defendant Johnson withheld medical treatment from Plaintiff as a means of retaliation. *Thomas v. Evans*, 880 F.2d 1235, 1242 (11th Cir. 1989) ("To state a first amendment claim for retaliation, a prisoner need not allege violation of a separate and distinct constitutional right."); *Oliver v. Calderon*, No. 6:17-cv-1792-Orl-31TBS, 2019 WL 1254844, at *5 (M.D. Fla. Mar. 19, 2019) ("Plaintiff's allegations that Defendants prevented him from attending medical appointments and denied him medical treatment as a result of filing grievances, if proven true, support a First Amendment violation."). And because this claim does not implicate the October 6, 2014, disciplinary report, Defendant Johnson cannot rely upon *O'Bryant*. Defendant Johnson's motion for summary judgment as to Plaintiff's First Amendment retaliation claim, therefore, is **DENIED.**[11]

---

[11] The undersigned does not address whether a reasonable jury may find the other two elements of retaliation—whether Plaintiff's speech was constitutionally protected and whether a causal relationship exists between the action and the protected speech— because Defendant Johnson does not challenge those elements. The undersigned, however, did not consider Plaintiff's other allegations of retaliation because there is no evidence in the record beyond Plaintiff's conclusory statements that, following the October 7, 2014, incident, Defendant Johnson and Hudson filed frivolous disciplinary reports or stole Plaintiff's grievances.

## D.   The PLRA Bar on Compensatory Damages

Lastly, Defendants argue they are entitled to summary judgment under the PLRA because Plaintiff claims he had a dislocated shoulder but was diagnosed with osteoarthritis, which was not caused by Defendants alleged inaction. ECF No. 89 at 25. Under the PLRA, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act as defined in section 2246 of title 18)." 42 U.S.C. § 1997e(e).

"[T]he physical injury must be more than de minimis, but need not be significant." *Harris v. Garner*, 190 F.3d 1279, 1286 (11th Cir. 1999), *vacated*, 197 F.3d 1059 (1999), *reinstated in relevant part*, 216 F.3d 970, 972 (2000). Although the meaning of the phrase "greater than de minimis" is "far from clear," *Chatham v. Adcock*, 334 F. App'x 281, 284 (11th Cir. 2009), the undersigned concludes that Plaintiff's alleged dislocated shoulder passes muster. *See Brinson v. Jackson*, No. CV412-105, 2013 WL 1180832, at *1 (S.D. Ga. Mar. 20, 2013) ("A dislocated finger is more than de minimis, though not significant."); *Cotney v. Bowers*, No. 2:03-cv-1181-WKW, 2006 WL 2772775, at *7 (M.D. Ala. Sept. 26, 2006) (holding the plaintiff's testimony that he suffered bruises to his ribs from officer's use

26

of force and that the bruises healed after several weeks without treatment surmounted PLRA's de minimis injury bar because the plaintiff put forth evidence from which a jury could determine his physical injuries were more than de minimis).  Plaintiff, therefore, may pursue his claim for compensatory damages.

## IV.  CONCLUSION

Accordingly, it is respectfully **RECOMMENDED** that Defendants' Motion for Summary Judgment, ECF No. 89, should be **DENIED**.

**IN CHAMBERS** this 25th day of February 2020.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  See 11th Cir. Rule 3-1; 28 U.S.C. § 636.**

Ben Conarck
Reporter, the Florida Times-Union
1 Riverside Ave
Jacksonville, FL 32202



July 10, 2018

Mr. Gerrard D. Jones aka "Lawyerboy:"

I hope this letter finds you well. Last time I wrote you, I said I would research the claims you made against the corrections officers. I was particularly troubled by what you described as open and active KKK membership by Sgt. Goldhagen, and potentially others.

Attempting to verify your claims, I filed a public records request for all complaints against Sgt. Goldhagen. I found two other people who had complained about KKK membership, which leads me to believe you are not making this up out of whole cloth. I have since requested complaints against other COs and one other Sgt. who worked with Goldhagen when he was at Santa Rosa C.I. These personnel were:

Hancock, Michael D. (CO)
Wilder, Mark (CO)
Hammontree, Jack (Sgt)
Johnson, Alton (CO)

In your complaint, you mentioned other COs as well. Do you think there would be similar complaints against any of them? If so, which ones?

I am going to continue to research this and have made it a high priority of mine. You can help me by writing again with any further information you have regarding KKK or other white nationalist prison staff. Do you know of any other inmates who have had similar experiences? If so, please put them in contact with me. That would help a great deal. I look forward to hearing from you soon.


Sincerely,

Ben Conarck

**The Florida Times-Union**
TIMES-UNION **media**●●▬ **jacksonville.com**

One Riverside Avenue | Jacksonville, FL 32202

– PRIVILEGED MAIL –

Gerrard D. Jones #503034
Florida State Prison
Po Box 800
Raiford, FL 32083

Hasler
07/11/2018
US POSTAGE $000.45°
FIRST-CLASS MAIL
PRSRT
ZIP 32216
011E12650818

00 FRCUNHP 3800 5099

2ND JUDICIAL CIRCUIT
LEON COUNTY, FLORIDA

GERRARD D. JONES,
___V___        PETITIONER,

CASE # 2015-2591
       2015-2594
       2015--2596

EXHIBIT
F

DEPT. OF CORRECTIONS,
         RESPONDENT.      /

MOTION FOR PRODUCTION AND PRESERVATION OF CAMERA FOOTAGES
WHICH RESPONDENTS POSSESS; WHICH DIRECTLY PROVES PETITIONER'S
INNOCENCE; AND, WHICH RESPONDENTS RECORDED, REVIEWED,
RELIED UPON AND HAD AVAILABLE FOR USE DURING (ADMIN) HEARINGS.
COMES NOW PETITIONER, GERRARD D. JONES, PRO SE, ABOVE, STATING:

1. PRISON CAMERA FOOTAGE IS IN POSSESSION OF RESPONDENTS AND IS
INDISPENSABLY RELEVANT TO A FAIR (DUE PROCESS OF FLORIDA/FEDERAL),
CONSTITUTIONAL ADJUDICATION OF THE MERITS OF THIS LITIGATION.

2. THE FOOTAGE WAS RELIED UPON, AVAILABLE AND OTHERWISE
CONSULTED BY RESPONDENTS TO AGREE UPON THE CHARGES, EVIDENCE
AND THE VERDICTS DURING THE ADMINISTRATIVE (ADMIN) PROCESSES.

3. THE FOOTAGE IS, THEREFORE, OF MATERIAL IMPORTANCE, REASONABLY
QUITE AUTHORITATIVE VIA 'A PICTURE IS WORTH A THOUSAND WORDS,' MAXIM.

4. THE FOOTAGE SOUGHT TO BE "PRODUCED/PRESERVED/SAFEGUARDED" BY
COURT ORDER, IS:
✓ 8-18-2015 (L-4 -DORM) CAMERAS: SHOWS EVERYTHING "PRE/DURING/POST INCIDENTS"
✓ 8-18-2015, J-2,4 (DORM) CAMERAS: SHOWS ARRIVAL/ STAFF INTIMIDATION/THREATS/ARREST.
✓ 8-19-2015, J-2 (DORM) CAMERAS: SHOWS ATTEMPTS TO GET MEDICAL/PSYCHOLOGY HELP.
✓ 8-21-2015, J-2 (DORM) CAMERAS: SHOWS ATTEMPTS TO GET MEDICAL/PSYCHOLOGY HELP.
✓ 8-21-2015, J-2 DORM) CAMERAS: SHOWS "INVESTIGATION" WAS NOT DONE ON DR'S, AND
   PAPERS STOLEN BY STAFF WHILE PETITIONER LOCKED IN SHOWER CELL.
✓ 8-25-2015,

PETITIONER SEEKS "JUDICIAL NOTICE" (F.S. 90.201, 202, 203, 204)
OF THE PRINCIPLES OUTLINED IN PEOPLE -V- HANDY,
20 N.Y. 3d 663; 988 N.E. 2d 879 (NEW YORK 2013) ("CASE ABOUT
PRISON OFFICIALS INTENTIONAL PRE-APPEAL DESTRUCTION OF CAMERA FOOTAGE").
IT IS SO PRAYED.                                   GERRARD D. JONES
                                                  (PETITIONER PRO SE)

JURAT / CERTIFICATE OF SERVICE

I DECLARE UNDER PENALTY OF PERJURY OATH THAT I HAVE
READ THE FOREGOING AND ALL FACTS ARE TRUE AND CORRECT
UNDER F.S. 92.525(2). ALSO, THIS DOCUMENT WAS SENT
BY U.S. MAIL ("MAILBOX RULE") ON 11 -    - 2015, TO:


(ORIGINAL)                          (1 COPY)
CLERK OF COURT                      ASSISTANT ATTORNEY GENERAL
LEON COUNTY                         K. C. HAGAN
P.O. BOX 1024                       THE CAPITOL - PL-01
TALL, FL. 32302-1024                TALL., FL. 32399-1050



(1 COPY)                            (5)
GENERAL COUNSEL                     GERRARD D. JONES #503034
DEPT. OF CORRECTIONS                NORTH FLORIDA RECEPTION
501 S. CALHOUN STREET               AND MEDICAL CENTER
TALL, FL. 32399-2500                P.O. BOX 628
                                    LAKE BUTLER, FLORIDA 32054

                                    (PETITIONER PRO SE)


(2)

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**GERRARD D. JONES**
**DOC # 503034,**

      **Plaintiff,**

v.

                                **Case No. 3:18-cv-155-LAC-MJF**

**SCHWARZ, ET AL.,**

      **Defendants.**

_____/

EXHIBIT "G"

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Jacob Ryan Denmon, Captain Schwartz, Mark K. Goldhagen, Wanda Beaudry** and **Eldridge Pogue** ("Defendants") move for summary judgment in their favor pursuant to Rule 56, Fed. R. Civ. P., and allege the following in support thereof:

### STATEMENT OF MATERIAL FACTS

On January 23, 2018, Plaintiff filed a lawsuit pursuant to 42 U.S.C. § 1983. (Doc. 1 at 1) Plaintiff is an inmate in the custody of the Florida Department of Corrections (FDC) serving a sentence for various criminal charges with a current

1

anticipated release date of June 10, 2022.[1] On August 18, 2015, Plaintiff was housed

at Santa Rosa Correctional Institution Annex. See Defendants' Exhibits A-C.

### The August 18, 2015 Incident

On August 18, 2015 at approximately 7:00 a.m., it was discovered that

Plaintiff had violated Rule 33-602.314(9-10), Florida Administrative Code

("F.A.C.") which prohibits Lying to Staff. See Defendants' Exhibit A.   That

disciplinary report, log number 135-151303, was issued by FDC official W.J. Strain

for filing falsified grievances and stated that Plaintiff would be housed in

administrative confinement pending disciplinary team action. Because of this

violation, Plaintiff was to be housed in administrative confinement pending

disciplinary team action. Id. Plaintiff was ultimately found guilty of this disciplinary

report and was sanctioned with sixty days of disciplinary confinement and forfeiture

of sixty days of gain time. Id. at 2.

On August 18, 2015 at approximately 8:31 a.m., Defendant Goldhagen was

assigned as an Internal Security Supervisor at Santa Rosa Correctional Institution

Annex and was present in front of cell L4206, where Plaintiff and his cellmate were

---

[1] Information regarding Plaintiff's convictions and current institution can be
obtained via the Department's Inmate Population Information Detail page at:
http://www.dc.state.fl.us/offenderSearch/detail.aspx?Page=Detail&DCNumber=50
3034&TypeSearch=AI

housed. See Defendants' Exhibits B at 1. Plaintiff refused several verbal orders to submit to hand restraints so that he could be taken to medical for a pre-confinement physical pending his placement on administrative confinement for the above disciplinary report. See Defendants' Exhibits B at 1. Plaintiff was given a second disciplinary report log number 135-151304 for violation of Rule 33-602.314 (6-1) which prohibits disobeying a verbal or written order, was ultimately found guilty of this disciplinary report and was sanctioned with thirty days of disciplinary confinement. See Defendants' Exhibit B at 2.

At approximately 8:39am, Plaintiff finally agreed to be placed in hand restraints and Defendant Schwarz ordered Defendants Demon, Pogue, Beaudry, and Goldhagen to enter the cell and place Plaintiff in hand restraints. See Defendants' Exhibits C at 1. The officers entered the cell at 8:39. See Defendants' Exhibits C at 1, E at 08:39. Upon those officers entering the cell, Plaintiff stated, "Let's go motherfuckers" and attempted to strike Defendant Goldhagen with a closed fist to the face which necessitated a reactionary use of physical force in the defense of Defendant Goldhagen. See Defendants' Exhibits B at 1. Plaintiff was given a disciplinary report for violation of Rule 33-602.314(1-15), F.A.C. which prohibits Battery or Attempt on a Corrections Officer. See Defendants' Exhibit C. Plaintiff was found guilty of that disciplinary report and sanctioned with sixty days of

disciplinary confinement and forfeited three hundred and sixty-four days of gain time. Id. at 2.

Once the reactionary use of force had ceased, Plaintiff was placed in hand and leg restraints and exited the cell at 08:43 a.m. See Defendants' E at 08:43. A handheld video camera was obtained which recorded the aftermath of the incident including his trip to medical for a post-use of force examination, and his subsequent placement in an administrative confinement cell. See Defendants' Exhibit D. Plaintiff's hands are visible for long stretches of the hand-held video footage. Id. at 08:46-08:49. Plaintiff arrived at medical at 8:49 a.m., just minutes after the incident ceased and his examination began at 08:50 a.m. Id. at 08:49; Defendants' Exhibit A at 1; F at Attachment 1-2. Medical staff can specifically be seen on the video examining Plaintiff's hands behind his back. Id. at 08:55. Plaintiff was escorted out of medical following the end of his examination at 8:57 a.m. Id. at 08:57. Plaintiff was then taken to a shower and strip searched before being placed in an administrative confinement cell in cell 2108. Id. at 08:57-09:04.

Plaintiff's medical records have been reviewed for an evaluation of his alleged injuries reported in his Complaint and revealed the following:

> According to patient's medical records provided to me for review, the patient was seen immediately after the incident of August 18, 2015 for a post-use of force examination. See Attachment at 1-2. Patient's vital signs were within normal limits with the exception of his pulse and blood pressure being slightly elevated. Id. Patient was ambulatory when

he arrived. He was alert to time, place, person, and situation and was answering questions verbally. Patient complained of pain in his hands, and so his hands were examined. The results of that examination determined that his hands were not deformed and that his hands had no redness or swelling. A capillary refill test was done and was within normal limits. Overall, patient's medical records demonstrate that he had no injuries at that time. Patient's medical records do not support his allegations that he had a "popped blood vessel", a broken bone in his right hand, nerve damage in his right hand or wrist, or any other injury to his hands at that time. Id.

Patients lungs also were examined and sounded clear with his respirations at 16, within normal limits. Patient expressed no other injuries at that time. Id. Accordingly, the patient's medical records do not support his allegation that he was struck with handcuffs or blocked a strike with handcuffs during the preceding use of force. Patient's medical records also do not support his allegation that he was choked to the point of being unable to breathe or to the point of losing consciousness during the preceding incident. Patient's medical records also do not support his allegation that he was bent backwards on the floor of his cell as if to be "hogtied" from his neck to his ankles, and patient made no such allegation of injury during the post use of force examination. Id. Additionally, patient's medical records do not support his allegation that his underwear were pulled up and something pushed into his rectum which cut his left buttock during the preceding incident, nor did patient make any such allegation during the post use of force examination. Id. Finally, patient's medical records do not support his allegation that his wrists and feet/ankles were pushed backwards causing his bones to "pop", or that patient made any such allegation to medical staff during that examination. Id.

See Defendant's Exhibit F (paragraph numbers omitted). That review also included information regarding Plaintiff's subsequent visits to medical for similar complaints on later dates. Id.

## MEMORANDUM OF LAW

### Standard for Summary Judgment

Summary judgment is proper if the pleadings and sworn statements show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the initial burden of demonstrating an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 322-23. Upon meeting this burden, the burden shifts to the nonmoving party to present evidentiary material demonstrating that a genuine issue of material fact exists. Id.

Applicable substantive law identifies those facts that are "material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Factual issues must have a real basis in the record to be considered genuine and the nonmoving party must show more than a "metaphysical doubt" regarding the material facts. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The evidence and reasonable inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party. Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999).

Although all reasonable inferences are made in favor of the nonmoving party, a court need not permit a case to go to a jury when the inferences drawn from the

evidence and upon which the nonmoving party relies are 'implausible.' Cuesta v. School Bd. of Miami-Dade County, 285 F.3d 962, 970 (11th Cir. 2002) (citations omitted). A mere "scintilla" of evidence in support of the nonmoving party's position is not sufficient; there must be evidence upon which a jury could reasonably find for the nonmoving party. Anderson, 477 U.S. at 252; see also Matsushita, 475 U.S. at 587 (there is no genuine issue for trial if record taken as a whole would not lead a rational trier of fact to find in favor of non-moving party). In other words, summary judgment is warranted against a nonmoving party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

In McMillian v. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996), the Eleventh Circuit clarified its earlier rulings on this point by indicating that their cases applying Celotex read Celotex "as simply allowing *otherwise admissible evidence* to be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form." The Court continues to apply this principle. See McCaskill v. Ray, 279 Fed. Appx. 913, 914 (11th Cir. 2008). However, the court was clear that "potential impeachment evidence [although admissible] . . . may not be used to create a genuine issue of material fact for trial" that would defeat a motion for summary judgment. McMillian, 88 F.3d at 1584.

The video evidence controls over any of Plaintiff's contradictory assertions. "Where the video obviously contradicts Plaintiff's version of the facts, we accept the video's depiction instead of Plaintiff's account." <u>Pourmoghani-Esfahani v. Gee</u>, 625 F.3d 1313, 1315 (11th Cir. 2010); <u>see</u> <u>also</u> <u>Scott v. Harris</u>, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L.Ed.2d 686 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonably jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). "If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no reasonable jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination." <u>Lord v. Allstate Ins. Co.</u>, 47 F.Supp.3d 1288, 1291 (N.D. Ala. 2014) (citing <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007)).

## I.     **Defendants are entitled to summary judgment on Plaintiff's claims that the use of force was not justified.**

The Eighth Amendment, which applies to the states through the Fourteenth Amendment, can give rise to claims challenging the excessive use of force. <u>Thomas v. Bryant</u>, 614 F.3d 1288, 1305 (11th Cir.2010) (reviewing categories of claims under the Eighth Amendment). An excessive-force claim requires a two-prong showing: (1) an objective showing of deprivation or injury that is "sufficiently serious" to constitute a denial of the "minimal civilized measure of life's necessities";

8

and, (2) a subjective showing that the official had a "sufficiently culpable state of mind." Id. (citing Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994) (other citations omitted)). It is the "unnecessary and wanton infliction of pain" caused by force used "maliciously and sadistically" for the very purpose of causing harm that constitutes cruel and unusual punishment. Whitley v. Albers, 475 U.S. 312, 322, 106 S. Ct. 1078, 89 L.Ed.2d 251 (1986). Thus, where an Eighth Amendment claim is based upon allegations of excessive force, the question turns on whether the prison guard's "force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purpose of causing harm." Bozeman v. Orum, 422 F.3d 1265, 1271 (11th Cir. 2005).

To determine whether force was applied "maliciously and sadistically," courts consider the following factors: "(1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them." Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quotations and citations omitted). When considering these factors, the courts "give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the

9

scene of a disturbance." Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (citations omitted).

Moreover, in the context of prison discipline, a distinction is made between "punishment after the fact and immediate coercive measures necessary to restore order or security." Ort v. White, 813 F.2d 318, 324–25 (11th Cir. 1987). When a prison's internal safety is of concern, courts conduct a more deferential review of the prison officials' actions. Williams v. Burton, 943 F.2d 1572, 1575 (11th Cir. 1991) (citations omitted). Indeed, "[t]hat deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches in prison discipline." Whitley, 475 U.S. at 322; see also Bell v. Wolfish, 441 U.S. 520, 547, 99 S. Ct. 1861, 60 L.Ed.2d 447 (1979).

Although there still remains a dispute of fact as to whether the amount of force used was the minimum necessary, Plaintiff's allegations that the use of force was unjustified must be dismissed because the claims are barred under Heck v. Humphrey and Edwards v. Balisok. Plaintiff's claims are barred by the Heck doctrine because if successful, they would necessarily undermine his DR guilty determination that arose from the same nucleus of operative fact. In the case of Heck v. Humphrey, 512 US 477 (1994), the Supreme Court held that actions brought under

42 U.S.C. § 1983 are barred when the allegations thereof necessarily challenge the validity of a conviction. There, the Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

Heck, 512 U.S. at 486-87. If such a § 1983 action is brought before the challenged conviction or sentence is invalidated, it must be dismissed. Id. at 487. Thus, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." Id.

The Supreme Court also applied the Heck analysis to claims made by prisoners challenging prison disciplinary actions involving the loss of good time credit. See Edwards v. Balisok, 520 U.S. 641 (1997). Since, the Supreme Court reiterated that "a state prisoner's § 1983 action is barred (absent prior invalidation) – no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings) – if success in that action would necessarily demonstrate the invalidity of confinement

or its duration." Wilkinson v. Dotson, 544 U.S. 74, 81-82, 125 S. Ct. 1242 (2005)

(emphasis retained). Plainly stated, where an inmate has lost gain time due to a DR,

he may not pursue a civil rights action under 42 U.S.C. § 1983 if success in that civil

rights action would necessarily imply the invalidity of the DR. For the civil rights

action to be viable, Plaintiff must first overturn the DR. The "relevant inquiry is not

whether a prisoner explicitly seeks to reinstate his good-time credits, but instead

whether the § 1983 claims call into question the validity of the deprivation of those

credits." Richards v. Dickens, 411 F. App'x 276, 279 (11th Cir. 2011) (unreported

op.).

"[F]or Heck to apply, it must be the case that a successful § 1983 suit and the

underlying conviction be logically contradictory." Dyer v. Lee, 488 F.3d 876, 884

(11th Cir. 2007); Abdullah v. City of Jacksonville, No. 3:04-cv-667-J-32TEM, 2006

WL 2789137, at *4 (M.D. Fla. Sept. 26, 2006) (noting that the Eleventh Circuit

would likely find the case Heck barred because "Plaintiff's § 1983 claim attacks the

very reason he was arrested and later adjudicated guilty (based on the plea of no

contest)."). Likewise, a claim is Heck barred where the plaintiff's basis for the action

is wholly inconsistent with the facts upon which the disciplinary conviction is based,

and a judgment in favor of plaintiff finding that he fully co-operated with the

Defendants orders and was not threatening in any way would necessarily imply the

validity of the conviction. LaFlower v. Kinard, No. 2:10-cv-82, 2011 WL 2183555 at *3 (M.D. Fla. June 6, 2011).

When the Heck bar does apply, the Court lacks subject matter jurisdiction. Alsobrook v. Alvarado, 986 F. Supp. 2d 1312 (S.D. Fla. Dec. 3, 2013) (dismissing Count II of the Complaint for lack of subject matter jurisdiction where the allegations necessarily would undermine the validity of a disciplinary action); see also Esensoy v. McMillan, No. 06-12580, 2007 WL 257342, at *1 (11th Cir. Jan 31, 2007) (affirming district court's lack of subject matter jurisdiction over Heck-barred claim).

This Court lacks subject matter over Plaintiff's claims because they are barred by Heck. Specifically, if Plaintiff's operative facts were proven true, they would necessarily undermine and contradict the disciplinary decision that found him guilty of Battery or Attempt on a Corrections Officer on Defendant Goldhagen. See Defendants' Exhibit C. The use of force is authorized to overcome an inmate's physical resistance to a lawful command. See F.S.A 944.35(1)(a)(5), F.A.C ¶33-602.210(2)(a)) Plaintiff pled not guilty to the allegation, was found guilty, and lost 364 days of gain time. See Defendants' Exhibit C.

The inconsistencies between Plaintiff's factual allegations and the disciplinary hearing record reveal that Plaintiff's claims are Heck-barred and that Plaintiff cannot now challenge whether the use of force was justified. If Plaintiff

were to prevail on his claims, it would necessarily undermine the basis for his disciplinary report and summary judgment should be granted in Defendants' favor.

As to Defendant Schwarz, the only action alleged by Plaintiff is that Defendant Schwarz authorized the use of force on Plaintiff. This is correct- as shown by Disciplinary Report Log number 135-151305, Defendant Schwarz did authorize a justified use of force on Plaintiff in order to bring him into compliance with lawful commands. See Defendants' Exhibit C. However, any challenge to the justification of such authorization is barred by Heck as described above. Accordingly, Plaintiff's claim against Defendant Schwarz should fail in its' entirety. Defendant Schwarz is not alleged to have personally used force on Plaintiff at any time.

As to the remaining Defendants, as addressed above, Plaintiff's claims that the use of force in itself was not justified are barred by Heck. Accordingly, Plaintiff fails to demonstrate any constitutional violation as to the need for the use of force against Plaintiff. Only Plaintiff's allegation that the amount of force used was excessive should survive summary judgment.

## II. **Defendants are entitled to summary judgment on Plaintiff's claims of deliberate indifference and/or failure to protect.**

### *Deliberate Indifference/Failure to Protect*

To survive summary judgment, Plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation. Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995). Merely negligent failure to protect an inmate from attack does not justify liability under section 1983 . . . the known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act can constitute deliberate indifference. Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990). Further, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 833, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994). The first element, a substantial risk of serious harm, is evaluated using an objective standard. Brooks v. Warden, 800 F.3d 1295, 1301 (11th Cir. 2015). There must be a "strong likelihood" of injury, "rather than a mere possibility," before an official's failure to act can constitute deliberate indifference. Id.

Plaintiff does not specify which Defendants he alleges failed to protect him as he alleges that all Defendants other than Defendant Schwarz were personally physically involved in the use of force. Plaintiff's allegations of excessive force

15

predominantly focus on Defendant Goldhagen, with Plaintiff alleging that various other officers (who Plaintiff admits he could not see which officers he refers to) assisted in the use of force by holding Plaintiff down and restraining him as well as placing hand and leg restraints on him. To the extent that Plaintiff alleges that Defendants Pogue, Denom, Beaudry, and/or Schwarz failed to protect him from Defendant Goldhagen, Plaintiff cannot demonstrate that any of those officers were subjectively aware of a substantial risk of harm to Plaintiff by participating in the restraining and cuffing of Plaintiff. In fact, as addressed above, the information contained in Plaintiff's disciplinary reports (which he cannot contest pursuant to Heck) demonstrate that the Defendants were subjectively aware of the need to hold, restrain, and cuff Plaintiff as a result of his lack of compliance with lawful commands and attempt to battery Defendant Goldhagen. Accordingly, Defendants are entitled to summary judgment to the extent that Plaintiff alleges that they were deliberately indifferent or failed to protect him from the use of force against him, as that use of force was justified.

### *Medical Deliberate Indifference*

To survive summary judgment for an Eighth Amendment claim for medical deliberate indifference under 42 U.S.C. § 1983, a prisoner must satisfy an objective and subjective component. Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000). The prisoner must (1) satisfy the objective component by

16

showing he had a "sufficiently serious" medical need; (2) satisfy the subjective component by showing the prison official acted with deliberate indifference toward the serious medical need; and (3) show that the injury was caused by the defendant's wrongful conduct. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007). Thus, § 1983 focuses on whether the prison official's acts or omissions were the cause, not merely a contributing factor, of the constitutional deprivation. LaMarca v. Turner, 995 F.2d 1526, 1535 (l lth Cir. 1993).

In the Eleventh Circuit, a serious medical need "is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)). It is a serious medical need that, if left unattended, will result in "a substantial risk of serious harm." Taylor, 221 F.3d at 1258. Deliberate indifference toward "serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976). To rise to a level of deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health or safety. Farmer, 511 at 837. This requires the official to be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id.

Plaintiff must demonstrate a "sufficiently culpable state of mind" which is "more blameworthy than negligence." Id. at 835. The United States Supreme Court has equated the state of mind requirement to be equivalent to the definition of recklessness normally applied in criminal law. Id. at 837.

To the extent that Plaintiff might allege (as his claims are vague and unspecific) that Defendants were deliberately indifferent to a serious risk of harm to his left shoulder via hand restraints clasped behind him rather than in front of him as a result of his medical pass, Plaintiff cannot demonstrate a constitutional violation. First, deliberate indifference claims contemplate a medical need that is left unaddressed and unattended. Here, Plaintiff was cuffed behind him because of the security risk that he posed to other inmates and corrections officials, and was being ordered to cuff up in order to attend a pre-confinement medical examination. Even if there was some risk that Plaintiff might be injured by being placed in hand restraints behind his back, Plaintiff cannot demonstrate that these officers were indifferent to a serious medical need that they subsequently intended to leave unattended. They were in the process of taking him to medical personnel at the time for a physical examination. Had there been some issue with his being restraint behind his back, medical personnel would have addressed that issue during his subsequent post-use of force examination. Accordingly, Plaintiff cannot meet the subjective component of his claim.

Finally, Plaintiff also cannot demonstrate that he suffered any injury as a result of the alleged failure to comply with his front cuff pass. Plaintiff must provide verifying medical evidence to support his claim. See Townsend v. Jefferson County, 601 F.3d 1152, 1158 (11th Cir. 2010) *superceded on other grounds*, 582 F.3d at 1259 (11th Cir. 2009). As addressed by the review of Plaintiff's medical records, there is absolutely no indication that he received an injury to his left shoulder or an exacerbation of a previous injury to his left shoulder as a result of being restrained behind his back for those twenty-four minutes. See Defendants' Exhibits D, F. Accordingly, Plaintiff also cannot meet the third element of his claim. For the above reasons, Defendants should be granted summary judgment on Plaintiff's claim of deliberate indifference as to his front-cuff pass, to the extent that a liberal construction of his complaint might present one.

## III.   Defendants are entitled to summary judgment on Plaintiff's First Amendment Claims

The First Amendment under the United States Constitution also protects a prisoner from retaliation for exercising the "right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement." Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008). To establish a retaliation claim, the plaintiff has the burden of proving that: "(1) his speech or act was constitutionally protected; (2) the defendant's retaliatory conduct adversely affected

the protected speech; and (3) there is a causal connection between the retaliatory actions and the adverse effect on speech." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011) (internal quotations and citations omitted). Regarding the first element (and third element), a prisoner's filing of a grievance is protected speech under the First Amendment. Boxer X v. Harris, 437 F.3d 1107, 1112 (11th Cir. 2006); see, e.g., Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008). However, "an inmate's First Amendment right to free speech is not protected if affording protection would be inconsistent with the inmate's status as a prisoner or with the legitimate penological objectives of the corrections system.'" Smith v. Mosley, 532 F.3d 1270, 1277 (11th Cir. 2008) (quoting Pell v. Procunier, 417 U.S. 817, 822, 93 S. Ct. 2800, 2804 (1974) (holding that a prisoner's false and insubordinate remarks in a letter "which reeked of disrespect for the administrators' authority, . . . could seriously impede . . . the institution's penological objectives.). "[A]rgumentative, coercive, and insubordinate statements, in a prison context" are not protected speech under the First Amendment. Bates v. Andrews, No. 4:09-cv-00026-SPM-GRJ, 2012 WL 592904,3 at *5 (N.D. Fla. Feb. 3, 2012) (report and recommendation (R&R)), 2012 WL 601268 (Feb. 23, 2012) (unpublished order adopting R&R) (citing Robinson v. Boyd, 276 F. App'x 909, 910 (11th Cir. 2008) (per curiam) (unreported op.), Smith v. Mosley, 532 F.3d 1270, 1277 (11th Cir. 2008), Lockett v. Suardini, 526 F.3d 866, 874 (6th Cir.2008), Garrido v. Coughlin, 716 F. Supp. 98, 99-101

(S.D.N.Y. 1989), <u>Riggs v. Miller</u>, 480 F. Supp.799, 804 (E.D.Va. 1979), and <u>Durkin v. Taylor</u>, 444 F. Supp. 879, 881-83 (E.D.Va.1977)); <u>see</u> <u>Christ v. Blackwell</u>, No. 2:10-cv-0760-EFB P, 2016 WL 4161129, at *8 (E.D.Cal. Aug. 4, 2016) (unpublished order) (threat to file a grievance constitutes protected speech unless it is delivered in an argumentative, confrontational, or disorderly manner).

Regarding the second element, the plaintiff must show that the defendant's conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights. <u>Smith</u>, 532 F.3d at 1277; <u>Bennett v. Hendrix</u>, 423 F.3d 1247, 1254 (11th Cir. 2005). To demonstrate if the alleged retaliatory conduct deterred a person of ordinary firmness, the plaintiff must show that the defendant's actions resulted in something more than a "de minimis inconvenience" to the exercise of his First Amendment rights because it "would trivialize the First Amendment to hold the harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise." <u>Bennett</u>, 423 F.3d at 1252 (quoting <u>Bart v. Telford</u>, 677 F.2d 622, 625 (7th Cir. 1982)).

Conclusory allegations of retaliation without "some facts" that would indicate that the retaliatory act was in retaliation for filing grievances is not sufficient. <u>See</u> <u>White v. Thompson</u>, No. CV406-207, 2007 WL 2324613, at *1 (S.D.Ga. June 20, 2007); <u>see also</u> <u>Farrow v. West</u>, 320 F.3d 1235, 1248 (11th Cir. 2003) (stating that a

prisoner may establish retaliation by "demonstrating that the prison official's actions were 'the result of his having filed a grievance concerning the conditions of his imprisonment.'"). Further, when prisoners raise allegations of retaliation, doubt is not automatically cast upon the defendant's action solely because the plaintiff was engaged in protected speech or conduct. Adams v. James, 784 F.2d 1077, 1082 (11th Cir. 1986). Instead, a presumption of legitimacy is afforded to the official conduct of government employees. National Archives & Records Admin. v. Favish, 541 U.S. 157, 174 (2004). Because claims of retaliation may be easily fabricated, they should be reviewed with skepticism. Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995).

Regarding the third element, the plaintiff must show that the alleged retaliatory conduct would not have occurred but for the retaliatory motive. Hartman v. Moore, 547 U.S. 250, 260, 126 S. Ct. 1695 (2006); Allen, 578 F. App'x at 840 (citing O'Bryant, 637 F.3d at 1217); see, e.g., Jackson v. Fair, 846 F.2d 811, 820 (1st Cir. 1988) (institutional transfer alleged to have been done out of retaliation). If the plaintiff makes a showing that his protected conduct was a motivating factor behind any harm, then if the defendant can demonstrate that he would have taken the same action in the absence of the protected activity, the retaliation claim fails. Hartman v. Moore, 547 U.S. 250, 260, 126 S. Ct. 1695 (2006); Moton v.

Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011); Smith v. Mosley, 532 F.3d at 1278-79.

### *Plaintiff's Disciplinary Reports*

If a prisoner is found guilty of an actual disciplinary infraction after being afforded due process *and* there was evidence to support the disciplinary panel's fact finding, the prisoner cannot later state a Retaliation claim against the prison employee who reported the infraction in a disciplinary report. O'Bryant v. Finch, 637 F.3d 1207, 1215-16 (11th Cir. 2011). "Whether an inmate actually committed the charged infraction or whether the disciplinary report falsely accuses the inmate are questions of fact that are decided by the disciplinary panel." Id.

Further, this Court has described the main rationale underlying O'Bryant:

> [O'Bryant] held that *"[i]f a prisoner is found guilty of an actual disciplinary infraction after being afforded due process and there was evidence to support the disciplinary panel's fact finding, the prisoner cannot later state a retaliation claim against the prison employee who reported the infraction in a disciplinary report."* O'Bryant, 637 F.3d at 1215. *"To find otherwise would render the prison disciplinary system impotent by inviting prisoners to petition the courts for a full retrial each time they are found guilty of an actual disciplinary infraction after having filed a grievance."* Id. at 1216. Ultimately, the Eleventh Circuit determined that because the prisoner in O'Bryant was guilty of the disciplinary infraction, his claim for retaliation failed.

23

Bates v. Andrews, 2012 WL 592904, *4 (N.D. Fla. 2012) (report and recommendation) (emphasis added). See also Bates v. Gionet, 2012 WL 601268 (N.D. Fla. 2012) (adopting report and recommendation).

"An inmate who claims that the defendant's retaliatory conduct was writing a false disciplinary report cannot maintain that claim, however, if he is 'convicted' of the behavioral violation alleged in the report after being afforded due process, and there is 'evidence to sustain the conviction.'" Perez v. Grant, 2014 WL 752375, *4 (N.D. Fla. Feb. 25, 2014) (citing O'Bryant, 637 F.3d at 1215).

In judicial challenges to prison disciplinary action, prisoners with the requisite liberty or property interest have a clear legal right to the limited due process protections set out in Wolff v. McDonnell, 418 U.S. 539 (1974), and Superintendent, Massachusetts Correctional Institution, Walpole v. Hill, 472 U.S. 445 (1985). Wolff requires that a prisoner receive: (1) advance written notice of the disciplinary charge; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in defense; and (3) a written statement by the fact finder of the evidence relied on and the reasons for the disciplinary action. Wolff, 418 U.S. at 564-65. Hill requires that there be "some evidence" to support the findings of the disciplinary hearing team. Hill, 472 U.S. at 455.

As to Plaintiff's disciplinary reports written by Defendant Goldhagen, Plaintiff makes no allegation that he did not receive due process for any of the reports issued, but rather states only that the DRs were written in retaliation. (Doc. 20 at 15) Plaintiff's claims are therefore barred by O'Bryant. See Defendants' Exhibits B-C.

**_Plaintiff's Administrative Grievances against Law Library Strain_**

Plaintiff alleges that the use of force against him was done in retaliation for his writing "Freedom of Speech" grievances regarding FDC employee J. W. Strain. (Doc. 20 at 11, 14) Those grievances, however, were determined to be attempts to lie to staff and Plaintiff was written a disciplinary report for violation of Rule 33-602.314(9-10), F.A.C. for Lying to Staff as a result. See Defendants' Exhibit A. Plaintiff was found guilty of this disciplinary report and was sanctioned to sixty days of disciplinary confinement and forfeited sixty days of gain time as a result. Id. at 2. Pursuant to Heck, Plaintiff cannot contest the statements made in that disciplinary report for the purposes of supporting a § 1983 claim. Accordingly, we take as true the fact that Plaintiff's grievances were, in fact, perpetuating lies.

As addressed above, "an inmate's First Amendment right to free speech is not protected if affording protection would be inconsistent with the inmate's status as a prisoner or with the legitimate penological objectives of the corrections system.'" Smith, 532 F.3d at 1277; See also Mathews v. Paynter, 752 Fed. Appx. 740 (11th Cir. 2018). Accordingly, as Plaintiff's grievances perpetuating lies to FDC officials

are not protected speech, Plaintiff fails to demonstrate a constitutional violation and

Defendants are entitled to summary judgment on Plaintiff's retaliation claim.

### *Florida Bar Complaint*

In the same vein as above, Plaintiff alleges that the use of force was conducted

in retaliation for Plaintiff's having filed a Bar Complaint against an attorney working

on behalf of the Florida Department of Corrections, Plaintiff's claims also fail. First,

Plaintiff's bar complaint was determined to be meritless by the Florida Bar almost

immediately after it was filed. See Defendants' Exhibit G. Plaintiff has no

constitutional interest in a frivolous or meritless claim. The Florida Supreme Court

has analyzed the question of whether Plaintiff's have a constitutionally protected

interest in such claims as such:

> As the United States Supreme Court has made clear, inmates simply do
> not have a right to file frivolous lawsuits. See Lewis v. Casey, 518 U.S.
> 343, 353, 116 S. Ct. 2174, 135 L.Ed.2d 666 (1996). The Supreme Court
> defined "access to courts" not as the affirmative assistance of inmates
> in the filing of their suits, as it had previously defined it in *Bounds v.
> Smith*, 430 U.S. 817, 97 S.Ct 1491, 52 L.ED.2d 72 (1977), but rather as
> the avoidance of significant impediments to the fling of nonfrivolous
> legal claims. *Lewis*, 518 U.S. at 352, 116 S.Ct 2174. The majority
> specifically noted that, contrary to its opinion, the dissent felt that
> inmates also had a constitutional right to bring frivolous actions. *Id*. at
> 353 n.3, 116 S.Ct. 2174. The majority stated that "[d]epriving someone
> of a frivolous claim . . . deprives him of nothing at all.

Spencer v. Fla. Dep't of Corr., 823 So.2d 752, 755-56 (Fla 2002).

The United States Supreme Court has also addressed specifically the issue of "sham litigation" as it relates to First Amendment claims and explicitly made the same comparison to the analysis for access to courts claims.

> The first amendment interests involved in private litigation . . . are not advanced when the litigation is based on intentional falsehoods or on knowingly frivolous claims. Furthermore, since sham litigation by definition does not involve a bona fide grievance, it does not come within the first amendment right to petition. . . Just as false statements are not immunized by the First Amendment right to freedom of speech . . . baseless litigation is not immunized by the First Amendment right to petition.

Bill Johnsons Restaurants Inc v. NLRB, 103 S.Ct. 2161, 2170 (1983). Accordingly, Plaintiff has no constitutional protected interest in filing a meritless bar complaint and cannot meet the first element of his retaliation claim.

Additionally, Plaintiff's bar complaint did not arrive at the Office of the Attorney General for review until August 19, 2015 – the day after the incident at issue. See Defendants' Exhibit G at 2. Therefore, Plaintiff is unable to demonstrate a causal connection between the filing of his complaint against former Assistant Attorney General Katherine Hagan whom Plaintiff alleges is related to Defendant Goldhagen and the use of force against him in alleged retaliation as the existence of the bar complaint would have been unknown to even that attorney at the time, let alone relatives of that attorney. Id.

27

Accordingly, Defendants are entitled to summary judgment on Plaintiff's retaliation claims as addressed above.

## IV.   **Plaintiff is not entitled to compensatory or punitive damages per 42 U.S.C. §1997e(e).**

Plaintiff fails to state a claim which would entitle him to compensatory or punitive damages as he fails to state a physical injury which is greater than *de minimus*. As such, Plaintiff's request for compensatory and punitive damages from Defendants must be dismissed pursuant to 42 U.S.C § 1997e(e).

"No federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  The Eleventh Circuit is in accord that, under 42 U.S.C. § 1997e(e), compensatory and punitive damages are unavailable absent physical injury. *Al-Amin v. Smith*, 637 F.3d 1192 (11th Cir. 2011) (holding that "the overall tenor of *Harris* and its progeny, when taken together, unmistakably supports" the conclusion that § 1997e(e) applies to constitutional claims and precludes the recovery of compensatory and punitive damages in the absence of the requisite physical injury; Smith v. Allen, 502 F.3d 1255, 1271 (11th Cir. 2007) (stating that § 1997e(e) precludes an inmate's claims for compensatory and punitive damages without a prior showing of physical injury); Slicker v. Jackson, 215 F.3d 1225, 1229 (11th Cir. 2000) ("compensatory damages

28

under § 1983 may be awarded only based on *actual injuries* caused by the defendant and cannot be presumed or based on the abstract value of the constitutional rights that the defendant violated"). The physical injury requirement applies to all federal claims, including constitutional claims.   Harris v. Garner, 216 F.3d 970, 984-85 (11th Cir. 2000).

While 42 U.S.C. § 1997e(e) does not define "physical injury," the Eleventh Circuit has held that to satisfy the statute, the physical injury must be more than minimal, but need not be significant. Daughtry v. Moore, Slip Copy, 2009 WL 1151858, *5 (S.D. Ala. 2009), citing Dixon v. Toole, 225 F. App'x 797, 799 (11th Cir. 2007). See also Harris v. Garner, 190 F.3d 1279, 1286 (11th Cir. 1999), vacated, 197 F.3d 1059, reinstated in relevant part, 216 F.3d 970, 972 (11th Cir. 2000) (en banc); Mitchell v. Horn, 318 F.3d 523, 536 (3rd Cir. 2003); Oliver v. Keller, 289 F.3d 623, 626-628 (9th Cir. 2002); Siglar v. Hightower, 112 F.3d 191, 193-94 (5th Cir. 1997), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010). In explaining the type of injury which is not barred by 28 U.S.C. § 1997e(e), some courts have proffered the following common-sense approach; "would the injury **require** or **not require** a free world person to visit an emergency room, or have a doctor attend to, give an opinion, diagnosis and/or medical treatment for the injury?" Luong v. Hatt, 979 F. Supp. 481, 486 (N.D. Tex. 1997) (emphasis added). Stated another way:

A physical injury is an observable or diagnosable medical condition requiring treatment by a medical care professional. It is not a sore muscle, an aching back, a scratch, an abrasion, a bruise, etc., which last even up to two or three weeks. People in regular and ordinary events and activities in their daily lives do not seek medical care for the injuries they receive unless it obviously appears to be of a serious nature, or persists after home remedy care. Thus, the seriousness of the injury needed... require more than the types and kinds of bruises and abrasions about which the Plaintiff complains.

Talley v. Johnson, 2008 WL 2223259, *3 (M.D. Ga. 2008) (citing Luong). See also Thompson v. Sec'y, Fla. Dep't of Corr., 551 F. App'x. 555, 557 n.3 (11th Cir. 2014) (per curiam) (unreported op.) (citing Luong); Brown v. McGowan, 2014 WL 4538056, *7 (N.D. Fla. 2014) (same); Kirkland v. Perkins, 2014 WL 1333214, *13 n.7 (S.D. Fla. 2014) (same).

Further, the Eleventh Circuit has held that Harris and its progeny determined that § 1997e(e) foreclosed claims for both compensatory and punitive damages. Al-Amin v. Smith, 637 F.3d 1192, 1197-98 (11th Cir. 2011); Fraizer v. McDonough, 264 F. App'x 812, 815 (11th Cir. 2008). Nominal damages, however, are not precluded by § 1997e(e). Fraizer, 264 F. App'x at 815; Smith v. Allen, 502 F.3d 1255, 1271 (11th Cir. 2007), abrogated on other grounds by Sossamon v. Texas, 563 U.S. 277, 283 n.3 (2011). Nominal damages are appropriate "if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages." Hughes v. Lott, 350 F.3d 1157, 1162 (11th Cir. 2003).

30

In this case, Plaintiff's injuries do not rise to a level which is greater than *de minimus* in nature as Plaintiff. See Defendants' Exhibit F. Plaintiff's medical records stemming directly from the incident demonstrate that he not only suffered no injury but also reported only pain in his hands which was thoroughly examined at that time. See Defendants' Exhibit F. Camera footage in this case demonstrate that Plaintiff appears to be entirely uninjured after the incident. See Defendants' Exhibit D, generally.

Plaintiff's medical records do not support his allegation that an item was placed in his rectum despite multiple examinations and Plaintiff did not report that allegation when he was first examined by medical staff immediately after the incident of August 18, 2015. See Defendants' Exhibit F at ¶9-11. Plaintiff's medical records do not support his allegation that his previous left shoulder injury was worsened or in any way impacted by the use of force of August 18, 2015. Id. at ¶ 9, 12-13. Finally, Plaintiff's medical records do not support Plaintiff's contention that his hands or fingers were in any way injured during the use of force on August 18, 2015. Id. at ¶9-10. To the extent that Plaintiff alleges that the injuries to his hands were not reflected in those medical records because medical staff were instructed to "do the minimum" or that the medical staff did a less than adequate examination of him, his claim is refuted by the record. Even taking Plaintiff's statement as true that the medical personnel did "the minimum," that minimum included a physical

31

examination of his hands which was recorded on the handheld video footage, an analysis of his hands sufficient to determine that there was no deformity, swelling, or redness, and a capillary refill test of his blood flow. Id. Plaintiff fails to allege what additional examination was necessary at that time. Id. at ¶ 14. To the extent that Plaintiff might rely on the fact that injury to his hands and/or fingers were found by other medical professionals at a later date to support his allegation that said injury was the result of the use of force of August 18, 2015, his claim is again refuted by the record which demonstrates that no injury was seen by any medical staff until three days later, during which time any number of occurrences may have resulted in an injury to Plaintiff. The fact remains that Plaintiff was thoroughly examined immediately after the use of force and had no such injury at that time. Id. at ¶ 9-10.

As a result, should this Court not determine that Plaintiff has failed to state a constitutional violation against Defendants and that Plaintiff's claims are not subject to summary judgment as described above, based on Plaintiff's injuries not being greater than *de minimus* in nature, Plaintiff's potential relief should be limited to nominal damages.

## CONCLUSION

Wherefore, for the foregoing reasons, summary judgment must be entered in favor of the Defendants on all claims.

Respectfully Submitted,

**ASHLEY MOODY**
ATTORNEY GENERAL

/s/ Kristen J. Lonergan
Kristen J. Lonergan
Assistant Attorney General
Florida Bar No.: 125556
Office of the Attorney General
The Capitol, Suite PL-01
Tallahassee, Florida 32399
Telephone: (850) 414-3300
Facsimile: (850) 488-4872
Kristen.Lonergan@myfloridalegal.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed electronically through CM/ECF on March 9, 2020, and sent via U.S. Mail to: Gerrard D. Jones, DOC# 503034, Dade Correctional Institution, 19000 S.W. 377th Street, Florida City, Florida 33034-6409 on March 9, 2020.

/s/ Kristen J. Lonergan
Kristen J. Lonergan

## CERTIFICATE OF WORD COUNT

I HEREBY CERTIFY that in accordance with Northern District of Florida local rule 7.1(F), the total word count for this motion and memorandum is 7911 words.

/s/ Kristen J. Lonergan
Kristen J. Lonergan
33

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

GERRARD D. JONES
DOC # 503034,

       Plaintiff,

v.                             Case No. 3:18-cv-155-LAC-MJF

SCHWARZ, ET AL.,

       Defendants.

_____/

## EXHIBITS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

- **Exhibit A: Disciplinary Report Long Form Log#231-171170 (Doc. 77-1)**
- **Exhibit B: Disciplinary Report Long Form Log#231-171170 (Doc. 77-2)**
- **Exhibit C: Disciplinary Report Long Form Log#231-171170 (Doc. 77-3)**
- **Exhibit D: Handheld Video Footage for Use of Force 17-13944 (Under Seal)**
- **Exhibit E: Fixed Wing Video Footage for Use of Force 17-13944 (Under Seal)**
- **Exhibit F: Declaration of Kellie Caswell with Medical Records (Doc. 77-4)**
- **Exhibit G: Bar Complaint against Attorney Hagan (Doc. 77-5)**

EXHIBIT
"H"

# UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA
## _____PENSACOLA_____ DIVISION

## CIVIL RIGHTS COMPLAINT FORM
## TO BE USED BY PRISONERS IN ACTIONS UNDER 42 U.S.C. § 1983

GERRARD D. JONES (A|K|A "LAWYERBOY"),

FOURTH AMENDED COMPLAINT

Inmate # _____503034_____

(Enter full name of Plaintiff)

vs.

CASE NO: _3:18cv155-LC-EMT_

(To be assigned by Clerk)

1. CAPTAIN SCHWARZ,
2. SGT. GOLDHAGEN,
3. OFFICER BEAUDRY,
4. OFFICER DENMON
5. OFFICER F.D. POGUE,

(Enter name and title of each Defendant.

If additional space is required, use the

blank area below and directly to the right.)

( ALL SUED IN "INDIVIDUAL" CAPACITY).

## ANSWER ALL QUESTIONS ON THE FOLLOWING PAGES:

## I.   PLAINTIFF:

State your full name, inmate number (if applicable), and full mailing address in the lines below.

Name of Plaintiff:   GERRARD JONES, A/K/A "LAWYERBOY",

Inmate Number   503034

Prison or Jail:   FLORIDA STATE PRISON

Mailing address:   P.O. BOX 800

RAIFORD, FLORIDA

32083

## II.   DEFENDANT(S):

State the name of the Defendant in the first line, official position in the second line, place of employment in the third line, and mailing address. Do the same for every Defendant:

(1)   Defendant's name: 1. CAPTAIN SCHWARZ
      Official position:   PRISON GUARD
      Employed at:   SANTA ROSA C.I.
      Mailing address:   5850 E. MILTON ROAD
      MILTON, FL. 32583

      4. OFFICER DENMON
      PRISON GUARD
      SANTA ROSA C.I.
      5850 E. MILTON ROAD
      MILTON, FL. 32583

(2)   Defendant's name: 2. SGT. M. GOLDHAGEN
      Official position:   PRISON GUARD
      Employed at:   SANTA ROSA C.I.
      Mailing address:   5850 E. MILTON ROAD
      MILTON, FL. 32583

      5. OFFICER POGUE
      PRISON GUARD
      SANTA ROSA C.I.
      5850 E. MILTON ROAD
      MILTON, FL. 32583

(3)   Defendant's name: 3. OFFICER BEAUDRY
      Official position:   PRISON GUARD
      Employed at:   SANTA ROSA C.I.
      Mailing address:   5850 E. MILTON ROAD.
      MILTON, FL. 32583

## ATTACH ADDITIONAL PAGES HERE TO NAME ADDITIONAL DEFENDANTS

III.   **EXHAUSTION OF ADMINISTRATIVE REMEDIES** *YES. ALL "FULLY EXHAUSTED."*

Exhaustion of administrative remedies is required prior to pursuing a civil rights action regarding conditions or events in any prison, jail, or detention center. 42 U.S.C. § 1997e(a). Plaintiff is warned that any claims for which the administrative grievance process was not completed prior to filing this lawsuit may be subject to dismissal.

IV.   **PREVIOUS LAWSUITS**

NOTE: FAILURE TO DISCLOSE ALL PRIOR CIVIL CASES MAY RESULT IN THE DISMISSAL OF THIS CASE. IF YOU ARE UNSURE OF ANY PRIOR CASES YOU HAVE FILED, THAT FACT MUST BE DISCLOSED AS WELL.

A.   Have you initiated other actions in **state court** dealing with the same or similar facts/issues involved in this action?
Yes(X)                              No(  )

  1.   Parties to previous action:
       (a)   Plaintiff(s): _____ *SEE 3-A.* _____
       (b)   Defendant(s): _____
  2.   Name of judge: _____   Case #: _____
  3.   County and judicial circuit: _____
  4.   Approximate filing date: _____
  5.   If not still pending, date of dismissal: _____
  6.   Reason for dismissal: _____
  7.   Facts and claims of case: _____
       _____

       **(Attach additional pages as necessary to list state court cases.)**

B.   Have you initiated other actions in **federal court** dealing with the same or similar facts/issues involved in this action?

Yes(X)                              No(  )

  1.   Parties to previous action:
       a.   Plaintiff(s): _____ *SEE 3-B.* _____
       b.   Defendant(s): _____
  2.   District and judicial division: _____
  3.   Name of judge: _____   Case #: _____
  4.   Approximate filing date: _____
  5.   If not still pending, date of dismissal: _____
  6.   Reason for dismissal: _____

3

CONTINUATION LISTING OF STATE COURT (PRIOR/PENDING) CASES:
(CASES "OPEN" ARE UNDERLINED).

LEON COUNTY, FLORIDA
2012-CA-2275; 2014-CA-3256;
2014-CA-3287; 2015-CA-1304;
2015-CA-2253, 2015-CA-2408;
2015-CA-2591; 2015-CA-2594;
2015-CA-2596; 2016-CA-1015;
2016-CA-1306; 2016-CA-1308;
2016-CA-1309; 2016-CA-1467;
2016-CA-1469; 2016-CA-1478;
2016-CA-1643; 2016-CA-1845;
2018-CA-0477; 2018-CA-1285.

BRADFORD COUNTY, FLORIDA:
2018-CA-222.

JEFFERSON COUNTY, FLORIDA:
2013-CA-33; 2014-CA-287.

SANTA ROSA COUNTY, FL:
2015-CA-209.

MIAMI-DADE COUNTY, FL:
GERRARD JONES-V-CECELIA JONES
DIVORCE GRANTED (2011).
CASE # UNKNOWN).

FIRST DCA
1D13-2645; 1D15-2106;
1D15-2377; 1D15-4831;
1D15-5190; 1D16-0597;
1D16-0696; 1D16-2974;
1D16-2990; 1D16-3481;
1D18-_____ (PENDING "MANDAMUS"
                ACTION, 1ST DCA)
(NO CASE # ASSIGNED YET).

FLA. SUPREME COURT:
SC 00-80544;
SC 13-142;
SC 16-530.

I STATE IN GOOD FAITH, THAT LISTED HEREIN,
THESE ARE THE STATE CASES. I RECOLLECT NO
OTHERS RELEVANT HERE AND DEFER MYSELF
TO FURTHER SCRUTINY OF THIS COURT AND
OTHER PARTIES.

Gerrard D. Jones
10-19-18.

(3-A)

CONTINUATION LISTING OF FEDERAL COURT (PRIOR/PENDING) CASES:
(CASES "OPEN" ARE UNDERLINED).

11ᵗʰ CIRCUIT (ATLANTA):
18-12624-E; 18-11918-K
16-15254-C; (THERE MAY BE ONE MORE. I'M NOT SURE).

N.D. TALLAHASSEE:
4:16-CV-36; 4:16-CV-236;
4:18-CV-76; 4:18-CV-77.

N.D. PENSACOLA:
3:16-CV-155; 3:16-CV-313*;
3:18-CV-1118.

M.D. JACKSONVILLE:
3:16-CV-35, 3:18-CV-390.

M.D. TAMPA:
8:91-CV-1083; 8-92-CV-795;
8:92-CV-1000; 3:16-CV-35.

M.D. OCALA:
5:18-CV-56; 5:18-CV-78.

I STATE IN GOOD FAITH, THAT LISTED HEREIN
THESE ARE THE FEDERAL CASES. I RECOLLECT
NO OTHERS RELEVANT HERE AND OFFER MYSELF
TO FURTHER SCRUTINY BY THIS COURT AND
OTHER PARTIES. THERE WAS A PRIOR "DISMISSAL" AS
*FRIVOLOUS, FOR ME NOT LISTING "ALL PRIOR CASES"
ONCE. I CORRECT THAT. ALSO SAME, I BELIEVE IN
ONE OF THE NEARLY 30 YEAR OLD TAMPA CASES.

(3-B)

10-19-18

7.   Facts and claims of case: _____ *SEE,* **3-B** _____

_____

**(Attach additional pages as necessary to list other federal court cases.)**

C.   Have you initiated other actions (*besides those listed above in Questions (A) and (B)*) in **either state or federal court** that relate to the fact or manner of your incarceration (including habeas corpus petitions) or the conditions of your confinement (including civil rights complaints about any aspect of prison life, whether it be general circumstances or a particular episode, and whether it involved excessive force or some other wrong)?

Yes(X)                    No(  )

If YES, describe each action in the space provided below.  If more than one action, describe all additional cases on a separate piece of paper, using the same format as below.

1.   Parties to previous action:
     a.     Plaintiff(s): _____ *SEE 3-A AND 3-B.* _____

     b.     Defendant(s): _____

2.   District and judicial division: _____

3.   Name of judge: _____    Case #: _____

4.   Approximate filing date: _____

5.   If not still pending, date of dismissal: _____

6.   Reason for dismissal: _____

7.   Facts and claims of case: _____

_____

**(Attach additional pages as necessary to list cases.)**

D.   Have you ever had any actions in **federal court** dismissed as frivolous, malicious, failing to state a claim, or prior to service?  If so, identify each and every case so dismissed:

Yes(X)                    No(  )

1.   Parties to previous action:
     a.     Plaintiff(s): _____ *SEE 3-A AND 3-B.* _____

     b.     Defendant(s): _____

2.   District and judicial division: _____

3.   Name of judge: _____    Case Docket # _____

4.   Approximate filing date: _____    Dismissal date: _____

5.   Reason for dismissal: _____

4

20. GOLDHAGEN CONTINUED, SAYING "YOU SEE JONES, WE GOT A BIG BIG FAMILY UP HERE IN THE PANHANDLE. THIS IS REDNECK/CRACKER/COUNTRY BOY/KKK TURF—, AND, IF YOU THINK WE WON'T KILL YOU JONES, JUST TRY US".

21. GOLDHAGEN THEN SAID "JONES, WHEN I GET YOU TO LOCK-UP (J-DORM), I'M GONNA TURN YOU OVER TO ANOTHER ONE OF OUR BROTHERS, AND HE WILL FURTHER EXPLAIN STUFF TO YOU." WE ENTERED J-DORM, AND I WAS TAKEN FOR A "POST-USE-OF-FORCE" EXAMINATION. (THIS WILL BE DISCUSSED IN GREATER DETAIL LATER IN THIS LAWSUIT. BUT, SCHWARZ AND GOLDHAGEN STAYED IN THE EXAMINATION ROOM AND SCHWARZ TOLD THE NURSES TO "DO THE MINIMUM", AND THE NURSES COMPLIED, AND "DID THE MINIMUM").

22. THEREAFTER, GOLDHAGEN DELIVERED ME TO THE CUSTODY OF HIS "BROTHER", OFFICER RICHARDSON, A WHITE MALE WHO WORKS IN J-DORM. RICHARDSON CAME TO MY CELL AND, IN A THREATENING WAY, HE WAVED A PIECE OF PAPER AND SAID "JONES, DO YOU INTEND TO SIGN THIS HERE FORM AGAINST MY BROTHERS (SCHWARZ AND GOLDHAGEN) ABOUT USE OF FORCE?". I SAID "NO", AS I DIDN'T HAVE ANY STRENGTH LEFT TO ENDURE MORE.

23. RICHARDSON THEN SAID "LAWYER BOY, WE WILL STARVE YOU TO DEATH, GET YOU GASSED-MACED, WRITE BOGUS DISCIPLINARY REPORTS ("DR'S"), TEAR UP ALL YOUR MAIL AND MORE AND GET CLEAN AWAY WITH IT." HE CAME BACK LATER AND TOLD ME TO "LOOK OUT YOUR WINDOW TONIGHT" (I WAS IN ROOM J 210BL).

24. LATER THAT NIGHT (OR EARLY MORNING) THERE WAS A "BAM" ON MY WINDOW, AND I SAW AN OFFICER "FAST-WALKING" AWAY. I LOOKED OUT MY WINDOW INTO THE PARKING LOT. IT WAS TWO TRUCKS OVER THERE, AND FOUR WHITE MEN POINTING GUNS. I DUCKED DOWN, AND I SAT ON THE FLOOR ALL NIGHT.

25. RICHARDSON CAME BACK TO WORK AND THREATENED ME ABOUT WHAT WILL HAPPEN IF I FILED ANY GRIEVANCES AGAINST HIM OR HIS "BROTHERS" OR LIBRARY TECH-ASSISTANT, J.W. STRAIN. HE STOPPED BY MY CELL MANY DAYS TO THREATEN ME ON THIS.

(5-F)

26. ON ONE SUCH OCCASION, RICHARDSON "BRAGGED", WHILE THREATENING ME ABOUT REPRISALS/RETALIATIONS HIM AND HIS "BROTHERS" WOULD DO IF I FILED GRIEVANCES/COURT ACTIONS, RICHARDSON TOLD ME THAT HE TOO WAS A KKK-MEMBER AND THAT DAVID MORAN (THE KKK-PRISON GUARD LISTED IN THE FOOTNOTE ON PAGES #5-C AND #5-D) WAS "HIS BROTHER, TOO."

27. RICHARDSON TOLD ME THAT HE GETS ALL OF HIS KKK-BROTHERS "DISCOUNTS" ON FIREARMS, BECAUSE HIS COUSIN (WHO IS ALSO, ACCORDING TO RICHARDSON, A KKK-MEMBER TOO) — WORKS AT "DEEP SOUTH GUNS AND AMMO" (A LOCAL GUN STORE?), AND THAT THIS COUSIN ALSO GETS THEM "THROW AWAY GUNS", WITH THE SERIAL NUMBERS/MARKINGS "SHAVED OFF".

28. RICHARDSON TOLD ME THAT HIS OTHER COUSIN, "ERNIE", OWNS A BOAT AND HAS A SECRET-SPOT "GATOR PIT", (AND THAT HE (RICHARDSON) HAS SEEN ERNIE'S GATORS "EAT A COUPLE OF NIGGERS, THAT THE KKK "BROTHERS" HAD KILLED".

29. GOLDHAGEN, WITH SCHWARZ AUTHORIZATION, RETALIATORILY WROTE TWO (2) DISCIPLINARY REPORTS (DRS) TO COVER UP THE 8-18-2015 ATTACK ON ME, HE RETALIATED ONE "DR", SAYING I DISOBEYED HIS "CUFF UP" ORDER (HE WROTE IT UP, INTENTIONALLY OMITTING THE FACT OF HIM DISREGARDING MY "FRONT CUFFS" MEDICAL PASS) — AS IF I HAD JUST FLAT OUT REFUSED TO BE HANDCUFFED IN ANY WAY, AT ALL.

30. GOLDHAGEN RETALIATED THE SECOND "DR", TO SAY THAT I HAD tried to strike/hit him, AS HE WAS ATTEMPTING TO CUFF ME, AND THAT HE HAD TO USE "REACTIONARY FORCE".

31. GOLDHAGEN (AND SCHWARZ, AS WELL AS THE OTHER OFFICERS PRESENT) KNEW THAT THEY HAD VIOLATED "USE-OF-FORCE" PRISON RULES, AS THIS WAS NOT "REACTIONARY USE OF FORCE", BUT AN "ORGANIZED USE OF FORCE"; WHICH HAS A STRICTER PROTOCOL TO FOLLOW, AND KNEW THEY NEEDED A "COVER-UP" PLAN.

32. INDEED, THE FACT OF ME PASSIVELY REFUSING CUFFS FOR A TOTAL OF ABOUT 20 MINUTES, AND GOLDHAGEN SECURING ALL THE OTHER INMATES IN THEIR ROOMS, AND CALLING SCHWARZ AND THEN PUTTING HANDCUFFS ON HIS HAND/FIST TO USE AS BRASS KNUCKLES — SHOWS IT WAS NOT "REACTIONARY FORCE".

5-G).

6.  Facts and claims of case: _SEE 3-A AND 3-B._

(Attach additional pages as necessary to list cases.)

## V.    STATEMENT OF FACTS:

State briefly the FACTS of this case. Describe how each Defendant was involved and what each person did or did not do which gives rise to your claim. In describing what happened, state the names of persons involved, dates, and places. Do not make any legal arguments or cite to any cases or statutes. You must set forth separate factual allegations in separately numbered paragraphs. You may make copies of this page if necessary to supply all the facts. Barring extraordinary circumstances, no more than five (5) additional pages should be attached. (If there are facts which are not related to this same basic incident or issue, they must be addressed in a separate civil rights complaint.)

1. ON 8-18-15, ABOUT 9:10 AM, I WAS IN MY ROOM (L4206L) AT SANTA ROSA PRISON, WHEN A OFFICER CALLED ME, AND SAID GET DRESSED WITH MY I.D. CARD TOO. I DID, GO RIGHT TO MY ROOM AND SGT. GOLDHAGEN, OFFICERS DENMAN, BEAUDRY & POGUE ALL CAME TO MY DOOR AS I GOT DRESSED AND SAID I WAS GOING TO LOCKDOWN FOR J.W. STRAIN (THE LIBRARIAN) (I HAD WRITTEN "FREEDOM OF SPEECH" GRIEVANCES ON HER & K. HAGAN)

2. GOLDHAGEN SAID "TURN AROUND" AND FACE THE TOILET, AND I DID. HE SAID FOR ME TO PUT MY HANDS BEHIND MY BACK TO BE CUFFED, I TOLD HIM I HAVE A "FRONT CUFF PASS", BECAUSE MY (L) SHOULDER WAS INJURED, I SHOWED HIM MY PASS ON CAMERA, PUT MY HANDS IN FRONT OF ME.

3. GOLDHAGEN SAID "JONES, I'm ORDERING YOU TO TURN, FACE THE TOILET AND PUT YOUR HANDS BEHIND YOUR BACK, NOW!" I THEN REPEATED THAT I HAVE A "FRONT CUFF PASS" AND I OFFERED TO CUFF IN FRONT. GOLDHAGEN SAID "JONES, YOU CRAZY MOTHERFUCKER, I DON'T KNOW WHAT'S IN THOSE PILLS YOU TAKE EVERYDAY, I DON'T GIVE A FUCK WHAT KIND OF PASSES YOU GOT". HE SAID THIS BECAUSE, INTER ALIA, HE BELIEVED MEDS MADE ME "CRAZY".

4. I SLOWLY PUT MY HANDS TOGETHER, OFFERING HIM TO CUFF ME IN FRONT. I SLOWLY (ON CAMERA) EXTENDED MY ARMS TO HIM OUT MY DOOR TO BE CUFFED IN FRONT, BUT HE REFUSED TO FRONT CUFF ME, DESPITE SEEING MY VALID PASS. GOLDHAGEN THEN LOUDLY SAID "LET'S SEE WHAT MY BROTHER HAS TO SAY ABOUT IT, TOUGH-GUY". THEN, HE GOT ON HIS RADIO AND SAID "I GOT AN INMATE WHO IS REFUSING TO CUFF UP." DOZENS OF INMATES WERE MILLING AROUND AND GOLDHAGEN ORDERED ALL OF THEM TO LOCK THEMSELVES INTO THEIR ROOMS, AND OTHER STAFF ASSISTED IN CLOSING THE DOORS OF ALL THE OTHER INMATES.

FOOTNOTE #5-A : GOLDHAGEN AND OTHER STAFF PRESENT KNEW AT ALL TIMES THAT I
TAKE PSYCHOTROPIC MEDS, AS I HAVE HIGH ANXIETY, DEPRESSION,
"PTSD", GOLDHAGEN WOULD OFTEN SEE ME AND MOCK ME, CALLING ME "RETARD/CRAZY."

5. ALL OTHER INMATES WENT TO THEIR ROOMS AND GOLDHAGEN TOLD THEM TO LOCK THEIR DOORS, BECAUSE HE HAD "A SITUATION", AND ALL THE INMATES DID SO. GOLDHAGEN DID NOT LOCK MY DOOR, EVEN THOUGH I WAS ALLEGEDLY BEING "A SITUATION".

6. SOMETIME LATER, THE MAN GOLDHAGEN CALLED HIS "BROTHER" ARRIVED. GOLDHAGEN HAD BEEN IN THE DORM NOW FOR ABOUT 15 MINUTES. CAPTAIN SCHWARZ CAME IN, CAME UPSTAIRS TO MY CELL DOOR. I WAS LEANING BACK ONTO THE SINK. SCHWARZ HAD BROUGHT MORE OFFICERS WITH HIM. SCHWARZ SAID "JONES, DID MY STAFF TELL YOU TO CUFF UP?" I THEN BEGAN TO EXPLAIN MY INJURIES AND TOLD SCHWARZ THAT I HAVE A VALID "FRONT CUFF PASS." I AGAIN TOLD SCHWARZ "I'M NOT REFUSING TO CUFF UP, IT'S JUST THAT DUE TO MY INJURIES * THE DOCTORS ISSUED ME A FRONT CUFFS MEDICAL PASS".

7. SCHWARZ SAID "JONES, TURN AROUND (IS BACK) AND CUFF UP." I THEN, AGAIN, PLACED MY HANDS IN FRONT OF ME, OFFERING TO SUBMIT TO BEING FRONT-CUFFED. GOLDHAGEN, BY THIS TIME, HAD PUT A PAIR OF HANDCUFFS INTO HIS RIGHT HAND, LIKE A PAIR OF BRASS KNUCKLES. SCHWARZ AND GOLDHAGEN STEPPED AWAY FROM MY CELL DOOR TO CONFER, THEN, GOLDHAGEN CAME BACK TO MY DOOR, NOW TIGHTLY CLENCHING THE HANDCUFFS LIKE "BRASS KNUCKLES" AGGRESSIVELY IN HIS RIGHT HAND.

8. SCHWARZ THEN SAID SOMETHING TO GOLDHAGEN THAT I DIDN'T HEAR. GOLDHAGEN RESPONDED TO SCHWARZ BY STATING "BRO, THIS IS A PILL-LINE RETARD!"(HE SCREAMED THIS LOUDLY).

(5-8).

* I HAD BEEN ISSUED THE "FRONT CUFFS" PASS BY DOCTORS AT JEFFERSON CORRECTIONAL INSTITUTION ("JCI") IN OCTOBER 2014, DUE TO THE ASSISTANT WARDEN AT JCI, ANTONIO M. HUDSON, AND COLONEL TORREY M. JOHNSON HAVING ATTACKED ME AT JCI ON 10-7-2014, IN RETALIATION FOR ME INFORMING THE FBI AND FDLE ABOUT PRISON GUARDS MURDERING AN INMAI

9. SCHWARZ AND GOLDHAGEN AND POGUE HAVE A KNOWN REPUTATION FOR BEING OVERLY VIOLENT AGAINST INMATES AND SCHWARZ AUTHORIZES THEM TO WRITE FALSE "DR'S" WHICH SCHWARZ "APPROVES". SO, I BELIEVE SCHWARZ AUTHORIZED THEM TO INJURE ME, AS SCHWARZ THEN TOLD GOLDHAGEN "DO <u>WHATEVER</u> YOU NEED TO DO TO CUFF HIM, <u>IN BACK!!</u>" GOLDHAGEN IMMEDIATELY CAME AT ME, SWINGING HIS FIST, CURLED AROUND THE CUFFS TO USE THEM LIKE BRASS KNUCKLES TO HIT ME IN MY FACE. I DEFLECTED THE PUNCH AND HE BECAME ANGRIER AND SWUNG AGAIN WITH THE SAME INTENT TO HIT ME IN THE FACE WITH HIS RIGHT HAND, STILL HOLDING CUFFS LIKE BRASS KNUCKLES. I BLOCKED THAT PUNCH TOO, AND, SEEING THAT GOLDHAGEN WAS LITERALLY TRYING TO KILL ME, I SAID "OKAY, SARGE, YOU GOT THAT"— (SAYING THAT HE COULD CUFF ME <u>BEHIND MY BACK</u>).

10. DURING ALL THIS TIME, OTHER OFFICERS WERE IN THE ROOM AND THEY SEEMED "STARTLED" THEMSELVES AT GOLDHAGEN'S AGGRESSION TOWARDS ME. THEY HAD NOT, AT THAT POINT, DONE ANYTHING TO ME. THEY WERE WATCHING GOLDHAGEN TRY TO TAKE ME DOWN WITH A PUNCH WITH HIS HANDCUFFED RIGHT FIST.

11. SO, GOLDHAGEN STOPPED TRYING TO HIT ME AND HE WALKED AROUND BEHIND ME AND I GAVE HIM MY HANDS BEHIND MY BACK. (I DID NOT "MOVE, TWITCH, NOR OTHERWISE RESIST."). GOLDHAGEN CUFFED ME BEHIND MY BACK—— THEN, WHILE BEHIND ME HE PUT ME IN A CHOKE HOLD. HE BEGAN YELLING AT ME WHILE CHOKING ME. HE WAS SAYING "YOU AIN'T NO FUCKING LAWYER, "LAWYERBOY/LB", YOU DONE FUCKED 'ROUND AND PISSED A REAL LAWYER OFF".
(5-C).

* PLAINTIFF'S 20 YEAR OLD PRISON <u>"NICKNAME"</u> IS "LAWYERBOY/LB", DUE TO MY JAILHOUSE LAWYERING/PRISON ACTIVISM. GOLDHAGEN AND SCHWARZ REFERRED TO ME DURING THIS INCIDENT AS "LAWYERBOY". ALSO, UPON MY ARRIVAL AT SANTA ROSA CORRECTIONAL INSTITUTION ("SRCI"), GOLDHAGEN AND ME HAD NUMEROUS CONVERSATIONS AFTER HE HEARD ANOTHER INMATE CALL ME "LAWYERBOY". GOLDHAGEN AND ME DISCUSSED POLITICS, RELIGION, RACE-RELATIONS. HE SAID HE WAS PROUDLY RACIST/KKK AND HE DON'T LIKE RACE-MIXING, ESPECIALLY BLACK MEN WITH WHITE WOMEN SEXUALLY. HE TOLD ME HE <u>HATES</u> JAILHOUSE LAWYERS AND HE OPENLY TOLD ME HE "TOOK UP A MONEY-COLLECTION FOR HIS BROTHER, NAMED DAVID MORAN," WHO IS ON TRIAL FOR A KKK MURDER PLOT TO KILL A BLACK

FOOTNOTE CONTINUED: PRISONER: GOLDHAGEN SAID HE GOT MONEY FOR MORANS LAWYER FROM HIS SANTA ROSA "KKK BROTHERS AND OTHER WHITE STAFF."

12. I BEGAN LOSING CONSCIOUSNESS. GOLDHAGEN SAID "I GOT THIS MOTHERFUCKER — Y'ALL JUST HOLD HIS FEET." I FELT OTHER HANDS ON ME AND GOLDHAGEN CHOKED ME HARDER, TAKING ME DOWN TO THE CONCRETE FLOOR. I WAS THEN BENT BACKWARDS, WITH GOLDHAGEN PULLING/CHOKING MY NECK BACKWARDS, AND THE OTHERS HELPED PIN AND HURT ME. THEIR FORCE HAD ME BENT BACKWARDS, AS IF TO "HOGTIE" MY NECK TO MY ANKLES. I COULDN'T BREATHE, I WAS IN SEVERE PAIN. GOLDHAGEN KEPT CHOKING ME. I WENT UNCONSCIOUS.

13. I DON'T KNOW HOW LONG I WAS UNCONSCIOUS, BUT I CAME-TO, AND WAS LAYING ON MY STOMACH, STILL ON THE FLOOR. GOLDHAGEN SAID "OH, YOU'RE BACK WITH US, LAWYERBOY/LB". HE THEN BEGAN PULLING MY UNDERWEAR (BOXER SHORTS) INTO MY BUTT, AND HE HAD SOMETHING IN HIS HAND. HE STARTED PUSHING IT WILDLY, TO PUSH IT INTO MY RECTUM. I SQUIRMED/WIGGLED, AND HE KEPT PUSHING IT TO GET IT INSIDE ME. THE OBJECT CUT MY LEFT BUTTOCK, THEN WENT INTO MY RECTUM, AS THE OTHER OFFICERS PUSHED DOWN ON MY WRISTS BACKWARDS AND BENT MY FEET/ANKLES BACKWARDS WITH GREAT FORCE, CAUSING ME EXCRUCIATING PAIN AND INJURIES. I SCREAMED OUT IN PAIN.

14. I HEARD, THEN FELT BONES POPPING. I SCREAMED SOME MORE, AND REALIZED GOLDHAGEN WAS BENDING/BREAKING MY HANDS AND FINGERS IN ALL PAINFUL DIRECTIONS. GOLDHAGEN DID THIS FOR ABOUT A FULL CLOCK MINUTE, THEN, SOMEONE HEAVY SAT ON MY BACK, WHILE OTHERS KEPT BENDING BACKWARDS AND PUTTING PAINWRENCHING PRESSURE ON MY WRISTS/ANKLES/FEET, AND IT HURT SO SO MUCH AND I SCREAMED SO SO LOUDLY.

15. SCHWARZ CAME IN, AND STOOD UP NEAR MY HEAD, WHICH WAS TOWARDS THE ENTRYWAY. GOLDHAGEN WAS IN FRONT OF ME NOW, BETWEEN SCHWARZ AND ME. GOLDHAGEN TURNED MY FACE TOWARDS SCHWARZ AND PUSHED MY HEAD DOWN FLAT WITH HIS PALMS AND INVITED SCHWARZ TO KICK ME IN THE FACE. SCHWARZ SAID "JONES, YOU SEE MY FEET?". I TRIED TO TALK, BUT THE WEIGHT OF THE OFFICERS ON ME WAS TOO GREAT. I WAS SUFFOCATING, GOING BACK UNCONSCIOUS. SCHWARZ SAID "THAT'S ENOUGH".

(5-D)

16. OFFICERS BEAUDRY, DENMON, E.D. POGUE ALL KEPT PINNING ME DOWN TO HURT ME. THE THE OTHER OFFICERS ALL GOT OFF ME, EXCEPT GOLDHAGEN, WHO WAS STILL AIMING MY FACE AND INVITING SCHWARZ TO KICK ME. SCHWARZ SAID "JONES/LAWYERBOY/LB — DO YOU SEE MY FEET?" I NODDED "YES". SCHWARZ SAID "NEXT TIME I'LL USE THEM ON YOU." SCHWARZ THEN TOLD GOLDHAGEN AND THE OFFICERS "STAND HIM UP", AND THEY DID. THEY HELD ME, AS I COULDN'T STAND. MY LIMBS AND BODY WERE NUMBED WITH PAIN. SCHWARZ TOLD ME TO "TAKE SOME DEEP BREATHS", WHICH I TRIED TO DO.

17. SCHWARZ THEN WHISPERED SOMETHING TO GOLDHAGEN, THEN SAID TO THE OTHER OFFICERS "A COUPLE OF YOU TAKE JONES OVER TO CONFINEMENT (J-DORM)". GOLDHAGEN THEN TOLD SCHWARZ "OH, I'M GONNA WALK WITH LAWYERBOY/LB. WE STILL GOT SOME SHIT TO TALK OVER AND GET THE PROPER RESPECT."

18. GOLDHAGEN AND ANOTHER WHITE MALE OFFICER HELD ME UNDER MY ARMS AND WALKED ME OUT THE L-DORM-Y WING, TO J-DORM, GOLDHAGEN THEN BEGAN ACCUSING ME OF FILING GRIEVANCES AGAINST LAW LIBRARY TECH-ASSISTANT, J.W. STRAIN, AS WELL AS MY HAVING FILED FLORIDA BAR COMPLAINTS AGAINST J.W. STRAIN'S SUPERVISING ATTORNEY (PER "FREEDOM OF SPEECH"). BUT, GOLDHAGEN TOLD ME THAT I'D BETTER STOP FILING GRIEVANCES AND SO FORTH, BECAUSE MS. STRAIN DISAPPROVES.

19. GOLDHAGEN THEN ASKED ME "DO YOU KNOW A LAWYER WHO WORKS FOR OUR PRISON STAFF, OUT OF TALLAHASSEE?" I SAID "NO". GOLDHAGEN SAID, "WELL, SHE KNOWS YOU, AND I'M HERE BECAUSE YOU FILED SOME PAPERWORK AGAINST HER TOO, AND I WANT IT STOPPED". I THEN SAID "YOU MEAN MS. HAGAN, THE ATTORNEY GENERAL LAWYER?" GOLDHAGEN SAID "THAT WOULD BE HER". I SAID "DAMN", AND GOLDHAGEN SAID. "SHE (ATTORNEY GENERAL HAGAN) MAY BE SOME KIN TO ME" MEANING HIM, GOLDHAGEN AND MS. HAGAN).

(5-E).

---

* IMMEDIATELY AFTER GOLDHAGEN'S ATTACK OF 8-18-2015, I FILED A FLORIDA BAR COMPLAINT AGAINST ATTORNEY GENERAL HAGAN. I HAVE BEEN ADVISED IN WRITING BY THE ATTORNEY GENERAL'S OFFICE THAT MS. HAGAN'S EMPLOYMENT HAS BEEN TERMINATED, AS OF 10-1-2015, AND SHE HAS MOVED ALSO, OUT OF FLORIDA TO ILLINOIS.

33. I WAS, AT ALL TIMES, STANDING BY THE TOILET IN MY ROOM. ALL SCHWARZ AND/OR GOLDHAGEN OR ANY OTHER OFFICER NEEDED TO DO WAS SIMPLY CLOSE MY ROOM DOOR, AS I WAS ALONE IN THE ROOM, AS THE OFFICERS HAD SECURED MY ROOMMATE TO ANOTHER LOCATION, PRIOR TO LOCKING THE OTHER DOZENS OF INMATES INTO THEIR ROOMS TOO.

34. THIS SHOWS THE ATTACK WAS PLANNED, ANTICIPATED, AND INTENTIONAL — IN ORDER TO NEEDLESSLY INFLICT PAIN, INJURY, SUFFERING, PAIN, DEGRADATION, RACISM ON ME; BECAUSE THERE IS NO ANSWER FOR WHY THEY ALL LOCKED EVERYONE IN THEIR ROOMS except for me.

35. THE "ORGANIZED USE OF FORCE" RULES, CALLED FOR THEM TO SIMPLY LOCK ME IN MY ROOM, THEN, GAS/MACE ME, OR "CELL EXTRACT" ME, OR, JUST CUFF ME UP THROUGH THE CLOSED CELL-DOOR after verifying to their satisfaction THAT I HAD A VALID "FRONT CUFFS PASS" ISSUED BY THE JCI DOCTOR AND RE-ISSUED by the Santa Rosa DOCTOR — 8 MONTHS prior to THE 8-18-2015 ATTACKS. (ALL OF THEM FAILED TO PROTECT ME).

36. SCHWARZ, GOLDHAGEN AND ALL THE OTHER OFFICERS, NEEDLESSLY, MALICIOUSLY INFLICTED INJURIES/PAIN, FOR NO BONA FIDE "SECURITY" REASONS, BUT TO PUNISH/TORTURE ME FOR MY HAVING WRITTEN GRIEVANCES AGAINST J.W. STRAIN (THE LIBRARY TECH-ASSISTANT) AND THE BAR COMPLAINT AGAINST ATTORNEY GENERAL HAGAN — AS WELL AS RETALIATING AGAINST ME FOR MY PRISON ACTIVISM/JAILHOUSE LAWYERING AT JEFFERSON CORRECTIONAL INSTITUTION ("JCI"), AND AT SANTA ROSA.

5-H).

* THERE IS A SEPARATE LAWSUIT NOW FILED (CASE # 4:18-CV-76, N.D. TALLAHASSEE) AGAINST COLONEL TORREY M. JOHNSON (AS ASST. WARDEN, ANTONIO M. HUDSON, IS DECEASED NOW) FOR THEM ATTACKING ME ON 10-7-2014, DISLOCATING MY LEFT ARM/SHOULDER, WHICH IS WHY I HAD A "FRONT CUFFS PASS." AFTER ATTACKING ME AT JCI, THEY RETALIATORILY SENT ME TO SANTA ROSA, WHERE JOHNSON WORKED FOR 15 YEARS prior to BEING HIRED AT JCI

37. SCHWARZ, GOLDHAGEN, DENMON, BEAUDRY AND E.D. POGUE, (AS WELL AS OTHER OFFICERS WHO ARE NOT BEING SUED.), WERE ALL PRESENT IN L-DORM DURING THE 8-18-2015 ATTACK, AND EACH DEFENDANT INJURED, AND FAILED TO PROTECT ME.

38. I SUFFERED BEING CHOKED UNCONSCIOUS BY CONSTRICTION OF MY AIR PASSAGES; BEING ALSO CRUSHED UNDER THE WEIGHT OF THE OFFICERS; I SUFFERED BROKEN FINGERS ON BOTH HANDS, A POPPED BLOOD VESSEL IN MY RIGHT HAND; A BROKEN BONE ON THE BACK (MIDDLE) OF MY RIGHT HAND; SEVERE NERVE DAMAGE IN MY RIGHT HAND/RIGHT WRIST; PERMANENT DISFIGUREMENT OF MY EXTREMITIES; THE CUTTING OF MY LEFT BUTTOCK; THE FORCED ENTRY OF A (METAL) OBJECT PUSHED INTO MY RECTUM; RE-DISLOCATION OF MY LEFT ARM/SHOULDER; PERMANENT SCARRING OF MY WRISTS AND ANKLES FROM THE BENDING OF THOSE LIMBS AGAINST HANDCUFFS/LEG-SHACKLES SADISTICALLY TO TORTURE ME. I SUFFERED THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY ALL THE OFFICERS, WHO WHOLLY FAILED TO PROTECT ME. I SUFFERED AND STILL SUFFER A WORSENING OF MY MENTAL-DISABILITIES AND POST-TRAUMATIC STRESSES.

39. RICHARDSON AND GOLDHAGEN, FURTHER ACTED TO DETER ME BY "THREATS" FROM REPORTING THE PHYSICAL/SEXUAL ABUSE-ATTACK, AND SOUGHT TO DETER ME FROM FILING GRIEVANCES/COURT ACTIONS, BY THEIR THREATS OF BOGUS "DR'S"; GASSING/MACING. (RICHARDSON ALSO STOLE A BOXFUL OF MY LEGAL PAPERS/EXHIBITS FOR THIS LAWSUIT, IN SEPTEMBER 2016 ON CAMERA)

40. GOLDHAGEN WROTE ME TWO (2) "RETALIATORY" DISCIPLINARY REPORTS ("DR'S"), TO "COVER-UP" HIS OTHERWISE UNCONSTITUTIONAL, UNMERITED PHYSICAL ATTACKS, WHICH WERE RACIALLY MOTIVATED AS DESCRIBED.

41. HE WROTE THAT I "REFUSED A LAWFUL ORDER", AND THAT I "ATTEMPTED TO BATTER HIM", KNOWING BOTH WERE SOLELY RETALIATION-BASED AND DONE WITH RACIAL ANIMUS (AS I AM BLACK AND ALL DEFENDANTS, EXCEPT E.D. POGUE, ARE WHITE PERSONS). THIS WAS ALSO DONE TO & DID HAVE A "CHILLING EFFECT" ON MY "FREEDOM OF SPEECH"/JAILHOUSE LAWYERING RIGHTS, TO FORESTALL ME FROM FILING GRIEVANCES/COMPLAINTS ABOUT THIS, AND OTHER PRISON ACTIVISM ACTIVITIES LISTED HEREIN.

5-I).

42. THE OTHER OFFICERS, BEAUDRY/DENMON/POGUE ACTIVELY ASSISTED IN INJURING ME, AND FAILED TO HELP ME, AND SCHWARZ KNEW ALL THE OTHERS WOULD HURT ME, AND HE STILL SENT THEM TO HURT ME AND HE COULD HAVE STOPPED IT ALL, BUT DIDNT.

43. SCHWARZ "OKAYED" RETALIATION DR'S AND CONSCIOUSLY JOINED IN LEAGUE TO "COVER-UP" THE ATTACKS, BY SUBMITTING FALSE REPORTS, AND BY THEIR "THREATS / INTIMIDATION" (SCHWARZ, GOLDHAGEN) AND PLANS TO FURTHER INJURE ME, IN RETALIATION FOR ME FILING "FREEDOM OF SPEECH" GRIEVANCES.

44. I AM IN CONSTANT TURMOIL / MENTAL ANGUISH. I FEAR BEING ATTACKED FURTHER, EVEN THOUGH I'm AWAY FROM THERE. IT "REPLAYS" IN MY HEAD, DAILY.

45. I TAKE VARIOUS PSYCHE MEDS (VISTARIL / LIBRIUM) AND HAVE HAD TO CHANGE PSYCHE MEDS NUMEROUS TIMES, TO TRY TO FIND SOMETHING TO AFFORD ME RELIEF (I CONTINUE TO BE "HAUNTED" BY THE ATTACK).

46. I FEAR GETTING "AIDS": I TAKE YEARLY TESTS, I'm FEARFUL OF WHAT GOLDHAGEN PLUNGED INTO MY RECTUM AND CUT MY BUTTOCKS WITH.

47. I STILL SUFFER PAINS (SEVERE) IN MY NECK, BACK, (L) ARM/SHOULDER, HANDS, FINGERS, WRISTS, RIGHT FOOT, RECTUM, BUTTOCKS. I WAS HUMILIATED.

48. (I HAD "SECRETED" THE UNDERWEAR I WAS WEARING WHEN ATTACKED. HOWEVER, IT WAS STOLEN OUT MY PROPERTY BY STAFF AT TOMOKA C.I., WHEN INSPECTORS / INVESTIGATORS CAME OVER THERE TO RETRIEVE IT OUT OF MY STORED PROPERTY IN THE TOMOKA C.I. PROPERTY ROOM. THAT IS THE SUBJECT OF AN UPCOMING LAWSUIT. (IT HAD MY BLOOD/FECES; THEIR DNA)).

49. ALL DEFENDANTS, AT ALL TIMES, ACTED TO PUNISH ME, RETALIATE ON ME, AND TO INFLICT CRUEL AND UNUSUAL TORTURE, GRATUITOUSLY, FOR THE VERY PURPOSE OF INJURING ME, AND WITH NO BONA FIDE SECURITY REASONINGS, AND TO BE SADISTIC, RACIST, MALICIOUS — ALL INTENTIONALLY / INTELLIGENTLY.

50. ALL DEFENDANTS ACTED UNDER COLOR OF STATE LAW, AND ALL KNEW OR SHOULD HAVE KNOWN THAT THEIR ACTIONS / INACTIONS IN INJURING ME AND FAILING TO PROTECT ME (SCHWARZ, GOLDHAGEN, BEAUDRY, DENMON, POGUE) WHEN EACH COULD AND SHOULD HAVE INTERVENED, WERE IN DIRECT VIOLATION OF THE 8th AND 1st AMENDMENTS TO THE U.S. CONSTITUTION, AS I HAD A RIGHT TO NOT BE ATTACKED; TO BE PROTECTED ONCE ATTACKED, AND TO BE TREATED.

51. NO MONEY IS SOUGHT FOR, AND NO CLAIMS ARE MADE FOR RELIEF FROM THESE FACTS OUTSIDE OF THE 8th AND 1st AMENDMENT VIOLATIONS, THOUGH I STILL HEREIN LIST MY FACTS AS KNOWN AND REASONABLY BELIEVED AS TRUE TO ME. THERE IS A CAMERA THAT POINTED STRAIGHT AT MY ROOM, AND ALL THE ATTACK IS ON VIDEO. I ALSO HAVE A LOT OF INMATE WITNESSES FOR USE AT JURY TRIAL.

## VI.   STATEMENT OF CLAIMS:

State what rights under the Constitution, laws, or treaties of the United States you claim have been violated. Be specific.  Number each separate claim and relate it to the facts alleged in Section V.  **If claims are not related to the same basic incident or issue, they must be addressed in a separate civil rights complaint.**

DEFENDANTS VIOLATED MY 8TH AMENDMENT RIGHTS
TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT, UNDER
THE U.S. CONSTITUTION (SEE PARAGRAPHS #1 THRU #51),
AND, VIOLATED MY 1ST AMENDMENT "FREEDOM OF SPEECH"
RIGHTS, UNDER THE U.S. CONSTITUTION (SEE PARAGRAPHS #1 THRU 51)

## VII.   RELIEF REQUESTED:

State briefly what relief you seek from the Court.  Do not make legal arguments or cite to cases/ statutes.

JURY TRIAL, NOMINAL DAMAGES, COMPENSATORY DAMAGES, ATTORNEYS
FEES/COSTS, COSTS OF PROSECUTION, THE COMPENSATORY $ IS $200 THOUSAND
DOLLARS PER DEFENDANT. ALSO, PUNITIVE DAMAGES OF 10 MILLION DOLLARS PER
DEFENDANT, ALL JOINTLY/SEVERALLY, FOR A TOTAL AWARD OF 51 MILLION DOLLARS,
PLAINTIFF SEEKS THIS, AND ALL OTHER JUST AND PROPER RELIEF.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS OF FACT, INCLUDING ALL CONTINUATION PAGES, ARE TRUE AND CORRECT.**

10-19-18
(Date)

(Signature of Plaintiff)

### IF MAILED BY PRISONER:

I declare (or certify, verify, or affirm) under penalty of perjury that this complaint was (check one): ☒ delivered to prison officials for mailing or ☐ deposited in the prison's internal mail system on: the _19th_ day of _OCTOBER_, 20 _18_.

(Signature of Plaintiff)

GENARD JONES #503034
FLORIDA STATE PRISON
P.O. BOX 800 / RAIFORD, FLORIDA 32083

Revised 03/07

7

GERARD JONES # 503034
DADE CORRECTIONAL INSTITUTION
19000 S.W. 377th STREET
FLORIDA CITY, FLORIDA
33034

MAILED FROM A
STATE CORRECTIONAL
INSTITUTION
FLORIDA CITY

CLERK OF COURT
N. D. PENSACOLA
100 PALAFOX ST.
PENSACOLA, FL.

3 2 5 0 2

(LEGAL MAIL)

Legal Mail
Received
SEP 2 5 2020
Dade C.I.

RECEIVED  SEP 3 0 2020